11th CIRCUIT COURT OF APPEALS
CASE NO. 14-10074

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FLEETWOOD TRUCKING COMPANY, §
INC., §
 §
    Petitioner, §
 §
v. §
 §
JAMES GARY WARREN, and §
DIRECTOR, OFFICE OF WORKERS' §
COMPENSATION PROGRAMS, §
 §
    Respondents. §

ON PETITION FOR REVIEW FROM U.S. DEPARTMENT OF LABOR
BENEFITS REVIEW BOARD

BRB 2012-0559-BLA

APPENDIX

CHRISTOPHER LYLE McILWAIN, SR.
HUBBARD, McILWAIN & BRAKEFIELD, P.C.
P. O. Box 2427
Tuscaloosa, Alabama  35403-2427
Telephone:  (205) 345-6789

ATTORNEYS FOR PETITIONER

## INDEX TO APPENDIX

| Date | | Description | Pages |
|---|---|---|---|
| 11/2/09 | | Social Security Records | 1-5 |
| | | Claimant's Responses to Intake Questionnaires | 6-24 |
| 11/18/09 | | Statement Required by 20 C.F.R. § 725.495(d) | 25 |
| 1/12/10 | | Notice of Claim | 26-30 |
| 1/12/10 | | U.S. D.O.L. Memorandum to Claim File | 31-34 |
| 10/28/10 | | Statement of Lee Sellers | 35-36 |
| 10/29/10 | | Letter and Affidavit from Claimant | 37-40 |
| 11/30/10 | | Proposed Decision and Order by District Director | 41-51 |
| 12/7/10 | | Claimant's Petition for Review | 52 |
| 7/13/11 | | Transcript of Proceedings Before ALJ Ralph Romano | 53-126 |
| 6/26/12 | | Decision and Order Awarding Benefits by ALJ | 127-137 |
| 9/5/12 | | Petition for Review and Brief to BRB by Fleetwood Trucking Co., Inc. | 138-165 |
| 5/22/13 | | BRB's Decision and Order Affirming the ALJ's Decision and Order | 166-175 |
| 6/13/13 | | Motion for Revision and Formal Hearing by Fleetwood Trucking Co., Inc. | 181-182 |
| 10/18/13 | | Death Certificate | 176 |
| 12/12/13 | | BRB Order on Reconsideration | 177-180 |
| 1/6/14 | | Petition for Review to 11th Circuit | 183-194 |

_____

Christopher Lyle McIlwain, Sr. - MCI-002
Hubbard, McIlwain & Brakefield, P.C.
Post Office Box 2427
Tuscaloosa, AL 35403
Telephone: (205) 345-6789
Attorneys for Petitioner Fleetwood Trucking
Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Memorandum of Law on each of the below-named parties by placing a copy of the same in the U.S. Mail, first-class postage prepaid, and addressed as follows on this the 7 day of April, 2014.

Rae Ellen James, Associate Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC 20210

Steven Breeskin
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite C-3516, NDOL
Washington, DC 20210

James Garry Warren, Jr.
14536 Lake Wildwood
Cottondale, AL 35453

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 290, Suite 380
Birmingham, AL 35223

Gary K. Stearman
US Department of Labor/SOL-BLLLS
200 Constitution Avenue NW
Suite N-2119
Washington, D.C., 20210

_____

Of Counsel

`* * *   REC 2009306   075143 HE1D17E0 J2SD  CIPQYAF   PQAF   (F-J2S )  * * *`

```
QRY  DATE: 11/02/09  AN: 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  DOC: 448 UNIT: MJS448   PG: 001+ DEQR
INPUT: YRS REQ: 1966-2008; COVERED DETAILS; SELF-EMPLOYMENT; EMPLOYER ADDRESS
MEF: NA: J G WARREN DB: 01/1949 SX: M AK:
```

**DETAIL COVERED FICA EARNINGS AND EMPLOYER NAME AND ADDRESS FOR YEARS REQUESTED**

```
66         318.50 EARNED/NO DETAIL AVAILABLE

67        1019.88 EARNED/NO DETAIL AVAILABLE

68        1961.35 EARNED/NO DETAIL AVAILABLE

69        1912.30 EARNED/NO DETAIL AVAILABLE

70        6207.79 EARNED/NO DETAIL AVAILABLE

71        7234.48 EARNED/NO DETAIL AVAILABLE

72        5734.94 EARNED/NO DETAIL AVAILABLE

73        6032.03 EARNED/NO DETAIL AVAILABLE

74        6440.68 EARNED/NO DETAIL AVAILABLE

75       13329.83 EARNED/NO DETAIL AVAILABLE

76        7443.39 EARNED/NO DETAIL AVAILABLE

77        8898.40 EARNED/NO DETAIL AVAILABLE
```

RECEIVED

NOV 03 2009

ESA / OWCP / DCMWC
Mt. Sterling, KY

```
SELF EMPLOYMENT
RPYR   REO SMEM   NAME           EARNINGS      SE NUMBER     CONTROL NUMBER   PR    S
SE78   OI        G   WARREN         9711.00    630800000     2221-20-73205    00279
OASDI  SELF EMPLOYMENT TOTAL        9711.00
       78 OASDI YEARLY TOTAL        9711.00

 79 NONE
```

```
SELF EMPLOYMENT
RPYR   REO SMEM   NAME           EARNINGS      SE NUMBER     CONTROL NUMBER   PR    S
SE80   OI        J G WARREN       16219.00     510000000     2211-62-06434    00383
OASDI  SELF EMPLOYMENT TOTAL      16219.00
       80 OASDI YEARLY TOTAL      16219.00
```

```
SELF EMPLOYMENT
RPYR   REO SMEM   NAME           EARNINGS      SE NUMBER     CONTROL NUMBER   PR    S
SE81   OI        J G WARREN       14353.00     510100000     2211-62-06435    00383
OASDI  SELF EMPLOYMENT TOTAL      14353.00
       81 OASDI YEARLY TOTAL      14353.00
```

```
EIN: 630673209                   SELLERS TRUCKING CO INC
                                 11614 FLEETWOOD RD
                                 COTTONDALE      AL   35453-0547
RPYR   REO LOAC   NAME           EARNINGS      TOTAL COMP  CONTROL NUMBER   PR    S
0082   AA         J G WARREN      14081.50                 14081.50 2097-07-16583   00283
                  WAGE TOTAL      14081.50
       OASDI EMPLOYER TOTAL       14081.50
       82 OASDI YEARLY TOTAL      14081.50
```



QRY   DATE: 11/02/09   AN: 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   DOC: 448 UNIT: MJS448   PG: 002+ DEQR

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0083  AA          G  WARREN       13644.62        13644.62 3072-04-11581    00284
                  WAGE TOTAL       13644.62
          OASDI EMPLOYER TOTAL     13644.62
```
SELF EMPLOYMENT
```
RPYR   REO SMEM  NAME            EARNINGS       SE NUMBER    CONTROL NUMBER    PR      S
SE83  OI         J  WARREN        7901.00       510300000    2210-99-31342   00284
OASDI SELF EMPLOYMENT TOTAL       7901.00
      83 OASDI YEARLY TOTAL      21545.62
```

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0084  AA          G  WARREN       11823.25        11823.25 4065-11-05926    00285
                  WAGE TOTAL       11823.25
          OASDI EMPLOYER TOTAL     11823.25
```
SELF EMPLOYMENT
```
RPYR   REO SMEM  NAME            EARNINGS       SE NUMBER    CONTROL NUMBER    PR      S
SE84  OI         J G WARREN      12067.00       510400000    2210-89-98019   00285
OASDI SELF EMPLOYMENT TOTAL      12067.00
      84 OASDI YEARLY TOTAL      23890.25
```

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0085  AA          G  WARREN       17426.08        17426.08 5064-01-16019    00686 V
                  WAGE TOTAL       17426.08
          OASDI EMPLOYER TOTAL     17426.08
EIN: 630867829              FLEETWOOD TRUCKING CO INC
                           PO BOX 69
                           BROOKWOOD           AL  35444-0069
0085  AA          G  WARREN         993.90          993.90 5073-14-02006    01286 V
                  WAGE TOTAL         993.90
          OASDI EMPLOYER TOTAL       993.90
      85 OASDI YEARLY TOTAL       18419.98
```

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0086  AA          G  WARREN       21506.47        21506.47 6079-00-15339    01087 V
                  WAGE TOTAL       21506.47
          OASDI EMPLOYER TOTAL     21506.47
EIN: 630867829 FLEETWOOD TRUCKING CO INC
0086  AA          G  WARREN        3088.30         3088.30 6079-00-15312    01087 V
                  WAGE TOTAL        3088.30
          OASDI EMPLOYER TOTAL      3088.30
      86 OASDI YEARLY TOTAL       24594.77
```

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0087  AA          G  WARREN       22041.11        22041.11 7074-00-15067    00688 V
                  WAGE TOTAL       22041.11
          OASDI EMPLOYER TOTAL     22041.11
      87 OASDI YEARLY TOTAL       22041.11
```

EIN: 630673209   SELLERS TRUCKING CO INC
```
RPYR   REO LOAC   NAME           EARNINGS       TOTAL COMP  CONTROL NUMBER    PR      S
0088  AA          G  WARREN       26431.62        26431.62 8101-00-44554    01089 V
```




3

```
QRY   DATE: 11/02/09  AN: 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  DOC: 448 UNIT: MJS448  PG: 003+ DEQR
                      WAGE TOTAL          26431.62
          OASDI EMPLOYER TOTAL           26431.62
          88 OASDI YEARLY TOTAL          26431.62

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0089  AA         G    WARREN      24517.18        24517.18 9038-19-21266    00190 V
                      WAGE TOTAL          24517.18
          OASDI EMPLOYER TOTAL           24517.18
          89 OASDI YEARLY TOTAL          24517.18

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0090  AA         J G WARREN       23923.87        23923.87 0092-00-03591    R
                      WAGE TOTAL          23923.87
          OASDI EMPLOYER TOTAL           23923.87
          90 OASDI YEARLY TOTAL          23923.87
```

RECEIVED

NOV 03 2009

ESA / OWCP / DCMWC
Mt. Sterling, KY

```
EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0091  AA         J G WARREN       22731.31        22731.31 1062-00-34957    02392 P
                      WAGE TOTAL          22731.31
          OASDI EMPLOYER TOTAL           22731.31
          91 OASDI YEARLY TOTAL          22731.31

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0092  AA         J G WARREN       25803.75        25803.75 2074-00-50006    01193 P
                      WAGE TOTAL          25803.75
          OASDI EMPLOYER TOTAL           25803.75
          92 OASDI YEARLY TOTAL          25803.75

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0093  AA         J G WARREN       25435.21        25435.21 3068-00-32622    00894 P
                      WAGE TOTAL          25435.21
          OASDI EMPLOYER TOTAL           25435.21
          93 OASDI YEARLY TOTAL          25435.21

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0094  AA         J G WARREN       23255.40        23255.40 4097-67-63888    00695 V
                      WAGE TOTAL          23255.40
          OASDI EMPLOYER TOTAL           23255.40
          94 OASDI YEARLY TOTAL          23255.40

EIN: 630673209   SELLERS TRUCKING CO INC
RPYR  REO LOAC  NAME              EARNINGS     TOTAL COMP  CONTROL NUMBER    PR    S
0095  AA         J G WARREN       17715.40        17715.40 5094-67-23948    00696 V
                      WAGE TOTAL          17715.40
          OASDI EMPLOYER TOTAL           17715.40
EIN: 930432081            GEORGIA-PACIFIC LLC
                          TAX DEPT-CORP TKG FLOOR 33
                          133 PEACHTREE ST NE
                          ATLANTA          GA  30303-1808
0095  AA         G    WARREN      6038.68         6038.68 5101-85-76891     00596 V
                      WAGE TOTAL          6038.68
```



4

```
QRY   DATE: 11/02/09  AN: 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  DOC: 448 UNIT: MJS448   PG: 004+ DEQR
          OASDI EMPLOYER TOTAL         6038.68
          95 OASDI YEARLY TOTAL       23754.08


EIN: 930432081   GEORGIA-PACIFIC LLC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0096  AA        G   WARREN       30537.12     30537.12 6169-85-07011    01897 V
                WAGE TOTAL       30537.12
          OASDI EMPLOYER TOTAL   30537.12
          96 OASDI YEARLY TOTAL  30537.12


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0097  AA        G   WARREN        2021.12      2021.12 7078-71-32699    00798 V
      AA        G   WARREN       14821.51     14821.51 7078-71-32713    00798 V
                WAGE TOTAL       16842.63
          OASDI EMPLOYER TOTAL   16842.63
EIN: 930432081   GEORGIA-PACIFIC LLC
0097  AA        G   WARREN       15926.10     15926.10 7159-85-06486    01798 V
                WAGE TOTAL       15926.10
          OASDI EMPLOYER TOTAL   15926.10
          97 OASDI YEARLY TOTAL  32768.73


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0098  AA        G   WARREN       34982.66     33732.66 8100-67-85728    01099 V
                WAGE TOTAL       34982.66
          OASDI EMPLOYER TOTAL   34982.66
          98 OASDI YEARLY TOTAL  34982.66


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0099  AA        G   WARREN       35032.66     33732.66 9065-65-10529    00500 V
                WAGE TOTAL       35032.66
          OASDI EMPLOYER TOTAL   35032.66
          99 OASDI YEARLY TOTAL  35032.66


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0000  AA        G   WARREN       35629.34     35629.34 0085-65-62246    01201 V
                WAGE TOTAL       35629.34
          OASDI EMPLOYER TOTAL   35629.34
          00 OASDI YEARLY TOTAL  35629.34


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0001  AA        G   WARREN       36833.42     35533.42 1041-67-25899    00802 V
                WAGE TOTAL       36833.42
          OASDI EMPLOYER TOTAL   36833.42
          01 OASDI YEARLY TOTAL  36833.42


EIN: 630867829   FLEETWOOD TRUCKING CO INC
RPYR  REO LOAC  NAME          EARNINGS      TOTAL COMP  CONTROL NUMBER    PR    S
0002  AA        G   WARREN       23375.06     22625.06 2093-73-18852    01203 V
                WAGE TOTAL       23375.06
          OASDI EMPLOYER TOTAL   23375.06
SELF EMPLOYMENT
RPYR  REO SMEM  NAME          EARNINGS      SE NUMBER   CONTROL NUMBER    PR    S
```



5

QRY   DATE: 11/02/09  AN: 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   DOC: 448 UNIT: MJS448   PG: 005   DEQR
SE02   OI        J G WARREN        11881.00   630200000      2221-37-01311    02203  V
OASDI SELF EMPLOYMENT TOTAL        11881.00
      02 OASDI YEARLY TOTAL        35256.06

SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER    PR    S
SE03   OI        J G WARREN        46746.00   630300000      2121-37-10308    02204  V
OASDI SELF EMPLOYMENT TOTAL        46746.00
      03 OASDI YEARLY TOTAL        46746.00

SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER    PR    S
SE04   OI        J G WARREN        57171.00   630400000      2221-3█████████505  V
OASDI SELF EMPLOYMENT TOTAL        57171.00                         RECEIVED
      04 OASDI YEARLY TOTAL        57171.00
                                                                   NOV 0 3 2009
SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER R. KPR  S
                                                            ESA / OWCP / DCMWC
SE05   OI        J G WARREN        54993.00   630500000      2211-11-42822    01706  V
OASDI SELF EMPLOYMENT TOTAL        54993.00
      05 OASDI YEARLY TOTAL        54993.00

SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER    PR    S
SE06   OI2      G  WARREN          28015.00   630600000      2210-86-72737    01207  V
       UI2      G  WARREN         -28015.00   630600000      BO00-0X-72737    02607  V
       UI       G  WARREN          46230.00   000600000      BN00-0X-00000    02607  V
OASDI SELF EMPLOYMENT TOTAL        46230.00
      06 OASDI YEARLY TOTAL        46230.00

SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER    PR    S
SE07   OI       G  WARREN          60058.00   630700000      2110-50-00376    01608  V
OASDI SELF EMPLOYMENT TOTAL        60058.00
      07 OASDI YEARLY TOTAL        60058.00

SELF  EMPLOYMENT
RPYR  REO SMEM  NAME              EARNINGS      SE NUMBER    CONTROL NUMBER    PR    S
SE08   OI       G  WARREN          54168.00   630800000      2210-83-73336    01309  V
OASDI SELF EMPLOYMENT TOTAL        54168.00
      08 OASDI YEARLY TOTAL        54168.00

DETAIL COVERED MQGE EARNINGS AND EMPLOYER NAME AND ADDRESS FOR YEARS
REQUESTED (1983-1990)
 NO COVERED MQGE EARNINGS POSTED FOR YEARS REQUESTED

REMARKS
 NON-COVERED EARNINGS PRESENT FOR 1998-1999
 CLAIMS ACTIVITY--SEE MBR

**U.S. DEPARTMENT OF LABOR**
EMPLOYMENT STANDARDS ADMINISTRA~~TION~~
OFFICE OF WORKERS' COMPENSATION PROGRAMS
DIVISION OF COAL MINE WORKERS' COMPENSATION

**EMPLO~~YME~~NT HISTORY**

NOTE: Please complete as accurately as possible the miner's complete employment history. (Where employment was in coal mining, specify whether the mine was a strip mine or an underground mine.) This report is authorized by law (30 U.S.C. 901 et seq.). While you are not required to respond, your cooperation is needed to ensure that full and proper consideration is given to this claim. Disclosure of the social security number is voluntary. Failure to disclose such number will not result in the denial of any right, privilege or benefit to which you may be entitled.

Miner's Name ................................
**Ganies Mary Warren, Sr.**

Miner's Social Security Number ~~ESA / OWCP / DCMWC Mt. Sterling, KY~~

| 1. Name and Address of Employer (City and State) | 2. Type of Industry (Indicate if coal mining, extraction or preparation of coal, coal mine construction, or transportation in or around a coal mine, steel, manufacturing or other) | 3. Occupation (Specify type of work) | 4. Period of Employment | | 5. Exposure to dust, gases, or fumes? |
|---|---|---|---|---|---|
| | | | Mo/Yr | Mo/Yr | (Yes/No) |
| *Gary Warren Trk* 14536 Lake Wildwood Cottondale, al 35453 ~~trk~~ | Crawford Hauling Cahaba Resources leased 10-07 | Truck Driver | 10-07 | 10-09 | ~~not~~ yes |
| | Crawford Enterprises PO Box 206 Brookwood, al 35444 | | | | |
| Fleetwood Trucking Inc 11614 Fleetwood Road. Cottondale, al. 35453 | #5 JWR #7 JWR #4 JWR Jim Walter mine Pacifa Core Prep plant | Truck Driver | 6-97 | 10-07 | yes RECEIVED MAR 3 1 2010 ESA / OWCP / DCMWC Mt. Sterling, KY |
| Sellers Trkin 11614 Fleetwood Road Cottondale, al 35453 | Jim Walter mun #3 mine #4 mine #7 mine | Truck Driver | 3-82 | 9-95 | yes |
| | | | | | |
| | | | | | |
| | | | | | |

Form CM-911a
Rev. Sept. 1978

7

| Name and Address of Employer (City and State) | Type of Industry (Indicate coal mining, extraction or pre-paration of coal, coal mine construction, or transportation in or around a coal mine, steel, manufacturing or other) | Occupation (Specify type of work) | Period of Employment | | Exposure to dust, gases, or fumes? |
|---|---|---|---|---|---|
| | | | Mo/Yr | Mo/Yr | (Yes/No) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

I hereby certify that the information given me on and in connection with this form is true and correct to the best of my know-ledge and belief. I am also fully aware that any person who willfully makes any false or misleading statement or representation for the purpose of obtaining any benefit or payment under this title shall be guilty of a misdemeanor and on conviction thereof shall be punished by a fine of not more than $1,000, or by imprisonment for not more than one year or both.

| 6. Signature of Claimant (First, middle, last) James Gary Warren Sr. | 7. Date (Month, day, year) 10-23-09 |
|---|---|

| 8. Mailing Address (Number, Street, Apt. No., P.O. Box or Rural Route) 14536 Lake Wildwood Dr. | 9. City and State Cottondale, ALABAMA |
|---|---|

| 10. Zip Code 35453 | 11. County Where You Now Live Tuscaloosa | 12. Telephone Number (Include Area Code) 205-556-4475 |
|---|---|---|

Witnesses are required only if this application has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the applicant must sign below, giving their full address.

| Signature of Witness | Signature of Witness | RECEIVED |
|---|---|---|
| Address (Number, Street, City, State & Zip Code) | Address (Number, Street, City, State & Zip Code) | MAR 3 1 2010 ESA / OWCP / DCMWC Mt. Sterling, KY |

8

U. S. GOVERNMENT PRINTING OFFICE : 1973 O- 509- 316

OCT 23 2009

**U.S. DEPARTMENT OF LABOR**
EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKMEN'S COMPENSATION PROGRAMS
DIVISION OF COAL MINE WORKERS' COMPENSATION

## MINER'S CLAIM FOR BENEFITS UNDER THE FEDERAL COAL MINE HEALTH AND SAFETY ACT OF 1969, AS AMENDED

I hereby claim all benefits which may be payable to me under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended. I also hereby intend to apply on behalf of any member of my family for any benefits that may be payable under Title IV of the act.

(Do not write in this space)
RECEIVED

OCT 29 2009

ESA / OWCP / DCMWC
Mt. Sterling, KY

**IMPORTANT:** Completion of this form represents a claim against a coal mine operator. If there is sufficient evidence to indicate your eligibility for Black Lung benefits, it will be necessary to notify that operator of his responsibility for payment and send him a copy of this claim.

1. Miner's full name (First, middle, last)

   *James Gary Warren, Sr.*

2. Miner's Social Security Number

   *422 66 3646*

3. Miner's date of birth (Month, day, year)

   *1 / 9 / 1949*

4. Highest grade miner completed in school

   *12+*

5. Have you (or someone on your behalf) ever filed a claim for Federal Black Lung benefits before?

   ☐ Yes    ☑ No

6. Decision made (If more than one claim identify and show disposition of each in "Remarks".) *na*

   ☐ Allowed    ☐ Denied
   ☐ Withdrawn    ☐ Pending

7. Have you ever been told that you have pneumoconiosis (Black Lung)?    ☐ Yes    ☐ No   *Possible*

   If "Yes" when? *9 / 25 / 2009*    By what doctor or agency? *Dr. Phillip O'Reilly*

8. Are you still working in the mines?

   ☐ Yes (If "Yes" go on to question 9)
   ☑ No (If "No" answer a - c)

   a. When did you stop working in the mines?

   *10 / 2 / 2009*

   b. Why did you quit?

   *Dr. Phillip O'Reilly Ordered*

   c. When did you believe that your respiratory illness prevented you from engaging in what would be your regular work in the coal mines?

   *10 / 2 / 2009*

9. Describe briefly your disability due to pneumoconiosis (Black Lung) or other respiratory or pulmonary disease resulting from coal mine employment.

   *Pulmonary Fibrosis due to Coal Hauling 60% Lung Capacity Loss already*

DIRECTOR EXHIBIT
NO. *2* CONSISTING
OF *4* PAGES

10. How many years were you employed by a coal mine operator in an occupation involving the preparation or extraction of coal?



9

**NOTE:** If you are filing a claim under Part B of the FCMH&SA, as amended, you may be required to file a claim under your State's Workmen's Compensation (including occupational disease) law if you have not already done so.

If you are filing a claim under Part C of the FCMH&SA of 1969, as amended, the amount of Federal or State WC (including OD) benefits you are receiving based on your disability on account of pneumoconiosis will be offset against your benefits under Part C.

11. If you have filed a workmen's compensation claim under Federal law or the laws of your State a State unemployment compensation claim or a State disability insurance claim under the laws of your State on account of your disability, give the information requested below: *(Part B claimant receiving State WC, UI, and DI benefits will have black lung benefits offset by those amounts.)*

|  | WORKMEN'S COMPENSATION (Including occupational disease) | STATE UNEMPLOYMENT COMPENSATION (Based on your disability) Answer only if filing under Part B | STATE DISABILITY INSURANCE Answer only if filing under Part B |
|---|---|---|---|
| Claim Filed Approximate Date 10/27/2009 | Federal ☐ Yes ☐ No  State ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Claim Number | | | |
| Decision Made | ☐ Allowed ☐ Denied ☐ Not yet received | ☐ Allowed ☐ Denied ☐ Not yet received | ☐ Allowed ☐ Denied ☐ Not yet received |
| *Amt. of weekly payment | | | RECEIVED OCT 2 3 2009 |
| Payment — Began | | | ESA / OWCP / DCMWC |
| Payment — Ended | | | Mt. Sterling, KY |

*If you are receiving or have received payments on other than a weekly basis, such as bi-weekly or monthly payments, or if you have received a lump-sum payment based on your compensation claim, please indicate in "Remarks" the amount of such payment or payments and such payment period. *na*

| 12. Are you married now? ☑ Yes ☐ No | a. Date of marriage 5/20/1980 | b. Check whether your present marriage was performed by ☑ Clergyman ☐ Authorized Public Official ☐ Other *(Explain)* |
|---|---|---|

| 13. Your wife's maiden name (Print) *Blaich* | 14. Your wife's birth date 08/03/1952 | 15. Do you and your wife live together? ☑ Yes ☐ No If "No" answer items 16 and 17. |
|---|---|---|

| 16. Are you under a court order to make support payments to your wife? *na* ☐ Yes ☑ No If "Yes" attach a copy of order | 17. Do you make regular support payments to your wife? *na* ☐ Yes ☑ No $_____ per _____ *(week, month, other)* |
|---|---|

18. Were you previously married? ☑ Yes ☐ No If "Yes" answer a - f.

| a. Full name of previous wife *Deborah Colleen Blaich* | b. Date married (Mo., day, yr.) 4/24/1970 | c. Place married (City, State) *Livingston, al* |
|---|---|---|
| d. How marriage ended *Divorce* | e. Date marriage ended *March, 1972* | f. Place marriage ended (City, State) *Tuscaloosa, al* |

If prior marriage ended by divorce and you were married for 20 years before the divorce action, answer questions 19 and 20.

| 19. Are you under a court order to make support payments to a divorced wife? *na* ☐ Yes ☐ No If "Yes" attach order | 20. Do you make substantial contributions to a divorced wife pursuant to a written agreement? *na* ☐ Yes ☐ No If "Yes" attach a copy of agreement |
|---|---|
| 21. Was your present wife married before her marriage to you? *na* ☐ Yes ☐ No If "Yes" answer a - f. | $_____ per _____ *(week, month, other)* |

**COAL TRUCK DRIVER QUESTIONNAIRE**
**(EMPLOYEE of Fleetwood Trucking Co., Inc.)**

NAME: _James Gary Warren, Sr._        Claim No.: _XXX-XX-3646 LM C_

**PLEASE COMPLETE AS ACCURATELY AS POSSIBLE THE FOLLOWING QUESTIONS CONCERNING YOUR EMPLOYMENT.**

1.  (a)  Please give the name and address of the OWNER of the trucking business for whom you last worked.
        _Lee Sellers  11614 Fleetwood Road_
        _Cottondale, al. 354_

    (b)  When did you begin work for this employer (Month and Year)? _____
        _Aug 2002_

        When did you last work here (month and year)? _10-2-09  8-02_

2.  Did you haul only coal?  YES _____  NO ✓  If "No", answer (a) and (b) below:

    (a)  What other material did you haul?  _rock_

    (b)  How much (what percentage) of the time did you spend hauling coal?
        _500 %_

3.  Where did you pick up the coal (at a strip mine, deep mine, tipple, etc.)?
    _Strip mine_

    Give the location of the pick-up site (that is, give the name of the creek or hollow, to the nearest post office):
    _~~Webb Road~~ Davis Creek_

4.  Where did you unload the coal (give both the <u>kind</u> of unloading site -- tipple, stockyard, preparation plant, etc. -- its address)?
    _Stockyard, Gorgas Steam Plant, Gorgas al._

5.  How were you paid (check one): "by the hour" _____; by "tonnage" ✓; "salary" _____; OTHER _____ (specify): _____
    _Paid by tonage for work done, total amount of tonage end of wk._

*11*

Name:   James Gary Warren, Sr.
Claim No.:   XXX-XX-3646 LM C
Fleetwood Trucking Co., Inc.
Page 2

6.    Please describe, in as much detail as possible, the duties of your job for
      the employer listed in item 1.  For example, indicate whether you simply
      drove the truck; how many trips you made each day; how many miles each round-
      trip was; whether or not you also did repair work and, if so, how frequently:

drove Truck   averge 4 loads a day 80 miles
per trip
yes I repaired what I could, but out
The rest of work   when truck needed
repairs

7.    Please give the name and address of your immediate supervisor:

~~Herr Ed Crawford~~          Lee Sellers
~~Crawford Enterprises~~      11614 Fleetwood Road
~~PO Box 206~~                Cottondale, al
~~Brookwood, al   35044~~              35453

8.    Was Fleetwood Trucking Co., Inc, located in Cottondale or Brookwood, AL?

Cottondale, al.

      Or, located at both locations with different responsibilities?

      Please explain.  Moved from Brookwood to
11614 Fleetwood Road  Cottondale al. 35453


USE THE SPACE PROVIDED BELOW TO CONTINUE AN ANSWER TO ANY PREVIOUS QUESTION, OR TO
PROVIDE OTHER INFORMATION YOU FEEL WOULD BE HELPFUL.  PLEASE REFER TO PREVIOUS
QUESTIONS BY NUMBER.

I didn't realize that some of these Question
Were for Fleetwood Trk. So I answered then
after I crossed out.

Signature:  James Gary Warren Sr.     Date:  11-17-09

12

Fleetwood Trucking
Began Working 7-97 to 8-2002
Work as Salary - 35,000.00 for 3 yrs
                  37000 last 2 yrs

We did not haul Coal for first three
years. But hauled Coke product
In 2000 to 2001 we began a
Coal haul.
   Pacifi Core Corp. at a Prep Plant
   located in Brookwood, al. Davis ck a
Haul from Prep Plant Brookwood to
   Slow Coke plant North Birmingham
   abc Coke Plant Tarrant City, al.
   Port McDonald - Tuscaloosa al
If not hauling to those places
We were stocking for Prep Plant
JWR # 4th 5th 7th mines
These was another Prep Plant at
Pumkin Center Gorgos, alabama
   Hauled to WYN & abc Coke
WYN - Prep Plant It was not a
Pacifi Core Plant
                              Gary Warren
1997 to 2000 Rock 90%
2000 to 2002 Coal 50%            1-25-10

④

Leased to Fleetwool Trucking
Began January 20003 to Oct. 2007
hauled Rock 2003 to 2004
2004 We began hauling Coal for
ameri Core located in West Bleton, al
Hauled to Pine Hill Weyhouser
Hauled WYN to Pine Hill
Hauled ameri core to WYN
   We began to haul Coke from Hunt oil
   to Cheney Lime Corp + Dravo Corp.
   both located in alabaster, al.
Sept    In march or april of 2005
        of 2005 to may of 2006
   We began hauling Coal for
   Twin Pine Coal Co

Hauled    mine was located alemoste, alabama
85%       Shennon mine
of        Hauled to WYN & Green fuel Prep Plant
time      at Brookwood, WYN located at Buming
          Port al. Sloss Corp at North Bumingham
          June 20006 - Hauled #7 to Sloss
85%    Oct 2006 Began haul for Calabex Res.
of       Hauled out of Deerlick mine to
time     WYN at Buming Port
          Big River Corp - Livingston alabama
          lasted until Oct 2007.

                                    1-25-10
                                    Garry warren

Leased to Crawford Hauling
Worked Oct 2007 to Oct 2009
Hauled from Deerlick mine Pit
   "      "   Carter - Johnson Pit
Deerlick mine located in
North River area Tuscaloosa County
Carter Johnson Pit located
in Brookwood, Al
Hauled to WGN - Burning Port Al.
Big River Corp. Livingston Al.
We began haul to Alabama
Power at Gorgas, Alabama
Feb 2009

1-25-10
Gary Brown

15

### COAL TRUCK DRIVER QUESTIONNAIRE
### (EMPLOYEE of Sellers Trucking Co., Inc.)

NAME: James Gary Warren, Sr.                    Claim No.: XXX-XX-3646 LM C

PLEASE COMPLETE AS ACCURATELY AS POSSIBLE THE FOLLOWING QUESTIONS CONCERNING YOUR EMPLOYMENT.

1.  (a)  Please give the name and address of the OWNER of the trucking business for whom you last worked: _B R. Sellers  116 14 Fleetwood Rd_
        _Cottondale, al. 35453_
        _Gary Warren Trk 14536 Lake childress D. Cottondale, al 354_

    (b)  When did you begin work for this employer (Month and Year)? _____
        _aug 2002   3-1982_

        When did you last work here (month and year)? _10-209  9-95_

2.  Did you haul only coal? YES_____   NO ___✓___ If "No", answer (a) and (b) below:

        (a)  What other material did you haul? _rock_

        (b)  How much (what percentage) of the time did you spend hauling coal?
            _50%_

3.  Where did you pick up the coal (at a strip mine, deep mine, tipple, etc.)?
    _Strip Mine_

    Give the location of the pick-up site (that is, give the name of the creek or hollow, to the nearest post office):
    _Sellers Road Davis Creek_

4.  Where did you unload the coal (give both the kind of unloading site -- tipple, stockyard, preparation plant, etc. -- its address)?
    _Stock Yard, Gorgas Steam Plant, Gorgas al._

5.  How were you paid (check one): "by the hour" _____; by "tonnage" _✓_; "salary" _____; OTHER _____ (specify): _____
    _Paid by tonage for work done total amount_
    _of tonge end of week._

16

Name:   James Gary Warren, Sr.
Claim No.:   XXX-XX-3646 LM C
Sellers Trucking Co., Inc.
Page 2

6.   Please describe, in as much detail as possible, the duties of your job for
     the employer listed in item 1.  For example, indicate whether you simply
     drove the truck; how many trips you made each day; how many miles each round-
     trip was; whether or not you also did repair work and if so, how frequently:

_drove truck   Average 4 load a day, 80 miles
per trip.  I repaired what I could,
hired out the rest of mech. Work_

7.   Please give the name and address of your immediate supervisor:

_Gene Ed Crawford   B.R. Sellers
Crawford Enterprises   11614 Fleet Wood Rd.
P.O. Box 206   Cottondale, al. 35453
Brookwood, al   35444_

USE THE SPACE PROVIDED BELOW TO CONTINUE AN ANSWER TO ANY PREVIOUS QUESTION, OR TO
PROVIDE OTHER INFORMATION YOU FEEL WOULD BE HELPFUL.  PLEASE REFER TO PREVIOUS
QUESTIONS BY NUMBER.

_I Didn't realize that these forms
on this page was for Sellers Trk.
so I crossed out and answered
them Correctly.  1 - 7_

17

Miner:  James Gary Warren, Sr.
Claim Number:  XXX-XX-3646 LM C
Self-Employed Truck Driver

Give the exact dates of your employment as a **self-employed truck driver**.

8-2-02  to   10-2-09

Give the full business name and mailing address of your trucking business.

Gary Warren Trucking
14536 Lake Wild Wood Dr.
Cottandale  Al  35453

Was your business incorporated?

no

    If so, please provide a copy of the Articles of Incorporation.

How many drivers, if any, did you employ?

Self Employed    none

Did you provide workers' compensation coverage for them?

no

    If so, who was your insurance carrier?

    Were you insured under this policy?

no

Did you haul only coal?

no

    If not, what percentage of your work time was spent hauling coal?

70%   last 2 yrs    8-02 to 10-09   100%

What other materials did you haul?

rock

Was your work steady (5 days every  week, 12 months every year) or were there
periods of time when the mine was closed or you  were unable to work for other
reasons?

Yes

18

Miner:  James Gary Warren, Sr.
Claim Number:  XXX-XX-3646 LM C
Self-Employed Truck Driver
Page 2

In what state did your work take place?   *Alabama*

Did you own the truck you drove?   *yes*

   If not, who owned it?   *Self Employed for 1 year  8-002 to 10-*
   *Fleetwood Trking  6-97 to -8-02*

Who actually owned the coal being hauled?   *different Companys*
*Cahaba Resorces Crawford Enterprises.*
*Jim Walter corporation*

Did you have a written contract with a coal mine operator?
   *no*

   IF so, did that contract state that the coal operator would provide
   workers' compensation for you?
      *no*

   If so please provide the name of that operator and describe in
   detail their involvement in your duties.

   Describe any contact you had with employees of the coal company on a
   regular basis.   *Daily to get truck loaded*

   Did coal company employees tell you when to pick up the coal?
      *Yes yes*

   Did the coal company have specific requirements as to how your job
   was to be done?   *Just in a safe manner Manner*

Did you own the truck you drove?   *yes*

Miner:  James Gary Warren, Sr.
Claim Number:  XXX-XX-3646 LM C
Self-Employed Truck Driver
Page 3

Was the truck you drove air conditioned?  *yes*

Where did you pick up the coal?  *Cahaba Resources.*
*Deer Lick mine*
*Brookwood mine*

Who owned and/or operated that facility?
~~Crawford Enterpr~~ *Cahaba Resources*

How was the coal loaded into the truck?  (Conveyor belt, front end
loader, hopper, etc.)  *front end loader*

Was the coal wet or dry?  *both*

Were you required to leave the cab during loading?
~~no~~ *yes to pick up shipping invoice*

Were you regularly exposed to significant amounts of coal dust
during loading?  *no*

Describe in detail the facility at which the coal was unloaded. (Again if
there was more than one delivery site, describe each and give your best
estimate as to the percentage of deliveries to each site.)

Who owned and/or operated that facility?  *4 Loads a Day Alabama Power Co*
*these loads would be a - 3 loads a Day Big River Corp.*
*normal Day 5 to 6 loads a Day Port Walker*
Were you required to leave the cab during unloading?
*Just to open tail gate*

Were you regularly exposed to significant amounts of coal dust
during unloading?  *no*

RECEIVED

FSA, OWCP / DCMWC
Mt. Sterling, KY

Describe how dusty the inside of the truck became and how dusty your clothing
became on a daily basis.  *off & find some dust. you could wipe dash of truck.*
*clothes were dirty from days work*

20

```
Miner:  James Gary Warren, Sr.
Claim Number:  XXX-XX-3646 LM C
Self-Employed Truck Driver
Page 4
```

How were you paid?              _____ cash              ✓ check

How much were you paid?      $_____ per hour      $ 6.00 per ton  *different locati*
*alabama power different amo*
*Gorgas al.*

Please provide a copy of your self-employment tax returns and any other
available documents verifying the nature of your work.


Signature _James Gary Warren Sr._ Date _11-17-09_

21

**Description of Coal Mine Work and Other Employment**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs
Division of Coal Mine Workers' Compensation



| | OMB No. 1215-0056 |
|---|---|
| This report is authorized by the Black Lung Benefits Act (30 U.S.C. 901 et. seq.) While you are not required to respond, your cooperation is needed to ensure that your claim is given full and proper consideration. | Expires 02/28/2011 |

| 1. Miner's Name | 2. Claim Number |
|---|---|
| James Gary Warren, Sr. | XXX-XX-3646 LM C |

Please provide the following information concerning your current or last coal mine work, or the miner's last coal mine work prior to death.

## PART I - DESCRIPTION OF COAL MINE WORK

| 1. Job Title  *Truck Driver* | 2. Dates Worked (mm/dd/yyyy) From:    To:  *Oct 2, 2009* |
|---|---|
| 3. Highest or current rate of pay  *58,000 yr.* | 4. Number of days worked per week  *5 1/2* |

5. Describe the duties of this job in you own words.

*Relocate Coal to other sites*

6. List all other jobs you or the deceased miner did in the mines for at least one year.

| a. Job Title | b. Dates Worked (Month and Year) | |
|---|---|---|
| | From | To |
| | | |
| | | |
| | | |
| | | |

RECEIVED

ESA, OWCP / DCMWC
Mt. Sterling, KY

**Public Burden Statement**

Public reporting burden for this collection of information is estimated to average 30 minutes per response including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Division of Coal Mine Workers' Compensation, Room N-3464, 200 Constitution Avenue, N.W., Washington, D.C. 20212. DO NOT SEND THE COMPLETED FORM TO THIS OFFICE.

NOTE: Persons are not required to respond to this collection of information unless it displays a current valid OMB control number.

Form CM-913
Rev. Feb. 1999

DIRECTOR EXHIBIT
NO. 4 CONSISTING
OF 4 PAGES

22

7. Describe the physical activity required by the coal mine job described in number 5.

Sitting for _____9½_____ hours (Give number of hours per day).

Standing for_____ hours (Give number of hours per day).

Crawling_____ (distance) for _____ hours per day.

Lifting_____ pounds _____ times per day.

_____ pounds _____ times per day.

_____ pounds _____ times per day.

( Example: 25 pounds ten times per day)

Carrying_____ pounds _____ (distance) _____ times per day.

_____ pounds _____ (distance) _____ times per day.

_____ pounds _____ (distance) _____ times per day.

( Example: 20 pounds 50 feet 15 times per day)

8. Did the coal mine job discussed above involve:

1.  The use of tools, machines or equipment?     ☑ YES  ☐ NO

2.  Technical knowledge or special skills?     ☑ YES  ☑ NO

3.  Any supervisory responsibilities?     ☐ YES  ☑ NO

Please explain all "YES" answers.  For example, the specific type of tools, machines or equipment used; the nature of any technical knowledge or special skills needed and the nature of any supervisory duties including the number and type of employees supervised, the extent to which they had to be supervised, etc.

operation of truck & trailer dumping & driving ability

9. Were you (or the deceased miner) transferred from a previous job due to health reasons?
☐ YES  ☑ NO   If "YES", provide the following information:

| a. Previous Job: | b. Job transferred to: |
|---|---|
| c. Effective date of transfer: | d. Reason: |

e. If coal mine work has stopped, give the reason and last date worked:

RECEIVED

ESA, OWCP / DCMWC
Mt. Sterling, KY

23

## PART II: DESCRIPTION OF OTHER EMPLOYMENT

Please provide the following information about your current or last non-coal mine employment

**10.** Job Title _Truck Driver_                    **11.** Type of business or industry _Building supplys_

**12.** Dates Worked (mm/dd/yyyy)       **13.** Highest or current rate of pay       **14.** Number of days worked per week
From _9-95_ To: _5-97_                _31,500 yr._                _5_

**15.** Describe the duties of this job in your own words.

_I delivered building supplies_

**16.** Describe the physical activity required by the job described above.

Sitting for ___9___ hours per day.                    Standing for _____ hours per day.

Lifting ___20___ pounds _Varied_ times per day.

_____ pounds _____ times per day.

_____ pounds _____ times per day.

( Example: 25 pounds ten times per day)

Carrying ~~80 lbs~~ pounds _10 pd_ (distance) _____ times per day.

_10 to 20_ pounds _10 yds_ (distance) _1 to 3_ times per day.

_____ pounds _____ (distance) _____ times per day.

( Example: 20 pounds 50 feet 15 times per day)

**17.** Did the job discussed above (10 to 16) involve:

a. The use of tools, machines or equipment?        ☑ YES   ☐ NO

b. Technical knowledge or special skills?        ☑ YES   ☐ NO

c. Any supervisory responsibilities?        ☐ YES   ☑ NO

Please explain all "YES" answers. For example, the specific type of tools, machines or equipment used; the nature of any technical knowledge or special skills needed and the nature of any supervisory duties including the number and type of employees supervised, the extent to which they had to be supervised, etc.

_Drive truck, read delivery forms_

**18.** If work has stopped, give date of last employment and reason.

Date _5-97_                    Reason for Stopping _Offered better paying jo_

**PART - III**

19. Use this section for additional space to answer any previous question, or to provide any other information you feel would be helpful. Please refer to previous questions by corresponding number. If more space is needed, use a blank sheet and attach.

**PRIVACY ACT**

The following information is provided in accordance with the Privacy Act of 1974. (1) Submission of this information is required under the Black Lung Benefits Act. (2) The information will be used to determine eligibility for and the amount of benefits payable under the Act. (3) The information may be used by other agencies or persons in handling matters relating, directly or indirectly, to the subject matter of the claim, so long as such agencies or persons have received the consent of the individual claimant or beneficiary, or have complied with the provisions of 20 CFR Part 725. (4) Furnishing all requested information will facilitate the claim adjudication process; and the effects of not providing all or any part of the requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits.

I certify that the information given by me on and in connection with this form is true and correct to the best of my knowledge and belief. I am also fully aware that any person who willfully makes any false or misleading statement or representation for the purpose of obtaining any benefit or payment under this title shall be guilty of a misdemeanor and on conviction thereof shall be punished by a fine of not more than $1,000, or by imprisonment for not more than one year or both.

| Signature of claimant or person filing in his/her behalf | Date |
|---|---|
| James Gay Warren Sr. | 11-17-09 |

25

U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs
Division of Coal Mine Workers' Compensation

RECEIVED
NOV 1 8 2009
ESA / OWCP / DCMWC
Mt. Sterling, KY

DOL Claim No: **XXX-XX-3646**
Miner's Name:  **James Gary Warren, Sr**

RECEIVED
NOV 1 8 2009
ESA / OWCP / DCMWC
Mt. Sterling, KY

## STATEMENT REQUIRED BY 20 C.F.R. s 725.495(d)

I am employed by the United States Department of Labor in the Division of Coal Mine Workers' Compensation Branch of Standards, Regulations and Procedures (BSRP). BSRP maintains records of insurance and self-insurance information submitted to the Department under 20 C.F.R. Part 726. Those records allow BSRP to determine, based upon the last date of a miner's employment with a particular coal mine operator, whether the operator secured its liability for any benefits that might be payable to that miner or his or her survivors.

In connection with the referenced claim for benefits, I received a request from the Department's **Mt. Sterling, KY** district office to search those records for information with regard to whether **Fleetwood Trucking Co., Inc** secured its/their liability for any benefits that might be payable to **James Gary Warren, Sr.** survivors. Based on that search, I have determined that none of the listed operators was covered by a policy of insurance, or approved to self-insure its liability, on the date on which the miner was last employed by that operator. My search used the following dates as the dates on which each operator last employed the claimant:

| Coal Mine Operator | Date of Last Employment of Claimant |
|---|---|
| **Fleetwood Trucking Co., Inc** | **2002** |
|  |  |

Beverly A. Branch
Workers' Comp. Specialist
Signature/Title

_____**November 12, 2009**_____
Date

26

**U.S. DEPARTMENT OF LABOR**     **Office of Workers' Compensation**
**Division of Coal Mine Workers' Compensation**
**402 Campbell Way**
**Mt. Sterling, KY  40353-7847**

**January 12, 2010**     **Phone:   (859) 497-8501 or 1-800-366-4628**
**Telefax:  (859) 498-5787**


Fleetwood Trucking Co., Inc.
Rt. 2, Box 664
Cottondale, AL  35453


RE:  Black Lung Claim XXX-XX-3646 LM C
     James Gary Warren, Sr.

Dear Mr. Sellers:

The above named individual has filed a claim for benefits under the Federal
Coal Mine Health and Safety Act of 1969, as amended.

The evidence in the file indicates that Fleetwood Trucking Co., Inc. may be the
putative responsible operator for this claim.  Our records do not show that
Fleetwood Trucking Co., Inc. was insured for Federal Black Lung Benefits on Mr.
Warren's last date of employment.  To clarify the matter, we need additional
documentary information regarding this company.  Please submit the following
item(s) to our office.

   1.   Complete tax returns for the last three years the company
        was in operation;

   2.   An affidavit listing all assets, including coal reserves
        and any disposable property;

   3.   A copy of the articles of incorporation for this company;

   4.   The name and address of the insurance company with whom
        Fleetwood Trucking Co., Inc. had workers' compensation
        coverage during 2002.

   5.   A copy of Fleetwood Trucking Co., Inc.'s workers'
        compensation insurance policy for 2002.


We appreciate your cooperation in providing the above requested information to
our office within thirty (30) days.  **Failure to respond within thirty (30) days
will result in our finding that your company is the proper responsible operator
and that you are financially able to assume liability for any benefits that may
accrue from this claim.**

27

Please feel free to call me at 1-800-366-4628, if you have any questions.

Sincerely,

Kathy L. Ballard
Claims Examiner

cc: James Gary Warren, Sr.

28

**U.S. DEPARTMENT OF LABOR**     **Office of Workers' Compensation**
**Division of Coal Mine Workers' Compensation**
**402 Campbell Way**
**Mt. Sterling, KY  40353-7847**



**Phone:   (859) 497-8501 or 1-800-366-4628**
**Telefax:  (859) 498-5787**

NOTICE OF CLAIM

Date Issued: January 12, 2010

Miner's Name: James Gary Warren, Sr.

| Claimant's Name/Address | Claim Number |
|---|---|
| James Gary Warren, Sr.<br>14536 Lake Wildwood Dr.<br>Cottondale, AL  35453 | XXX-XX-3646 LM C |
| Potentially Liable Operator/Address | Insurance Carrier/Address |
| Fleetwood Trucking Co., Inc.<br>Rt.2, Box 664<br>Cottondale, AL 35453 | **Uninsured**<br><br><br>Policy Number: Uninsured |

The claimant named above has filed a claim for benefits under the Black Lung Benefits Act, 30 U.S.C. 901 et seq.  We are currently developing the claim to determine the claimant's eligibility.  Enclosed is a copy of the claimant's application and any evidence OWCP has obtained to date relating to the miner's employment.

This Notice of Claim is issued pursuant to 20 C.F.R. 725.407.  We have identified you as a "potentially liable operator" in this claim.  A "potentially liable operator" is an employer of the miner (or a successor of an employer pursuant to 20 C.F.R. 725.492) who may be held liable for the payment of benefits should the claimant be found entitled to them.  Designation as a potentially liable operator does not constitute a determination that you are in fact liable.  Where OWCP's records indicate you obtained a policy of insurance, and the claim falls within such policy, we are sending a copy of this notice to your insurer.  You and your insurer shall be considered parties to the claim unless an adjudication officer dismisses you and you are not thereafter notified again of your potential liability.

*Our rationale for identifying Fleetwood Trucking Co., Inc. as a "potentially liable operator" is as follows:*

*Mr. Warren alleges coal mine employment as a Truck Driver from 1982 to 2009.  He worked as Self-Employed Truck Driver from 2002 to 2009, hauling coal to Alabama Power, Big River Corporation and Port Walker.  Mr. Warren has provided his last date of coal mine employment as October 2, 2009. Federal Regulations prohibit Mr. Warren from being his own responsible coal mine operator.*

*Prior to Self-Employment, Mr. Warren was employed by Fleetwood Trucking Co., Inc. from 1997 to 2002, according to the partial*

29

*Social Security Earnings Record. The employment questionnaire indicates he hauled an average of four loads per day (about 80 miles per trip) from the Davis Creek area. According to Mr. Warren he hauled coal 50% of the time. He delivered the coal to a stockyard and to Gorgas Steam Plant. Federal Regulations do not require trucking companies to secure insurance coverage. Our records indicate Fleetwood Trucking Co, Inc. was uninsured in 2002.*

*Please provide specific details regarding Mr. Warren's employment including dates of employment, job titles/duties, provide the company names (including city, state, and the type of industry), of the locations where he delivered the coal. And, if possible, please address the amount of time Mr. Warren would have been exposed to coal dust given the responsibilities of a Truck Driver during this period.*

Within 30 days of receipt of this Notice of Claim, you (or your insurer) must file a response pursuant to 20 C.F.R. 725.408 indicating your intent to accept or contest your identification as a potentially liable operator. This time period may be extended for good cause shown if you file an extension request with the District Director prior to expiration of the 30 days. We have enclosed a form entitled "Operator Response to Notice of Claim" for your use. Please send your response and any other correspondence to the Office of Workers' Compensation Programs, Division of Coal Mine Workers' Compensation, at the address shown above.

If you accept liability for the payment of benefits should the claimant obtain an award (*i.e.* you accept that you are the "responsible operator"), please mark the box in Section A (entitled "Acceptance of Liability") on the Operator Response to Notice of Claim. **Accepting liability means only that you are the operator liable for the payment of any benefits due; it does not constitute a stipulation or admission that the claimant is entitled to benefits.**

If you wish to contest your status as a potentially liable operator, you must state the precise nature of your disagreement by accepting or denying each of the five assertions listed in Section B (entitled "Contest of Potential Liability – Operator Assertions) on the Operator Response to Notice of Claim. The assertions are limited to information about your employment of the miner and your status as an operator. If you deny any of the five operator assertions, you have 90 days from your receipt of this notice to submit documentary evidence in support of your response. This time period may be extended for good cause shown if you file an extension request with the District Director prior to expiration of the 90 days. **Absent extraordinary circumstances, no documentary evidence relevant to the assertions set forth in 20 C.F.R. 725.408(a)(2) (reiterated in Section B of the Operator Response to Notice of Claim) may be admitted in any further proceedings unless it is submitted within 90 days of your receipt of this notice or an extended period authorized by the District Director.**

If you do not respond within 30 days of your receipt of this Notice of Claim, you will not be allowed to contest your liability for payment of benefits on any of the grounds set forth in 20 C.F.R. 725.408(a)(2) (reiterated in Section B of the Operator Response to Notice of Claim).

Please note that your response need not include evidence about any other potentially liable operator and its employment of the miner. At the conclusion of the initial evidence-gathering period, the District Director will issue a Schedule for the Submission of Additional Evidence pursuant to 20 C.F.R.

*30*

725.410.  In that schedule, the District Director will select and designate one "responsible operator" from the potentially liable operators notified.  All parties will then be given an opportunity to present evidence regarding the liability of the designated responsible operator or any other operator.

NOTE: THE "OPERATOR RESPONSE TO NOTICE OF CLAIM" MUST INCLUDE THE ORIGINAL SIGNATURE OF AN AUTHORIZED OFFICIAL FOR THE POTENTIALLY LIABLE RESPONSIBLE OPERATOR OR ITS INSURANCE CARRIER.  WE CANNOT ACCEPT A COPY OF THE RESPONSE SENT BY FAX IN LIEU OF THE ORIGINAL DOCUMENT.

We are available to assist you with this process.  I may be contacted at the address and telephone number shown above.

Sincerely,

Kathy L. Ballard
Claims Examiner

Enclosures:   Copy of claim and evidence relating to miner's employment history
              Operator Response to Notice of Claim form (Form No. CM-2970a)

cc: James Gary Warren, Sr.; Fleetwood Trucking Co. Inc.

31

U. S. DEPARTMENT OF LABOR
ESA/OWCP/DCMWC

MEMORANDUM TO:  Claim File

| | | | |
|---|---|---|---|
| Miner's Name: | James Gary Warren, Jr. | SSN: | XXX-XX-3646 |
| Claimant's Name: | | Claim Type | |
| Person Contacted: | James Gary Warren, Jr. | Telephone: | 205/556-4475 |

SUBJECT:  MEMO TO FILE

---

**01/12/2010**

Contacted Mr. Warren to touch base regarding his appointment with Birmingham Health Care and his coal mine employment as a Truck Driver.

He confirmed that he underwent a PFT, ABG & x-ray on December 9, 2009 and that he returned on 01/08/2010 to repeat the chest x-ray since the earlier one could not be read.  He stated he doesn't have an appointment yet, but will see Dr. Barney for the Physical Examination.  He confirmed he has never been a patient of Dr. Barney.

**Self-Employment:**

He stated he had his own truck and leased (no written agreement) to Cahaba Resources.  I asked if that was Birmingham or Vance, AL and he stated it was in Brookwood, AL.  I asked who his immediate supervisor was and initially he stated Jim Ed Crawford, but then stated that basically whoever was running the loader, told him where to take the coal.  We briefly discussed his delivery of coal. He delivered to Alabama Power Plant, Big River Corp. (described as company which manufactures filler for cinder blocks) and Port Walker (described as company which mixed coals to create a specific blend of coal to ship to AL Power.  Most of his Self Employment Trucking was hauling from Surface Mining sites.

**Fleetwood Trucking Employment:**

Mr. Warren noted he hauled from Jim Walter Resources, Inc. (underground mining sites) to ABC Corp. and from near Davis Creek, which was strip mining site, to stockyard, Gorgas steam plant or to the river to be put on barges while working for Fleetwood Trucking.

I asked Mr. Warren about the relationship between Sellers Trucking Co., Inc. and Fleetwood Trucking.  He stated the Father started the company and his two sons each took a company, B.R. Sellers was Sellers Trucking Co. and Lee Sellers was Fleetwood Trucking Co.  Although same type of company, they were separate companies.

Mr. Warren confirmed that he generally was paid by tonnage.  I asked if as a Truck Driver he always hauled the coal on the local highways to whatever company they instructed, whether power plant or wherever and he confirmed this.  I asked if he ever hauled the coal on-site from one location to another such as from the mine to the tipple, he stated no, always on the highways.

---

[ ]  See Page 2

| | | |
|---|---|---|
| _Keith X Bailey_  / | Claims Examiner  / | 01/12/2010 |
| Signature | Title | Date |

*32*



U. S. DEPARTMENT OF LABOR
ESA/OWCP/DCMWC

MEMORANDUM TO:  Claim File

| | | | |
|---|---|---|---|
| Miner's Name: | James Gary Warren, Sr. | SSN: | XXX-XX- |
| Claimant's Name: | | Claim Type | |
| Person Contacted: | | Telephone: | |

SUBJECT:  MEMO TO FILE

---

01/25/2010

Received a call from Mr. Warren regarding the Notice of Claim sent to Fleetwood Trucking Co., Inc. and the fact that he wanted to ensure that we knew he did not haul to Alabama Power Company while hauling for Fleetwood Trucking Co.   I took at look at the Truck Driver Questionnaire he completed for his employment with Fleetwood Trucking Company and assured him that the form indicates he hauled to "stockyard" and "Gorgas Steam Plant".   He confirmed this as correct.

Mr. Warren then began to provide much detail about what, when, where and for whom he hauled what materials whether coal, rock or etc.  He had so much detail I asked if he had the data already written there in front of him.  He confirmed that he had written it all down and agreed to fax a copy of the data he had put together.  I asked that he be sure and date the information before faxing and he agreed to do so.

Upon receipt of the data, we will review the CME to determine if data warrants any additional Notice of Claim.

---

[  ]  See Page 2

| | | |
|---|---|---|
| *Kelly L. Ballard* / | Claims Examiner / | 1/25/10 |
| Signature | Title | Date |

33

U. S. DEPARTMENT OF LABOR
ESA/OWCP/DCMWC

MEMORANDUM TO:  Claim File

| | | | |
|---|---|---|---|
| Miner's Name: | James Gary Warren, Sr. | SSN: | XXX-XX-3646 |
| Claimant's Name: | | Claim Type | |
| Person Contacted: | Mr. Warren | Telephone: | 205/556-4475 |

SUBJECT:  MEMO TO FILE

---

03/02/2010
Called Mr. Warren to discuss further the information provided within his five page fax dated
January 25, 2010.

**Sellers Trucking (Page 2 of Fax) Employed from 03/1982 to 09/1995.**
1982-1985 confirmed he hauled coal 90% of time
   Hauled From Jim Walter Resources Mine #3 to Gorgas Steam Plant.(Coal was washed & prepared)

1985-1995 He hauled rock taken from Surface Rock Mine-Limestone.
 Hauled from Alabaster, Martin & Marietta areas & delivered rock to:
     Tenco Roofing or Elk Roofing or a paving company
     (The rock was washed and was to be mixed to make a roofing material or mixed to be used
      in paving.)
According to Mr. Warren when hauling rock for Sellers Trucking the rock always came from
strip pits and was always washed.


**Fleetwood Trucking (Page 3 of Fax) Employed from 07/1997 to 08/2002**
Did not haul coal for first three years (1997-2000).
1997-2000 Rock 90% & 2000 to 2002 Coal 50%.

Hauled Coke product:
   Hauled from ABC Corporation Coke Plant to Warrior Gulf Navigating (WGN).
   (He described WGN as a barge used to stockpile coke and coal - this was a washed &
    finished product.)

Hauled coal:
   From Pacific Coal or
   From Jim Walter Resources Mines #4, #5 or #7
       to ABC Coke Plant or JWR Coal Plant or Port McDonald or Port Tuscaloosa.

If not hauling to these locations, he was:
   Stockpiling for JWR's Prep Plants at Pumkin Center, Gorgas, Alabama.
   Hauling to WGN & ABC Coke or WGN Prep Plant.
According to Mr. Warren all the coal hauled from JWR was washed.  He was directed/supervised
by Fleetwood Trucking as a Representative from JWR would contact Fleetwood as to where Mr.
Warren would pick-up or deliver. He added he was never an employee of JWR.

34

**Gary Warren leased (Page 4) to:  B.R. Sellers from 08/2002 to 12/31/2002**
**Fleetwood Trucking from 02/2003 - 02/2007**

Per fax, he hauled rock from 01/2003 to 10/2007 and 2003 to 2004.

In 2004 hauled coal:
  From Americore to Pine Hill (Manf. Of Paper Products-Coal used to generate power for kiln.)
  From Americore to Weyhauser (Man. Of Lumber-Coal used to generate power for kiln.)
  From Americore to WGN (Warrior Gulf Navigating) coal loaded onto barge for steam plant.

In 2005 hauled coke from strip mine:
  From Hunt Oil to Cheney Lime Corp. in Alabaster, AL-used lime rock to manufacture products.
  From Hunt Oil to Dravo Corp. in Alabaster, AL-used lime rock to manufacture products.

In March or April 2005 and Sept 2005 to May 2006 hauled coal from Twin Pine Coal Co. -
(Shannon Mine) in Abnerate, AL.  Twin Pine Coal Co. was a strip mine.
  LM hauling "blended coal" from Twin Pine Coal Co. to ABC, JWR or WGN, per phone call.
  Per fax, LM hauled to WGN at Birmingham Port
          Hauled to Green Fuel Prep Plant at Brookwood - they washed the coal.
          Hauled to Sloss Corporation at N Birmingham.
  This coal was reportedly crushed and not washed. (Per LM, coal was not sent to a Prep
  plant once it was placed on barge.  It was used as it was.)

06/2006 - Hauled from JWR #7 to Sloss Corporation.

10/2006 - 10/2007 LM hauled for Cahaba Resources (f/k/a Crawford Coal)
  (LM hauled blended/crushed-unwashed coal)
  Hauled from Deerlick Mine (Strip Mine) to WGN at Birmingham Port
  Hauled from Deerlick Mine to Big River Corp. in Livingston, AL (used coal to heat kiln
   ·Manufacturing block - using grinded up coal to create a light material for the blocks.

[ ]  See Page 2

_Kathy L. Baldwin_          /          Claims Examiner          /          3/2/10
Signature                                Title                              Date

## STATEMENT OF LEE SELLERS

My name is Lee Sellers and I am President of Fleetwood Trucking Company, Inc. I have personal knowledge of the facts stated herein.

Fleetwood Trucking Company is a trucking company incorporated in 1984. The products it has hauled since 1984 include such things as rock, sand, gravel, foundry coke, recyclable metals, grain and, over the last two or three years, some coal. It has never been a coal mine operator.

Insofar as coal, Fleetwood Trucking Company has never hauled coal from an underground coal mine facility. Instead, it has only hauled coal that has been strip mined and placed on stockpiles at least one-quarter mile from the mining operations. All of the hauling was on public highways to consumers of the coal. Thus, Fleetwood Trucking was not involved in the transportation of coal in or around a coal mine or the extraction or preparation of coal.

This applies to the claim of James Gary Warren, Sr., who was employed exclusively as a truck driver by Fleetwood Trucking Company, Inc., from approximately 1997 to 2002. During his employment, Warren was not a miner and did not work in or around a coal mine. He had no role in either the extraction or the processing or preparation of coal. He did not even load the coal on his truck. Instead, during the few times that he hauled coal, he simply drove a truck to the stockpile where it was loaded by others while he remained in the cab of his truck.

RECEIVED

NOV 1 2 2010

ESA / OWCP / DCMWC
Mt. Sterling, KY

conditioned truck. In short, he had no known exposure to coal mine dust. He simply delivered several different types of products to consumers.

_Lee Sellers_
Lee Sellers

STATE OF ALABAMA          )
                          )
COUNTY OF TUSCALOOSA      )

I, the undersigned authority, a Notary Public in and for said County and State, do hereby certify that Lee Sellers, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he/she executed the same voluntarily on the day the same bears date.

IN WITNESS WHEREOF, I hereunto set my hand and official seal on this the 28th day of _October_, 2010.

_Bonnie Sutton_
Notary Public
My commission expires: _5-21-2014_

RECEIVED

NOV 1 2 2010

ESA / OWCP . DCMWC
Mt Sterling. KY

*37*



# QUINN, WALLS,
# WEAVER & DAVIES LLP

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
ATTORNEYS AT LAW        WWW.QWWDLAW.COM
2700 HIGHWAY 280 EAST, SUITE 380 BIRMINGHAM, AL 35223
PHONE 205/870-9989        FAX 205/803-4143

October 29, 2010

**RECEIVED**

**NOV 0 3 2010**

ESA / OWCP / DCMWC
Mt. Sterling, KY

Ms. Kathy L. Ballard
Claims Examiner
U.S. Department of Labor
Office of Workers' Compensation
402 Campbell Way
Mt. Sterling, KY 40353-7847

Re: James Gary Warren, Sr.
Claim No.: XXX-XX-3646 LM C

Dear Ms. Ballard:

Enclosed please find additional evidence being submitted in support of Mr. Warren's claim for Black Lung benefits. The evidence consists of an affidavit from the claimant that clarifies some of his answers to a questionnaire that he forwarded to the Department in November 2009. The affidavit makes clear that Mr. Warren was exposed to a considerable amount of coal dust during the times that he was at the mines to pick up a load of coal because he was out of his cab for much of the time. In addition, he was in and out of mine sites at least four times each day picking up or dropping off loads. Mr. Warren has offered a more detailed picture of his exposure to the dust that has caused his totally disabling pulmonary impairment by explaining the different ways he was exposed as well as the types of coal he hauled at different times during his career as a truck driver.

We believe that this additional evidence will help explain how he developed the coal workers' pneumoconiosis that the doctors have diagnosed.

Thank you for your consideration of this evidence. Please don't hesitate to call me if you need further information.

Sincerely yours,

*Abigail P. van Alstyne*

Abigail P. van Alstyne

cc: Fleetwood Trucking Co.

**DIRECTOR EXHIBIT**

NO _____*18*_____ CONSISTING

OF _____*4*_____ PAGES




38

## U.S. DEPARTMENT OF LABOR
### OFFICE OF WORKERS' COMPENSATION
### DIVISION OF COAL MINE WORKERS' COMPENSATION

| | |
|---|---|
| JAMES GARY WARREN, SR., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| LEE SELLERS and FLEETWOOD | ) |
| TRUCKING CO., INC., | )    CLAIM NO. XXX-XX-3646 LM C |
| | ) |
| Employer, | ) |
| | ) |
| and | ) |
| | ) |
| DIRECTOR, OFFICE OF WORKERS | ) |
| COMPENSATION PROGRAMS, | ) |
| | ) |
| Party-in-Interest. | ) |

## AFFIDAVIT OF CLAIMANT

1.  My name is James Gary Warren, Sr., and I am a U. S. citizen over the age of nineteen (19) years and competent to testify to the matters herein.

2.  I worked as a truck driver for Sellers Trucking from March 1982 through September 1995. In the mid-eighties, Billy Ray Sellers, the son of Horace Sellers who owned Sellers Trucking, assumed ownership of the company. The name of the company remained Sellers Trucking.

3.  Between 1982 and 1985, approximately 90% of the material I hauled was washed coal, and the remainder was rock.

RECEIVED
NOV 03 2010
ESA / OWCP / DCMWC
Mt. Sterling, KY

4.  Between 1985 and 1995, the percentages were reversed. I hauled approximately 90% rock, but the 10% coal that I hauled was unwashed. I would pick up the coal from strip mines in the Brookwood, Alabama area.

5.  While waiting in line for my truck to be loaded, I would turn the engine off to save fuel, and roll down the windows of my cab. On the average day, it would take about one hour to get into the pit, pick up the load, get it weighed, and then

39

leave the pit.

6. During that hour, I was constantly exposed to coal mine dust, whether I was sitting in the cab or standing outside waiting, conversing with miners, or getting my ticket.

7. In July 1997, I began working for Fleetwood Trucking, a company owned by Horace Sellers' other son, Lee Sellers. In 2000, I started hauling coal for PacifiCorp. This was all blended coal, consisting of unwashed and washed coal. I delivered it to plants that were going to continue the processing of the coal into coke.

8. The blended coal was very dry and created substantial amounts of dust. We were required by PacifiCorp to cover the coal the coal with a tarp before we left the area in order to reduce the amount of flying coal dust. Then we would have to remove the tarp when we delivered the coal. I had to do the tarping by hand for several months until I got an automatic tarp installed on my truck.

9. I hauled blended coal for approximately 15 months, from 2000 through about February 2001. After that, I continued hauling both coal and rock until August 2002. Between August and December 2002, I hauled only rock.

10. In January 2004, I hauled unwashed coal from various mines to various processing plants which would blend it with other coal to create a blended product.

11. I performed that kind of hauling until September of 2005 when I started hauling blended coal to processing plants. At least 85% of my time was spent doing that from September 2005 through October 2007.

12. Most of the time, the coal companies would be operating the crushing machines right where my truck was being loaded. The amount of dust arising from the crusher was significant.

13. From October 2007 through October 2009, I hauled unwashed coal the entire time.

RECEIVED

14. Because I was paid by the tonnage, I tried to haul at least four (4) loads per day NOV 03 2010 5 ½ to 6 days a week throughout my career as a trucker.

ESA / OWCP / DCMWC
Mt. Sterling, KY

15. Over the course of my career, I would say that I hauled coal 70% of the time.

16. In a questionnaire I submitted to the Department, I stated that I was not **required** to leave my cab during unloading except to open the tail gate. Even though I was not required to leave the cab, I frequently did so because I did not want to sit in

40

the hot cab waiting for my turn to be unloaded or I wanted to talk with the miners while I waited.

17. Similarly, when I was picking up a load, I was not **required** to leave the cab except to pick up my invoice, but I usually did leave my truck to talk with miners or when I had to roll the tarp over the coal or adjust the weight of coal I had on the truck.

18. When I answered the questions about my exposure to coal dust during loading and unloading of my truck, I was thinking only about the times that I had to be inside the cab. The rule at every coal mine is that the truck driver **must** be inside the cab during the actual loading and unloading as a safety precaution to ensure that the miner is not inside the trailer when coal is being dumped in there. My answers were not directed to the rest of the time I was on site either waiting to pick up my load or deliver my load.

19. I can truthfully attest to the fact that I was breathing significant amounts of coal dust every time I was in the pits, every time I was putting on or taking off the tarps, and every time I had one or more windows open in the truck. I spent lots of time breathing coal dust, especially when the trucks were running together to a site, and the truck in front would blow dust back on me.

20. The inside of my truck **always** had a noticeable layer of coal dust all over the dash and the seat.

_Oct. 25- 2010_
Date

_James Gary Warren_ Sr.
James Gary Warren, Sr.
DOL Claims No.: XXX-XX-3646 LM C


STATE OF ALABAMA      )
COUNTY OF JEFFERSON  )

Before me, the undersigned, a Notary Public in and for the State of Alabama, personally appeared James Gary Warren, Sr., who by me being first duly sworn, stated that he has read the foregoing, that it represents the truth, and that he has signed it willingly and without duress.

RECEIVE[
NOV 03 2010
ESA / OWCP / DCMV
Mt. Sterling, KY

My Commission expires:

_10-30-2011_

_Jacqueline Ward_
Notary Public  _State of Alabama_

 

*41*

**U.S. DEPARTMENT OF LABOR**

**Office of Workers' Compensation**
**Division of Coal Mine Workers' Compensation**
**402 Campbell Way**
**Mt. Sterling, KY   40353-7847**

**Phone:   (859) 497-8501 or 1-800-366-4628**
**Telefax:  (859) 498-5787**

| | |
|---|---|
| <u>Miner's Name</u><br><br>James Gary Warren, Sr. | <u>Designated Responsible Operator</u><br><br>Lee Sellers<br>Fleetwood Trucking Co., Inc.<br>11614 Fleetwood Road<br>Cottondale, AL 35453 |
| <u>Claimant's Name</u><br><br>James Gary Warren, Sr. | |
| <u>Claimant's Address</u><br><br>14536 Lake Wildwood Drive<br>Cottondale, AL  35453 | <u>Insurer</u><br><br>Not insured – Still in Business |
| <u>DOL Claim Number</u><br>XXX-XX-3646 LM C | <u>Date Issued</u><br>August 31, 2010 |

**SCHEDULE FOR THE SUBMISSION OF ADDITIONAL EVIDENCE**

<u>James Gary Warren, Sr.</u> filed an application for benefits under the Black Lung Benefits Act on 10/29/2009.  We have reviewed the medical evidence developed under 20 C.F.R. § 725.405, and the evidence relevant to coal mine operator liability received under 20 C.F.R. § 725.408.  A copy of our "Summary of Medical and Employment Evidence" is attached.

Based on a review of that evidence, we have made the following preliminary conclusions:

1.  The claimant would not be entitled to benefits if we issued a decision at this time; and
2.  The coal mine operator named above is the responsible operator liable for the payment of benefits.

**<u>Entitlement</u>**

We have reviewed the evidence developed thus far.  Our preliminary analysis is that the claimant would not be entitled to benefits if we issued a decision at this time.  Our analysis of the evidence and the reasons for our conclusions are set forth in the attached Summary.  In addition, a "Guide for Submitting Additional Evidence" is attached, explaining the limitations on the quantity of evidence that each party may submit and the types of medical evidence sufficient to establish each element of entitlement.

The responsible operator may respond to this schedule by September 30, 2010, in the manner prescribed in 20 CFR 725.412(b) and either accept or reject the claimant's entitlement to benefits. If the responsible operator does not respond, it will be considered to have contested the claimant's entitlement, and will be liable for the cost of obtaining additional medical and other necessary evidence in the event that the claimant is ultimately found entitled to benefits. The Black Lung Disability Trust Fund will be liable for those costs if the claimant is ultimately found entitled to benefits and this office has not designated a responsible operator.

42

**U.S. DEPARTMENT OF LABOR**

**Office of Workers' Compensation
Division of Coal Mine Workers' Compensation
402 Campbell Way
Mt. Sterling, KY  40353-7847**



**Phone:   (859) 497-8501 or 1-800-366-4628
Telefax:  (859) 498-5787**

In the matter of the claim for benefits under
the Black Lung Act

James Gary Warren, Sr.
Claimant

v.

Fleetwood Trucking Co., Inc.
Responsible Operator

and

Director, Office of Workers' Compensation Programs

**PROPOSED DECISION AND ORDER**
**Denial of Benefits**

MINER: James Gary Warren, Sr.
CLAIM NO.:  XXX-XX-3646 LM C

Such development, examination, investigation, and review as is deemed necessary pursuant to the Black Lung
Benefits Act having been completed and duly considered, the District Director makes the following:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.  That James Gary Warren, Sr., born January 9, 1949, hereinafter referred to as the miner, was employed as a
    coal miner in the Nation's coal mines for at least one year but not more than two years, from approximately
    2000 to October 2, 2009;

2.  That a written claim for benefits was timely filed on October 29, 2009;

3.  That, as a result of the conditions of his coal mine employment, the miner contracted pneumoconiosis, as that
    term is defined in the Act and the Regulations;

4.  That the evidence does not show that the disease was caused, at least in part, by coal mine work;

5.  That such disease has caused a breathing impairment of sufficient degree to establish total disability, within
    the meaning of the Act and the Regulations;

6.  That Fleetwood Trucking Co., Inc. is the coal mine operator designated as responsible for payment of benefits
    due the claimant should this denial be reversed to an award of benefits as a result of subsequent proceedings.

7.  That the designated responsible operator would also be liable for the payment of all fees, charges, and other
    reasonable expenses incurred by the miner/claimant in developing the claim and for such medical
    examination, treatment, service, medicine and apparatus required due to the miner's disability should the
    claim be awarded as a result of subsequent proceedings.



43

**Proposed Decision and Order - Denial of Benefits**
Miner: James Gary Warren Sr
Claim No: XXX-XX-3646 LM C

Based upon the foregoing Findings of Fact and Conclusions of Law, the District Director makes the following:

### PROPOSED DENIAL OF BENEFITS

The claimant is not entitled to benefits because the evidence:

Does not show the disease was caused, at least in part, by the miner's coal mine work.

Within thirty (30) days after the date of issuance of this Proposed Decision and Order, any party may file a written request for revision or request a formal hearing before the Office of Administrative Law Judges. The party must specify the findings and conclusions with which they disagree and shall serve the written request on the District Director and all other parties.

Signed in the office of the District Director on November 30, 2010.

Kathy L Ballard
Claims Examiner



H4

## PROOF OF SERVICE

Claimant:   James Gary Warren, Sr.

Claim No.:   XXX-XX-3646 LM C

## CERTIFICATION

I hereby certify that on November 30, 2010, the Proposed Decision and Order was filed in the office of the District Director and a copy mailed to the parties and their representatives at the addresses listed below.

The Proposed Decision and Order shall become final within thirty (30) days from the date filed in the office of the District Director in accordance with Section 20 CFR 725.419.


Kathy L. Ballard
Claims Examiner


CERTIFIED MAIL

James Gary Warren, Sr.
14536 Lake Wildwood Dr.
Cottondale, AL  35453

Abigail P. Van Alstyne
Quinn Walls Weaver & Davies
2700 Highway 280, Suite 380
Birmingham, AL  35223

Fleetwood Trucking Co., Inc.
Rt.2, Box 664
Cottondale, AL 35453

Christopher L McIlwain, Sr.
Hubbard, Wiggins, McIlwain &
 Brakefield, PC
808 Lurleen B. Wallace Blvd., N.
Tuscaloosa, AL 35401-2116

45



## SUMMARY OF MEDICAL AND EMPLOYMENT EVIDENCE
## PROPOSED DECISION AND ORDER

Date Issued: November 30, 2010             DOL Claim No.: XXX-XX-3646 LM C
Miner's Name: James Gary Warren, Sr.      Claimant's Name:  James Gary Warren, Sr.
Coal Mine Company: Fleetwood Trucking Co   Insurance Carrier: Not insured
Inc

The claimant named above has filed an application under the Black Lung Benefits Act, 30 USC 901 et seq.  We have received the medical and employment evidence summarized below.  Based on a review of this evidence, we have concluded that ***Fleetwood Trucking Co., Inc.*** is the responsible operator liable for the payment of any benefits in this claim.  We have also concluded that the claimant is not entitled to benefits. A summary of the medical and employment evidence and an analysis of the evidence is set forth below.  No additional medical evidence was received following the issuance of the Schedule for the Submission of Additional Evidence.  Copies of other correspondence relating to the claimant's employment are enclosed.

## ENTITLEMENT ANALYSIS:

Based on the analysis of the medical evidence received to date, we have determined the following:

## PRESENCE OF PNEUMOCONIOSIS (BLACK LUNG DISEASE):

On behalf of the U.S. Department of Labor, Dr. J. Barney examined Mr. Warren on March 26, 2010.  Dr. Barney diagnosed Pneumoconiosis and Pulmonary Fibrosis due to coal dust exposure based on chest x-ray and history.   Dr. A. Ahmed interpreted the claimant's January 8, 2010 chest x-ray film as positive (2/3) for simple pneumoconiosis.  Dr. P. Barrett, Board-Certified B-reader has confirmed the chest x-ray film is of acceptable quality.   Dr. Barney noted Mr. Warren has "never smoked".

According to Mr. Warren's application for benefits, Dr. Phillip O'Reilly ordered him to stop working.  The application also notes pulmonary fibrosis caused by coal hauling, 60% lung capacity loss and on continuous oxygen at 3 LPM.  Medical records received submitted Dr. P. O'Reilly's office includes office visit notes dated November 20, 2009 and April 23, 2010.   According to Mary Wade's (NP-C) November 20, 2009 note, Mr. Warren was being treated for silicosis and pneumoconiosis, chronic bronchitis, hypertension, dyslipidemia and OSA.  He was on 3 LPM of oxygen.  Dr. O'Reilly's April 23, 2010 note references the fact that the claimant plans to go into the Lung Transplant Clinic this summer.  Dr. O'Reilly noted that he did not recommend a lung transplant at this time.  Dr. O'Reilly also stated, "It is uncertain what the etiology of his lung fibrosis is.  There is no definitive diagnosis of IPF, and he has always resisted the notation of a lung biopsy, but I feel as long as his pulmonary function is stable, we can continue with conservative management."

The presence of the disease is established by Dr. Ahmed's chest x-ray reading and corroborated by evidence of the disease based upon physical examination and a review of the objective testing.  The requirements of 20 CFR 718.202(a)(1) are met and, therefore, presence of the disease has been established.

## RELATIONSHIP OF BLACK LUNG DISEASE TO COAL MINE EMPLOYMENT:

Because the miner has proven less than ten (10) years of coal mine employment, the presumption in the regulations at 20 CFR 718.203(b) is not available to the miner.  Therefore, the miner must establish by other evidence that his pneumoconiosis arose out of his coal mine employment.  Dr. J. Barney stated the claimant has pneumoconiosis due to "coal dust exposure".  However, Dr. Barney did not provide a reasoned medical opinion which supports a finding that the disease arose at least in part out of coal mine employment.




46

The claimant noted that most of coal was loaded at a surface mine, most of the coal he transported had been washed and prepared and he exited his air-conditioned truck cab only to pick-up shipping invoices during loading and to open the tailgate during unloading. When asked if he was "regularly exposed to significant amounts of coal dust" during loading or unloading, he stated, "No". It is the Department's long-held position that the occupational dust exposure at issue under Black Lung Benefits Act is a total exposure arising from coal mining, and not only exposure to coal dust itself.

On November 3, 2010 we received Mr. Warren's "Affidavit of Claimant" signed on October 25, 2010. The Affidavit includes the claimant's specific dates of employment, employers and the type of material hauled. According to the statement between 1982 and 1985, he hauled washed coal 90% of the time (hauled rock the remaining 10% of time), between 1985 and 1995, he hauled rock 90% of the time and hauled unwashed coal, from strip mines, the remaining 10% of the time. In July 1997 he began working for Fleetwood Trucking Co., Inc. In 2000 he began hauling "blended coal" for PacifiCorp and hauled for 15 months (2000 to 02/2001). The blended coal consisted of both washed and unwashed coal which created substantial amount of dust and required tarping, which the claimant had to do himself for several months prior to the installation of an automatic tarp. He hauled coal and rock from 02/2002 to 08/2002 and from 08/2002 to 12/2002 he hauled only rock. In September 2005 began hauling blended coal to processing plants and continued until October 2007. From October 2007 to October 2009 he hauled unwashed coal the entire time. He stated that over the course of his career he hauled coal 70% of the time and although he was not required to leave the cab of the truck during loading or unloading, he often did so as he estimated on an average day it would take an hour to pick up the load.

On November 12, 2010 our office received a "Statement from Lee Sellers". The statement notes the company hauled "some coal" that had been strip mined and placed on stock piles at least one-quarter mile from the mining operations. The statement notes, "Mr. Warren was not a miner and did not work in or around a coal mine...He simply drove a truck to the stockpile where it was loaded by others while he remained in the cab of his air-conditioned truck. In short, he had no known exposure to coal mine dust."

In determining time periods in which the claimant was exposed to coal mine dust, we consider the Affidavit of Claimant, Mr. Sellers' Statement and Mr. Warren's January 25, 2010 handwritten note regarding his employment. The employment data is consistent in that he primarily hauled (washed, per Affidavit) coal from approximately late February/Early March 1982 to 1985. The handwritten note states he was hauling from Jim Walters Resources, Inc. Mine #3 to Gorgas Steam Plant; therefore the washed coal was hauled into the stream of commerce. He primarily hauled rock from 1985 to September or October 1995. Both documents confirm he began hauling for Fleetwood Trucking in July 1997. The handwritten note indicates he did not haul coal for the first three years (1997-2000), but hauled a coke product. However, noted at his signature is the notation "1997 to 2000 Rock 90%". From 2000 to 02/2001 he hauled blended coal (both washed and unwashed coal) from a Preparation Plant to Sloss Coke Plant, ABC Coke Plant and Port McDonald, all of which represents hauling into the stream of commerce. He continued hauling both coal and rock until August 2002, and then he hauled only rock until December 2002. From January 2004 to September 2005 he hauled unwashed coal from mines to processing plants to be blended and in September 2005 he began hauling the blended coal to processing plants and continued doing so until October 2007. The Affidavit states he hauled unwashed coal for the entire period of October 2007 to through October 2009. His handwritten note indicates he was hauling from the two different mine pits into the stream of commerce (WGN at Birmingham Port, Big River Corporation and beginning in 02/2009 Alabama Power at Gorgas, Alabama). Mr. Sellers' statement indicates the "stockpile" was "at least one-quarter mile from the mining operations".

The available evidence establishes Mr. Warren's prolonged exposure to coal dust. However, in evaluating his employment dates, the transported material and delivery locations, the evidence establishes limited exposure to coal mine dust. It is the Department's long-held position that the occupational dust exposure at issue under Black Lung Benefits Act is a total exposure arising from coal mining, and not only exposure to coal dust itself. The evidence establishes that most of the coal the claimant hauled was in the stream of commerce. Therefore, although the presence of pneumoconiosis as defined in 20 CFR 718.201 has been established, the provisions of 20 CFR 718.203, which relate to the causal relationship of the disease to coal mine employment is not established in accordance with 20 CFR 718.203.



47

## DISABILITY AND RELATIONSHIP OF DISABILITY TO BLACK LUNG DISEASE:

On January 8, 2010 Mr. Warren underwent a pulmonary function study and arterial blood gas studies. The results of breathing tests (Pulmonary Function Studies) meet the regulatory standards to establish total disability. On April 23, 2010 Dr. P. O'Reilly administered a pulmonary function study which also appears to meet disability standards. For the Pulmonary Function Studies to establish total disability under the regulations, that total disability must be DUE TO PNEUMOCONIOSIS.

The results of the January 8, 2010 resting Arterial Blood Gas Study meet disability standards. The exercise Arterial Blood Gas Study appeared to meet disability standards as set forth in the regulations; however Dr. J. Michos, Pulmonary Consultant, review the testing and deemed the exercise portion of the test invalid. On May 10, 2010, Mr. Warren repeated the exercise arterial blood gas study, again the test was deemed invalid by Dr. J. Michos, Pulmonary Consultant as he was "unable to ascertain if venous sample."

Dr. Barney stated, "Patient is severely short of breath with minimal exertion. Now on oxygen." (Patient is on 3 LPM according to physical examination report.)   The presence of pneumoconiosis has been established and the pulmonary function studies are positive for disability therefore, the claimant is considered to be disabled due to pneumoconiosis. Therefore, the requirements of 20 CFR 718.204(b)(2)(i) are met and, therefore, total disability due to pneumoconiosis has been established.

## FIFTEEN (15) YEAR PRESUMPTION

This claim has been reviewed to determine if the changes in the Black Lung Benefits Act mandated by the Patient Protection and Affordable Care Act of 2010 (PPACA), Public Law 111-148 §1556(a), apply. Section 411(c)(4) of the Act provides presumptions of total disability due to pneumoconiosis or death due to pneumoconiosis under certain circumstances. The presumptions are applicable to claims that were filed before January 1, 1982 or after January 1, 2005, and were pending on or after March 23, 2010.

The presumption is available to miners who worked for a cumulative period of fifteen or more years in underground mining, or comparable surface mining, and the evidence establishes the existence of a totally disabling respiratory or pulmonary impairment. If a survivor establishes that the miner worked for fifteen or more years in coal mine employment and that the miner suffered from a totally disabling chronic respiratory or pulmonary impairment prior to death, it is presumed that the miner's death was due to pneumoconiosis. The determination of the existence of a totally disabling respiratory or pulmonary impairment, for purpose of applying this presumption, shall be made in accordance with section 20 CFR 718.204.

For rebuttal in a miner's claim, the party opposing entitlement must establish either that the miner does not or did not have pneumoconiosis or that the miner's impairment did not arise out of or in connection with coal mine employment. In a survivor's case, the party opposing entitlement must provide evidence sufficient to rebut the presumption of death due to pneumoconiosis.

As discussed in the above analysis of the admissible medical evidence, the evidence establishes that the miner has a disabling respiratory impairment as well as fifteen (15) years of proven coal mine employment. While the evidence is adequate to invoke the presumption, the presumption is rebutted since the miner does not have either clinical or legal pneumoconiosis or that the miner's totally disabling respiratory or pulmonary impairment is wholly unrelated to pneumoconiosis.

## RELATIONSHIP/DEPENDENCY:

The file includes a marriage certificate indicating that the miner married Deborah Blaich on May 30, 1980. This was the claimant's second marriage to Ms. Blaich as they were initially married on April 24, 1970 and divorced in March 1972. Therefore, the requirements of 20 CFR 725.204(a)(1) and 725.205(a) and 725.205 (e) which relate to relationship and dependency are met.



48

On application Mr. Warren referenced his son, James Gary Warren, Jr. (DOB: 03/14/1981) as a dependent. A birth certificate was not submitted and not pursued as he is not under 18 years of age, not a full-time student and not a disabled adult child. Therefore, the requirements of 20 CFR 725.204, 725.205, 725.208 and 725.209 which relate to relationship and dependency are not met.

Based upon the above, the claimant would not be entitled to benefits.

**EMPLOYMENT EVIDENCE:**

Mr. Warren alleges 27 years of coal mine employment from 1982 to October 2009. His Employment History lists three employers, Sellers Trucking Co, Inc. (03/1982-09/1995), Fleetwood Trucking Co., Inc. (06/1997-10/2007) and Gary Warren Trucking (10/2007-10/2009). Based on the available evidence, which includes allegations and the Social Security Earnings Records (BDP & DEQY), at least 1 year but less than 5 years, of covered coal mine employment is established.

**LIABILITY ANALYSIS:**

Mr. Warren completed a Self-Employment Questionnaire indicating that he was a Self-Employed Truck Driver from 08/02/2002 to 10/02/2009, driving for his company, "Gary Warren Trucking". According to Mr. Warren he had no employees and did not carry insurance. The Social Security Earnings Record, which spans from 01/1961 thru 12/2008, documents his Self-Employment Earnings for 1972, 1976-1978, 1980-1984 and 2002-2008. Included in Mr. Warren's detailed employment he noted he hauled rock for B.R. Sellers from 08/2002-12/2002. On November 10, 2010 a statement was received from Seller's Trucking Co., Inc. which documents the claimant's employment from February 26, 1983 to October 6, 1995. He hauled coal from Americore to Pine Hill (Manufacture of paper goods-coal to generate power for kiln), Weyhauser (Manufacture of Lumber-coal used to generate power for kiln) and Warrior Gulf Navigating (WGN) (coal loaded on barge for steam plant.) In 2005 he hauled coke from Hunt Oil (Strip Mine) to Cheney Lime Corporation and Dravo Corporation. In September 2005 to May 2006 hauled blended coal from Twin Pine Coal Co. to Alabama By Products Corporation (ABC), Jim Walters Resources, Inc. (JWR) or WGN. During this period, he transported this crushed, unwashed coal to Green Fuel Preparation Plant at Brookwood, where they washed the coal. From 10/2006 to 10/2007 Mr. Warren reportedly hauled blended, crushed, unwashed coal for Cahaba Resources, from Deerlick Mine to WGN at Birmingham Port and to Big River Corporation (Manufacture of block coal used coal to heat kiln. From 10/2007-10/2009 Mr. Warren transported coal from Deerlick Mine, Carter Johnson Pit and hauled to WGN-Birmingham Port. Mr. Warren hauled to AL Power Company from 02/2009 to 10/2009. Mr. Warren was an uninsured, self-employed coal truck driver, he is not considered as a potentially liable operator.

Working back in time, the next most recent employer for whom Mr. Warren worked for a full calendar year was Fleetwood Trucking Co, Inc. The Social Security Earnings Record reflects earnings from 1985-1986 and 1997-2002. Mr. Warren alleged employment from 06/1997-07/2002 and indicated that he leased to Fleetwood Trucking, Inc. from 02/2003-02/2007. These dates collectively represent approximately nine years of employment. Mr. Warren stated he did not haul coal for the first three years, he hauled "coke product", in 2000-2001 he began to haul coal 50% of the time. According to Mr. Warren he hauled coal from Pacific Coal and from Jim Walter Resources, Inc. to ABC Coke Plant, JWR Coal Plant or Port McDonald or Port Tuscaloosa. If not hauling to these locations he was stockpiling for Jim Walter Resources, Inc. Preparation Plants. Based on the description of transportation provided by Mr. Warren, it appears all of his covered coal mine employment was from 2000-2001 and from 2005-2006. All of which was during Mr. Warren's work with/or for Fleetwood Trucking Co., Inc. According to the claimant, he was directed by Fleetwood Trucking, Inc. as a representative from Jim Walter Resources, Inc. routinely contacted Fleetwood to provide data regarding the needed transportation. Based on these findings Mr. Warren's last coal mine employment was in 2006 and available evidence including the Social Security Earnings Record, documents at least 1 year of coal mine employment. A Notice of Claim was issued to Fleetwood Trucking Co, Inc. on January 12, 2010, a certified receipt in file documents receipt of the Notice on March 9, 2010. Records maintained by the U. S. Department of Labor's Responsible Operator section show that Fleetwood Trucking Co., Inc. is uninsured and trucking companies are not required to secure the payment of benefits, however according to Alabama Secretary of State, Fleetwood Trucking Co., Inc. is still in business. Therefore, Fleetwood Trucking Co., Inc. is named as the potentially liable responsible coal mine operator.

 

49

Fleetwood Trucking Co., Inc. has been named as the designated responsible operator based upon the following:

1. The designated responsible operator was an operator after 06/30/73 and employed the miner as a miner for not less than one year based upon Mr. Warren's allegations and the Social Security Earnings Records (BDP & DEQY).

2. The miner's employment with this operator included at least one working day after 12/31/69 based upon Mr. Warren's allegations and the Social Security Earnings Records (BDP & DEQY).

3. There is a rebuttable presumption that coal mine construction or transportation workers were exposed to coal mine dust during all periods of such employment occurring in or around a coal mine or coal preparation facility. The presumption has not been successfully rebutted.

4. This operator or its insurer is financially capable of assuming liability for the payment of benefits in accordance with 20 CFR 725.494(e).

5. This operator is not the operator that most recently employed the miner, but is the designated responsible operator because Mr. Warren was a Self-Employed Truck Driver.

A Notice of Claim was received by the potentially liable operator/carrier, Fleetwood Trucking Co., Inc., on March 9, 2010, as evidenced by the signed return receipt from the post office. The potentially liable operator/carrier failed to respond timely to the Notice of Claim or Schedule for the Submission of Additional Evidence. On November 12, 2010 a letter was received from Attorney Christopher L. McIlwain along with a "Statement of Lee Sellers". Therefore, in accordance with 20 CFR 725.408(b), no documentary evidence relevant to the grounds set forth in the Operator Assertions - 20 CFR 725.408(a)(2) - may be admitted in any further proceeding.

Although Mr. Warren alleged 27 years of coal mine employment, a detailed review of his coal mine employment evidence has revealed that much of his employment as a coal truck driver involved the delivery of rock and/or coke, which is not, covered coal mine employment. In some cases, he delivered fully prepared coal to the ultimate consumer. A transportation worker must establish that he or she transported coal in or around a coal mine or coal preparation facility AND that the status of the coal with which he or she worked was still in the course of being processed and not yet a finished product in the stream of commerce. Mr. Warren's delivery of washed or prepared coal to locations such as Gorgas Steam Plant, Alabama Power, Birmingham Port, L Power, Big River Corporation do not represent covered coal mine employment as the coal was being delivered to the stream of commerce. As these deliveries do not represent covered coal mine employment no coal mine credit can be given. Mr. Warren's work as a self-employed truck driver who transported coal to independent processing plants does not meet the definition of miner. In applying the three-pronged function, status, situs test, the claimant failed the status test because once the coal was purchase it was injected into the stream of commerce and was no longer coal being processed. Also, transporting processed coal from a tipple to river barges cannot be considered covered coal mine work as it does not satisfy the function requirement.

A transportation worker who transports coal from the extraction site to the preparation plant or tipple is covered under the Black Lung Benefit Act. According to Mr. Warren's Employment History, he delivered some coal to preparation plants.



# MEDICAL EVIDENCE

(The first letter of the letter codes with the test dates represent the submitting party for the evidence: "D" stands for Director (the Department of Labor), "R" for designated responsible operator, the employer, and "C" for claimant. The second letter of each code indicates if the evidence is Evidence of record or New evidence developed for this claim.)

**MINER:** James Gary Warren, Sr.
**CLAIM NO.:** XXX-XX-3646 LM C

## X-ray Evidence

| X-RAY Film Date | Reread Date | Name of Reader | X-RAY Reader Qualifications | Film Quality | X-RAY Interpretation |
|---|---|---|---|---|---|
| 01/08/2010 | 12/24/2009 D-N | A. Ahmed | B-reader; Board-certified | 1 | |
| 01/08/2010 | 04/07/2010 D-N | P. J. Barrett | B-reader; Board-certified | 2 | 2/2-Simple 2/3 |

## Pulmonary Function Study (PFS) Evidence

| Date | Physician | Age/ Height | FEV1 | MVV | FVC | FEV1 FVC | DISABILITY STANDARDS FEV1 | MVV | FVC | Valid? |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/09/2009 D-N | J. Barney | 60/66.0 | 1.56 | —— | 1.76 | 89% | 1.75 | 070 | 2.23 | |
| 04/23/2010 C-E | P. O'Reilly | 61/68.0 | 1.68 | —— | 1.89 | 89% | 1.89 | 076 | 2.41 | Y |

## Arterial Blood-gas (ABG) Evidence

| Date | Physician | Resting/ Exercise? | PCO2 | PO2 | PO2 Disability Standards | Altitude | Valid? |
|---|---|---|---|---|---|---|---|
| 12/09/2009 D-N | J. Barney | Resting | 43.3 | 62.2 | 60.0 | 0-2999 | Y |
| | | Exercise | 41.4 | 33.3 | 60.0 | 0-2999 | |
| 05/10/2010 D-N | J. Barney | Resting | | | Any Value 60.0 | 0-2999 | N |
| | | Exercise | 43.1 | 31.7 | 60.0 | 0-2999 | |

## Physical Examination/ Other Evidence

| Exam Date | Examining Physician/Qualifications | Findings |
|---|---|---|
| 03/26/2010 D-N | J. Barney – Board Certified in Internal Medicine, Subspecialty in Pulmonary Disease | **Physical Exam** **Cardiopulmonary Diagnosis:** 1. Pneumoconiosis – cxr and history 2. Pulmonary fibrosis – by cxr and history **Etiology:** Coal Dust Exposure **Impairment:** "Patient is severely short of breath with minimal exertion. Now on oxygen." (Per PE, Patient is on Oxygen 3 LPM since Sept. 2009) **Extent to which each diagnosis contributes to impairment:** "Pneumoconiosis 100%" **Surgery/Hospitalizations:** None **Smoking History:** Never Smoked Dr. Barney noted Physician Referral for further evaluation. "Lung Transplant Referral" |



51

| 11/20/2009 to 04/23/2010 C-E | **(Continuation)**<br>P. O'Reilly, M.D. –<br>Board Certified in Internal Medicine, Subspecialty Pulmonary Disease and Critical Care | **Medical Records from Dr. P. O'Reilly's Office – 04/23/2010 Office Visit**<br>**Problems: (Same as 11/20/09 list)**<br>**IMPRESSION:**<br>He appears to be stable.  Pulmonary function testing was done in the Black Lung Clinic in December 2009 and revealed an FEV1 of 1.56 (same as last September) and the radiologist there was concerned about a possible mass in his L lung, but his chest CT here a few months before did not mention any concern for this.<br><br>**Plan:**<br>"He is inquiring about pulmonary rehab in Tuscaloosa and we will set this up for him.  I am also going to get pulmonary function testing again today to see where he stands.  He is going to go into the Lung Transplant Clinic this summer.  We talked a bit about that and I said as long as he was significantly stable, I would not recommend a lung transplant at this time.   We need to check PFT's regularly.  It is uncertain what the etiology of his lung fibrosis is.  There is no definitive diagnosis of IPF, and he has always resisted the notion of a lung biopsy, but I feel as long as his pulmonary function is stable, we can continue with conservative management.  I will see him back in 6 months." |
| | Mary Wade, NP-C | **11/20/2009 Office Visit**<br>**Problems:**<br>1. Silicosis and pneumoconiosis (black lung disease)<br>2. Chronic bronchitis<br>3. Hypertension<br>4. Dyslipidemia<br>5. OSA<br>6. Health maintenance: H1N1, influenza, and shingles vaccines given the fall of 2009; Pneumonia vaccine given in the fall of 2008.<br><br>**Impression/Plan:**<br>1. This is a 60 year-old white male with silicosis and  pneumoconiosis from many years of exposure to dust including coal dust with marked decline in spirometry, with FEV1 50% of  predicted, and FVC 41% of predicted, requiring supplemental oxygen at 3 liters per nasal cannula to maintain saturations within 90% while on exertion.  Because he is no longer  employed driving a truck with exposure to fine coal dust, this does provide him the opportunity to remain relatively stable.  We certain support his efforts to obtain black lung disability and anticipate that he should be able to do so because of  the severity of his disease and oxygen dependency......<br>2. Pleuritic chest pain.... |

**Length of Coal Mine Employment**
The claimant has proven **at least 1 year but not more than 5 years** of coal mine employment.

52

# QUINN, WALLS, WEAVER & DAVIES LLP

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
ATTORNEYS AT LAW          WWW.QWWDLAW.COM
2700 HIGHWAY 280 EAST, SUITE 380 BIRMINGHAM, AL 35223
PHONE 205/870-9989          FAX 205/803-4143

December 7, 2010

**RECEIVED**

DEC 0 9 2010

ESA / OWCP / DCMWC
Mt. Sterling, KY

Ms. Kathy L. Ballard
Claims Examiner
U.S. Department of Labor
Division of Coal Mine Workers' Compensation
402 Campbell Way
Mt. Sterling, KY 40353-7847

Re: *James Gary Warren, Sr.*
Claim No. XXX-XX-3646 LM C

Dear Ms. Ballard:

Please be advised that we respectfully disagree with the finding that claimant is not entitled to black lung benefits under the Federal Coal Mine Safety and Health Act of 1977.

We are writing to appeal that finding and ask that this claim be scheduled for a formal hearing conducted by the Office of Administrative Law Judges of the United States Department of Labor. This request is being made within thirty days of the date of your letter.

Yours sincerely,

*Abigail P. van Alstyne*

Abigail P. van Alstyne

cc:     James Gary Warren, Sr.
        Christopher L. McIlwain, Sr.

**DIRECTOR EXHIBIT**

NO. _____20_____ CONSISTING

OF _____1_____ PAGES

COPY 53

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| JAMES GAY WARREN, SR., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )    Case No. 2011-BLA-5343 |
| | ) |
| FLEETWOOD TRUCK COMPANY, INC., | ) |
| | ) |
| Employer/Uninsured, | ) |
| | ) |
| and | ) |
| | ) |
| DIRECTOR, OFFICE OF WORKERS' | ) |
| COMPENSATION PROGRAMS, | ) |
| | ) |
| Party in Interest. | ) |

PAGES:     1 through 73

PLACE:     Birmingham, Alabama

DATE:     July 13, 2011

## BAYLEY REPORTING, INC.
### *OFFICIAL FEDERAL REPORTERS*

| Nationwide | Washington, DC | Florida |
|---|---|---|
| (888) 443-2444 | (202) 234-7787 | (727) 585-0600 |

54

BEFORE THE

UNITED STATES DEPARTMENT OF LABOR

OFFICE OF ADMINISTRATIVE LAW JUDGES


In the Matter of:            )
                             )
JAMES GAY WARREN, SR.,       )
                             )
      Claimant,              )
                             )
v.                           )      Case No. 2011-BLA-5343
                             )
FLEETWOOD TRUCK COMPANY, INC.,)
                             )
      Employer/Uninsured,    )
                             )
and                          )
                             )
DIRECTOR, OFFICE OF WORKERS' )
COMPENSATION PROGRAMS,       )
                             )
      Party in Interest.     )


                             Wednesday
                             July 13, 2011

                             Clarion Hotel-Birmingham
                             521 Airport Highway
                             Birmingham, Alabama


        The above entitled matter came on for hearing,

pursuant to notice, at 8:21 a.m.

            BEFORE:    HONORABLE RALPH ROMANO
                       Administrative Law Judge




                    **Bayley Reporting, Inc.**
                        **(727)585-0600**

55

2

# A P P E A R A N C E S

On Behalf of the SOLICITOR:

BRIAN C. WINFREY, ESQ.
U.S. DEPARTMENT OF LABOR
OFFICE OF THE SOLICITOR
618 Church Street
Suite 230
Nashville, Tennessee 37219
(615)781-5321 Ext. 249

On Behalf of the CLAIMANT:

ABIGAIL van ALSTYNE, ESQ.
QUINN, CONNOR, WEAVER, DAVIES & RUCCO
2700 Hwy. 280
Suite 380, East
Birmingham, Alabama 35223
(205)967-8822

On behalf of the EMPLOYER/CARRIER:

CHRIS McILWAIN, ESQ.
HUBBARD WIGGINS McILWAIN & BRAKEFIELD, PC
P. O. Box 2427
808 Lurleen Wallace Boulevard, North
Tuscaloosa, Alabama 35403
(204)345-6789

3

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| James Warren | 11 | 24 | 40 | 42 | |
| Deborah Warren | 44 | 49 | | | |
| Lee Sellers | 66 | | | | |

E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| DIRECTOR'S 1-24 | | 5 |
| ADMINISTRATIVE LAW JUDGE'S 1 | 5 | |
| CLAIMANT'S 1-3 | 6 | 7 |
| EMPLOYER'S 1 | 6 | 6 |
| JOINT EXHIBIT | | |

**Bayley Reporting, Inc.**
**(727) 585-0600**

*57*

4

```
 1                      P R O C E E D I N G S
 2    July 13, 2011                               8:21 a.m.
 3              JUDGE ROMANO:   This is the matter of James Gary
 4    Warren, Sr.   The Employer is Fleetwood Trucking Company,
 5    Inc.   The case number is 2011-BLA-5343.   This is a hearing
 6    involving a claim for compensation under Title IV of the
 7    Federal Coal Mine Health and Safety Act of 1969, 30, U.S.C.
 8    901, et seq.   The Regulations are found at 20 C.F.R., the
 9    case number, if I hadn't mentioned it, 2011-BLA-5343.
10              An appearance on behalf of the Claimant, please.
11              MS. VAN ALYSTYNE:   My name is Abigail van Alstyne
12    with the firm Quinn, Connor, Weaver, Davies and Rucco.   The
13    address is 2700 Highway 280, Suite 380, East, Birmingham,
14    Alabama 35223.
15              JUDGE ROMANO:   For the Employer.
16              MR. McILWAIN:   I'm Chris McIlwain with the firm of
17    Hubbard, Wiggins, McIlwain and Brakefield, PC.   That's P. O.
18    Box 2427, Tuscaloosa 35403.
19              JUDGE ROMANO:   I've marked for identification --.
20              MR. WINFREY:   Your Honor, for the Director.
21              JUDGE ROMANO:   Oh, okay.
22              MR. WINFREY:   My name is Brian Winfrey on behalf
23    of the Director with the United States Department of Labor,
24    618 Church Street, Nashville, Tennessee, Suite 230, zip code
25    37219.   The telephone number is (615)781-5330, extension
```

5

1    249.

2              JUDGE ROMANO:  Marked for identification - oh, is

3    there another counsel involved?

4              MR. McILWAIN:  That is Lee Sellers of Fleetwood

5    Trucking.

6              JUDGE ROMANO:  He's assisting you.

7              MR. McILWAIN:  He's my client.

8              JUDGE ROMANO:  Okay, gotcha.

9              MR. McILWAIN:  A representative of my client.

10             JUDGE ROMANO:  I've marked for identification ALJ

11   1, the Notice of Hearing I issued April 15, 2011.

12                              (Whereupon, the document referred

13                              to was marked for identification as

14                              ALJ Exhibit No. 1.)

15             Director's 1 through 24, any problems?

16             MS. VAN ALYSTYNE:  No, Your Honor.

17             MR. McILWAIN:  No Your Honor.

18             JUDGE ROMANO:  Hearing no objection Director's 1

19   through 24 are received.

20                              (Whereupon, the documents, having

21                              been previously marked for

22                              identification as Director Exhibits

23                              No. 1 through No. 24, were received

24                              into evidence.)

25             Employer's 1, Notice that there is an RO issue.  I

**Bayley Reporting, Inc.**
**(727) 585-0600**

54

6

```
 1    didn't mark the date of the letter, but EX 1 is the

 2    notification by Fleetwood as to the contest status as an RO,

 3    correct?

 4                              (Whereupon, the document referred

 5                              to, was marked for identification

 6                              as Employer Exhibit No. 1.)

 7         MR. McILWAIN:  Yes, Your Honor.

 8         JUDGE ROMANO:  EX 1 is received.

 9                              (Whereupon, the document referred

10                              to, having been marked for

11                              identification as Employer Exhibit

12                              No. 1, was received into evidence.)

13         Claimants, I have 1 and 2, which was sent to me

14    under cover letter dated June 23.

15                              (Whereupon, the documents referred

16                              to, were marked for identification

17                              as Claimant Exhibits No. 1 and No.

18                              2.)

19         Claimants 3 is a Motion to leave the record open.

20    That was dated June 24th.

21                              (Whereupon, the document referred

22                              to, was marked for identification

23                              as Claimant Exhibit No. 3.)

24         Any problems with the admission of Claimant's 1

25    through 3?
```

1          MR. McILWAIN:  No, Your Honor.

2          JUDGE ROMANO:  Hearing no objection Claimant's 1

3    through 3 received.

4                              (Whereupon, the documents referred

5                              to, having been previously

6                              identified as Claimant Exhibits No.

7                              1 through No. 3, were received into

8                              evidence.)

9          We have an RO issue here then.  Are you going to

10   present any testimony on this, sir?

11         MR. McILWAIN:  Well, maybe some brief testimony.

12   Really, the evidence is already in the record, in the

13   Director's record, if I could show it to Your Honor and

14   point it out to you?

15         JUDGE ROMANO:  Well, in due time.  I want to just

16   get a feel on this.  Do we have a stipulation as to length

17   of coal mine employment by either of you gentlemen?

18   Irrespective of the RO issue, let's look at the merits of

19   the case.

20         MR. McILWAIN:  As far as the length – he was not a

21   miner at any point in time.  All he was was a truck driver.

22         JUDGE ROMANO:  Okay, so you're contesting the

23   status of miner.

24         Mr. Winfrey?

25         MR. WINFREY:  The Secretary was – notified what we

1    submitted – coal mine employment.

2              JUDGE ROMANO:  The case was denied, correct?

3              MR. WINFREY:  Yes.

4              JUDGE ROMANO:  Okay.  So, we're not going to

5    really get any kind of stipulation is the way it looks.

6              We have the RO issue and I take apart from the RO

7    issue what other issues are contested?

8              MR. McILWAIN:  Well, just as the Director found

9    there's an issue of causation and exposure.  The employee

10   admitted that he was not exposed to coal dust for any

11   significant period and was total exposure arising from coal

12   mining.  Which he was not just simply hauling on site, was

13   doing his hauling over the road.  Again, also no causal

14   relationship.

15             JUDGE ROMANO:  Yes, but the disease, you contest

16   the existence of the disease?

17             MR. McILWAIN:  Do not contest the existence of the

18   disease.

19             JUDGE ROMANO:  So, that's stipulated – did the

20   Government find the presence of the disease?

21             MR. McILWAIN:  It's my understanding that the

22   Director found that it was not caused by this employment.

23             JUDGE ROMANO:  I'm just talking about the

24   presence.

25             MR. WINFREY:  We found the causal relationship,

1    but not the presence of --.

2                COURT REPORTER:  I can't pick him up.

3                MS. VAN ALYSTYNE:  That's not true.

4                JUDGE ROMANO:  Wait, wait, wait, we have a problem

5    with the recording.  Perhaps you can move that to the

6    center, sir, so we can hear both.  Thank you.

7                JUDGE ROMANO:  Mr. Winfrey, you were saying?

8                MR. WINFREY:  Give me just one second, Your Honor.

9                        (OFF THE RECORD)

10                JUDGE ROMANO:  Okay, we're back on the record.

11                MR. WINFREY:  We found that the evidence does not

12    show that the disease was caused by his coal mine work.  I

13    think that's - I noticed an objection from his counsel, but

14    I don't really see the issue that you had.

15                JUDGE ROMANO:  No, I'm asking a question.  Did the

16    Government find the presence of pneumoconiosis?

17                MR. WINFREY:  Yes.

18                JUDGE ROMANO:  Okay, but not causation?

19                MR. WINFREY:  But not causation.

20                JUDGE ROMANO:  Okay.

21                MR. WINFREY:  Which is what I just said and what

22    she objected to and I don't really understand.

23                MS. VAN ALYSTYNE:  I objected to his original

24    statement that they didn't find the disease, but they did.

25                JUDGE ROMANO:  All right, let's go ahead then.  I

```
 1    take it you want Mr. Warren sworn?

 2              MS. VAN ALYSTYNE:  Yes, Your Honor, but let me

 3    just --.

 4              JUDGE ROMANO:  Thank you, ma'am.

 5              MS. VAN ALYSTYNE:  You're welcome.

 6              May I raise one other point first, Your Honor?

 7              JUDGE ROMANO:  Surely.

 8              MS. VAN ALYSTYNE:  In the Claimant's evidence

 9    summary that I just gave you I noticed this morning that

10    Exhibit listed in the blood gas study section Director's

11    Exhibit 12 indicates that the blood gas stud did show

12    disability.  Then I actually discovered that Dr. Mikos, who

13    reviewed the stud for validity, says that he was unable to

14    ascertain whether the blood drawn was from a veinous sample.

15    So, that's an error on my evidence summary form.

16              JUDGE ROMANO:  Right, full disclosure here, you're

17    saying Dr. O'Reilly did find numbers which qualify, but

18    there was another opinion also.  Okay, very good, thank you.

19              MS. VAN ALYSTYNE:  That's correct.

20              JUDGE ROMANO: All right, good.

21    Whereupon,

22                    JAMES GARY WARREN, SR.

23    having been first duly sworn, was examined and testified as

24    follows.

25                    DIRECT EXAMINATION
```

**Bayley Reporting, Inc.**
**(727) 585-0600**

```
1    BY MS. VAN ALSTYNE:

2              Q    Okay, Mr. Warren, can you tell us your full

3    name, age, and education, please?

4              A    James Gary Warren, Sr., I am sixty-two (62)

5    years old and a graduate of Tuscaloosa High School.

6              Q    Do you have any dependents other than your

7    wife?

8              A    No, ma'am.

9              Q    Let's start with a discussion about your

10   breathing difficulties.  Who is your regular treating

11   pulmonologist?

12             A    Dr. Phillip O'Reilly.

13             Q    How long have you been seeing him?

14             A    Since the last four years, I believe that's

15   right.

16             Q    Okay.  What has he told you about your

17   condition?

18             A    He tells me that I have Black Lung, that -

19   you know, right now it's in the controlled stage, but it

20   could move any time.  I'm down to forty (40) percent of lung

21   capacity.

22             Q    Okay.

23             A    Very hard to breathe.

24             Q    Has he discussed with you the possibility of

25   your requiring a lung transplant?
```

**Bayley Reporting, Inc.**
**(727) 585-0600**

```
 1              A     Yes, ma'am, he has.  He says right now that
 2      the place that I'm at with it right now that it's stable and
 3      we'll just watch it and if he feels it's time to do that,
 4      then we'll do that when the time comes.
 5              Q     Is he the person who prescribed oxygen for
 6      you?
 7              A     Yes, ma'am, he was.
 8              Q     Are you on continuous oxygen?
 9              A     Yes, ma'am, I'm supposed to be three liters
10      for twenty-four/seven (24/7) - sometimes.  It's tough.
11              Q     Have you ever smoked?
12              A     No, ma'am, non-smoking.
13              Q     Did Dr. Barney, who examined you for the
14      Department of Labor, you know, when you went for that exam,
15      what did he tell you?  Did he tell you anything about your
16      condition, what you had?
17              A     Yes, ma'am, he says there's no doubt I have
18      the Black Lung.  At that time he talked to me about a lung
19      transplant.  Said I would have a better life if I considered
20      at my age and there's nothing else wrong with me.  I'm in
21      good shape except for my lungs are just bad.
22              Q     Have you ever worked at any job other than as
23      a truck driver where you were exposed to some kind dust or
24      other pulmonary infiltrates, things that would get deposited
25      in your lungs?
```

```
 1              A    No, ma'am.

 2              Q    You started off your truck driver career

 3    working for Sellers Trucking, is that right?

 4              A    Yes, ma'am.

 5              Q    When did you start and finish with Sellers?

 6              A    I worked with Mr. Sellers from 1982 to 1985,

 7    I believe that's right.

 8              MR. McILWAIN:  Just for the record, it's a

 9    different Sellers than Mr. Sellers here.

10              THE WITNESS:  It was Harold Sellers, I'm sorry.

11    Later on they – they were two sons, there was B. R. and

12    there was Lee and B. R. – he took over Sellers Trucking Lee,

13    he started Fleetwood Trucking.

14              MR. McILWAIN:  This is Lee Sellers.

15              MS. VAN ALYSTYNE:  All right.

16    BY MS. VAN ALYSTYNE:

17              Q    Between 1982 and 1985 did you haul coal from

18    Jim Walter Resources Mines to Vargas?

19              A    Yes, ma'am, from 1982 to 1985 it was about

20    all we did, ninety (90) percent of the time.

21              Q    Was the coal you hauled still in the

22    preparation stage during those years?

23              A    No, ma'am, that was directly to the steam

24    plant and they used it to fire their furnaces at that time.

25              Q    All right.  In July 1997 you started working
```

```
 1    for Fleetwood Trucking, is that right?

 2              A    Yes, ma'am.

 3              Q    That's the company which has been named the

 4    responsible operator in this case?

 5              A    Yes, ma'am.

 6              Q    How long did you work for Fleetwood?

 7              A    I worked from July of '97 till - I believe it

 8    was August of '02, I believe that's right.

 9              Q    Did you haul coal for Fleetwood from - well,

10    you tell me, which years did you haul coal?

11              A    Basically we hauled coal the last two years I

12    was employed by Mr. Lee Sellers.  We hauled for Pacificor

13    and for some strip mines around that area.  Basically it was

14    just Pacificor mainly.

15              Q    That was from 2000 to 2002?

16              A    Yes, ma'am, roughly fifteen (15) months.

17              Q    Fifteen (15) months?

18              A    Yes, ma'am.

19              Q    What percentage of the coal you hauled during

20    those years was still in need of further processing before

21    it could be sent to the final consumer?

22              A    Well, what they did is they took - what it

23    was was the government thing.  I don't know whether you all

24    are familiar with that, but that's when they would take old

25    washer finds supposedly and take coal and they would mix it
```

1   to get a blend.  They would take oil, or some kind of

2   chemical, and they mixed with this at a mixing plant.  Then

3   it was loaded – you know, it was all mixed to a certain

4   percentage so that the coal would meet a blended status so

5   it could be used.  They made mostly coke out of it.

6           Q    That would have been after it was mixed --.

7           A    After it was processed, yes, ma'am.

8           Q    -- the oil?  All right.

9           So, you were hauling blended coal?

10          A    Yes, ma'am.

11          Q    So, it was still in need of further

12   processing?

13          A    Yes, ma'am.

14          Q    All right.  Now, in March of 2005, I think

15   this is correct, were you working as a self-employed driver

16   hauling blended coal?

17          A    Yes, ma'am, I was.  Yes, ma'am.

18          Q    That was hauling blended coal also?

19          A    Yes, ma'am.

20          Q    How long did that last?

21          A    Actually, it was from about '04 to '07 when I

22   left Mr. Sellers.

23          Q    You were also hauling for Cahabo Resources,

24   is that right?

25          A    Yes, ma'am.

```
 1              Q      During the time from October '06 through
 2      October '07 when you were hauling for Cahabo were you
 3      hauling unwashed blended coal?
 4              A      Yes, ma'am, it was unwashed, it was strip
 5      mine coal.
 6              Q      Then from October of 2007 through October of
 7      2009 were you also hauling coal?
 8              A      Yes, I was.
 9              Q      Now, was any of that coal unwashed?
10              A      It was all unwashed.
11              Q      It was all unwashed?
12              A      All unwashed, Yes, ma'am.
13              Q      All right.
14              A      Also, hauled out of Twin Pines and all that
15      coal was unwashed and that was from about 2004 to 2005, I
16      believe that's the right dates, and that was about - from
17      about October of that year till about May of the next year,
18      which would have been about six or seven months, I believe
19      that's be correct, that we hauled blended coal.  It was
20      strictly out of a strip pit that was not washed.  It went to
21      w. G. M.
22              Q      Okay.  Let me ask you some about the dust
23      conditions.  You know the Proposed Decision and Order
24      suggested that you were hardly ever exposed to dust.  Mr.
25      Sellers at Fleetwood says that you had practically no dust
```

70

17

1   exposure either.  Could you tell me – tell me about the dust
2   – tell me about how many loads did you carry on average back
3   and forth each day?

4          A     Generally it's – it's according to how far
5   you were going, but on a general day it would be four to
6   five loads on an average day.  Pacificor, we had to tarp
7   everything that came out of there.  Every load that you
8   hauled.  When I first started there I had to manually get up
9   in the truck, step over in the coal.  It would come up over
10  your boots, or whatever, tennis shoes, whatever you had on.
11  You had to drag the tarp and then get off the truck and tarp
12  it down.  You had to repeat the process when you got to
13  where you were going with it.  I don't see how you could
14  keep from being dusty.  I mean, it was – that was a terrible
15  place as far as the dust.

16         Q     Okay.  While we're talking about tarping,
17  what was the reason you had to tarp the truck?

18         A     It was mandatory.  You couldn't leave the
19  grounds because, you know, the coal would blow on the roads.
20  Of course, you'd get a ticket for it, so, you'd tried not
21  to, you know, break the law or anything at that time, you
22  know, doing it.

23         Q     Were there mandatory ordinances in
24  different --?

25         A     In some places there are, yes, ma'am.

71

18

```
 1          Q      That was to keep the coal dust from blowing?

 2          A      Yes, ma'am, as much as possible.

 3          Q      As much as possible.

 4          A      But it still blows.

 5          Q      Right.

 6          A      Dust is dust I don't care what you do.

 7          Q      Right.  Well, when you were taking your loads

 8   back and forth — you know, picking up and dropping off coal

 9   how many days a week did you typically work?

10          A      Usually five and a half.

11          Q      Now, besides the tarping that you had to do

12   of your truck were there any other occasions or functions

13   that you performed where you would be exposed to coal dust?

14          A      Yes, ma'am, usually when you get back to the

15   area if there were trucks ahead of you you would get out and

16   you would converse with the other truckers.  You know, you'd

17   talk about what was going on, how the day was going, were

18   they having any trouble with the trucks.  You also did a

19   vision inspection of your equipment.  You walked around, you

20   looked at it, you made sure you didn't have any flat tires,

21   or anything broken.  That was just a standard procedure that

22   was required of you, because you didn't want to break down

23   in the road, if you could help it, somewhere.

24          Q      So, you would spend some time out of your

25   truck waiting to be loaded?
```

1          A     Yes, ma'am.

2          Q     Now, when the coal company was actually

3    pouring the coal into your truck you were inside the cab?

4          A     Yes, ma'am, it was required.  You couldn't

5    load unless you were in the cab of your truck.  They had to

6    be able to visually see you in your cab.

7          Q     They had to see you?

8          A     Yes, ma'am.

9          Q     What was the reason for that requirement?

10         A     Safety, of course, you know, they didn't want

11   you in your truck dumping coal in the bed or something.  For

12   some reason you were up in your bed.

13         Q     So, you were required to sit in the cab--.

14         A     Sit in the cab, Yes, ma'am.

15         Q     -- while they were actually pouring it in?

16         A     While it was actually loading, you had to,

17   Yes, ma'am.

18         MS. VAN ALYSTYNE:  Let me just try to finish one –

19   my sentence, because he's trying to pick it up on the

20   recorder.

21         THE WITNESS:  Okay, I'm sorry.

22         MS. VAN ALYSTYNE:  Okay, no problem.

23         Q     Now, so after you picked up your load you

24   were given some kind of a ticket, is that right?

25         A     Yes, ma'am.  Generally the loader man would

1    write you a dumping slip or a processing slip that you'd

2    give to the scale personnel where you were going to dump.

3    That was showing that you had their product on there.  It

4    may not have a weight on it, but it would have a product on

5    it, you know.  Later on they got scales on the loaders and

6    they could tell you about how much you weighed from that.

7         Q    Were you ever out of your truck in terms of

8    getting the ticket or signing a ticket?

9         A    Oh, Yes, ma'am, you'd have to get out of your

10   truck and walk to the loader and, you know, you would be on

11   the stockpile.  Of course, the wind blows – if anyone has

12   ever been on a stockpile the wind, it's constant out there

13   because the land is barren.  There's no trees, or anything,

14   to stop the wind and it's a constant wind, you know, and

15   it's picking up the coal dust whether it's washed or

16   unwashed.  It doesn't matter.

17        Q    What about driving?  Once you got your load

18   and started leaving the mine you had to drive on a haul road

19   out of the mine area, right?

20        A    Yes, ma'am.  If you were following someone,

21   you know, of course they're going to kick up dust, also, but

22   the coal coming off of the truck even on the edges and

23   stuff.  Like I said, you can tarp it, but you're not going

24   to stip the dust from blowing.  If you roll your windows

25   down, or if your air conditioner happens to not be working

1    that day, then, of course, it's going to blow on you, you

2    know, it's going to come in your cab.

3         Q    Now, did you find any --?

4         MS. VAN ALYSTYNE:  Let me restart that question.

5         Q    When your air conditioning was working and

6    you had the windows rolled up did your cab remain clean

7    inside?

8         A    Oh, no, ma'am.  The dust is going to get in

9    your truck.  It doesn't matter.  You can wipe it off four or

10   five times a day and you can still write your name on the

11   dash, you know, from the coal dust.  When you get in and out

12   you're going to tromp the coal back in your truck,

13   especially if it's wet outside.  When it dries, of course,

14   it's going to blow up or, you know, be kicked around.

15        Q    Did you find at the end of each day that you

16   were hauling that your clothes were dirty?

17        A    Oh, yes, ma'am.  When you would take a bath

18   in the bathtub or shower you would always have - you could

19   see the coal dust.  When they washed your clothes - my wife

20   complained constantly about the coal dust.  She even

21   required that I take them off when I'd get home before I

22   could come in, you know.  So, shoes and clothes come off

23   before you go in the house.

24        Q    That was even though you were inside a cab

25   most of the day?

1          A    Oh, yes, ma'am, that's correct.

2          Q    Now, on the haul roads I guess – well, let me

3     ask you.

4               Were there a series of trucks?  I mean, you were

5     just kind of often following, or being the lead one,

6     depending?

7          A    Yes, ma'am, yes, ma'am.  Usually when you

8     would start a day they would usually be a number of – over

9     ten (10) to twelve (12) trucks would start a day usually in

10    one area.  Maybe more, maybe a few less, but you were

11    constantly conversing with your other drivers and – you were

12    just friends, you know, and you all worked together to get

13    the job done.

14         Q    I guess what I'm focusing on here is as you

15    were driving behind somebody was the dust blowing at your

16    truck?

17         A    Oh, yes, ma'am, of course.

18         Q    Your dust was blowing at the next guy's

19    truck?

20         A    This is true, yes, ma'am.

21         Q    Has Dr. O'Reilly or your pulmonary doctor, h

22    as he told you that your pneumoconiosis and fibrosis come

23    from your exposure to coal dust?

24         A    Yes, ma'am, occupational.

25         Q    He said it was occupational and did he ever

```
1    tell you that you should stop driving a truck hauling coal

2    because of your condition was being affected by it?

3         A    Yes, ma'am, he told when I first went to him

4    that he would monitor me and he would let me know.  But he

5    told - you know, about two years before I quit he told me,

6    you know, Gary, he said, you really need to do something.

7              I said, well, doc, I really need the work and I

8    like to work.  I enjoy my job, enjoy what I do.

9              He finally told me, said, you're just going to

10   have to stop.  Said, your lungs are just getting worse.

11   Then he did a test on the function of my lungs.  He seen

12   that my blood oxygen level was so low he couldn't believe I

13   wasn't even on oxygen at the time.  I hadn't been

14   complaining that I couldn't breathe.

15             I told him I just learned to live with it, you

16   know.

17        Q    So, he did tell you that you needed to stop

18   driving the truck?

19        A    Yes, ma'am.

20        Q    Is that why you stopped?

21        A    Yes, ma'am.

22        Q    Has any doctor told you that your lungs might

23   have been particularly susceptible to irritants such as coal

24   dust, you know, that you had lungs that were just not as

25   strong as average so that they would pick up the disease
```

```
 1    faster?

 2              A    Not that I know of.  I'm in good health other

 3    than my lungs.  I don't know why they went bad, you know.

 4              Q    Is there any explanation, can you think of

 5    any explanation whatsoever for how you managed to get

 6    pneumoconiosis at the level you have it other than your

 7    exposure to coal dust driving the trucks?

 8              A    No, ma'am, I can't think of anything.  I

 9    never smoked or anything.  I never done anything, never

10    drank or anything.  I've never done anything.

11              MS. VAN ALYSTYNE:  Nothing further.

12              JUDGE ROMANO:  Cross.

13              MR. McILWAIN:  Yes, Your Honor.

14                        CROSS EXAMINATION

15    BY MR. MCILWAIN:

16              Q    Mr. Warren, you talked about a period of time

17    from 2007 to 2009 that you hauled coal.  I think you said it

18    was all unwashed coal.

19              A    Yes, that's correct.

20              Q    You did that work for Cahabo Resources,

21    correct?

22              A    Yes.

23              Q    If you could tell the Judge who Cahabo

24    Resources is and what it does.

25              A    It's a strip mine coal operation and it
```

25

1    strips coal and sells it on the market.

2              Q    It has a strip mining operation and it also

3    has – it utilizes truck drivers like yourself to haul the

4    coal away from the strip mine, correct?

5              A    Yes, that's correct.

6              Q    It's during that period that you were working

7    the five and a half days per week, correct?

8              A    Yes, sir, that's true.

9              Q    The four to five loads per day, correct?

10             A    Yes, sir.

11             Q    That you were getting out to tarp your load,

12   correct?

13             A    We didn't tarp – we weren't required to tarp

14   those loads that I hauled for those people.

15             Q    I thought you said in response to your

16   attorney's questions that there were ordinances and laws

17   that required you to tarp.

18             A    If I went in that area, I was required to.

19   There were times, but basically we didn't go in that area.

20             Q    You would also get out there at the Cahabo

21   Resources operation to talk with the drivers there, correct?

22             A    Yes.

23             Q    You said you made visual inspections of your

24   equipment?

25             A    Yes.

*79*

26

1          Q      You owned your own truck didn't you?

2          A      Yes.

3          Q      So, you would actually make visual

4    inspections of your equipment before you left your base of

5    operations, which I assume was your home, correct?

6          A      That was a continuous process all day.

7          Q      Yes, but you would make that inspection

8    before you left.  It's required by DOT regulations isn't it?

9          A      Yes, but still you continue to monitor your

10   equipment all day.

11         Q      All right.  Also, while working with Cahabo

12   Resources you talked about you would have to get out for

13   paperwork and that sort of thing, correct?

14         A      Yes.

15         Q      Cahabo Resources is owned by some people

16   named Crawford?

17         A      Yes, that's cored.

18         Q      Do you know the Crawford's names?

19         A      I believe it's Gene Ed Crawford, I believe

20   that's correct.

21         Q      Have you talked to Mr. Crawford about your

22   symptoms and what the doctors are saying about you having

23   Black Lung Disease?

24         A      No, sir, I didn't make that determination as

25   to who would be responsible, but I told Mr. Crawford I's

1  going to have to quit on account of I had developed Black

2  Lung.  I did tell him that.

3          Q    It was on his watch that you were diagnosed

4  with this, correct?

5          A    Yes, sir, that's true.

6          Q    Not on Fleetwood Trucking's watch, correct?

7          A    Yes, sir, that's true.  Well, this has been

8  going on for about eight years as far as monitoring my

9  problem with this disease.

10         Q    Well, the only - you filed a document, or

11  submitted a document, to the Department of Labor that - it's

12  in the record.  It's marked as received by the OWCP October

13  29, 2009.  In answer to question 7 on the form Miner's Claim

14  for Benefits under the Federal Coal Mine Health and Safety

15  Act the question 7 is: Have you ever been told that you have

16  pneumoconiosis, or Black Lung?

17              You answered, Yes.  Then you said - well, actually

18  you answered possible.  Then the next question is:  If yes,

19  when?

20              You said September 25, 2009 by Dr. Phillip

21  O'Reilly.

22              Is that correct?

23              MR. McILWAIN:  I see you're looking at a copy of

24  this, but I'll show you my copy of it.

25         A    That's was his final - that's when I quit

1    though.

2            Q    I understand, but you were just describing

3    the situation to the Department of Labor as being just a

4    possible diagnosis for the first time September 25, 2009,

5    correct?  Then it was a month later that you were told that

6    you needed to retire, correct?

7            A    Yes.

8            Q    The Cahabo Resources still in business is it

9    not?

10           A    Yes.

11           Q    Mining coal, were doing apparently well,

12   correct?

13           A    Do what, sir, I didn't understand?

14           Q    They're mining coal and doing well?

15           A    I don't know about that, sir.

16           Q    Okay.  You also sent some materials to the

17   Director that you faxed January 25, 2010, some handwritten

18   notes where you describe on page 5 of the handwritten notes

19   that you leased to Crawford Hauling, correct?

20           A    Yes.

21           Q    Now, Crawford Hauling is the same thing as

22   this Cahabo Resources, correct?

23           A    Yes, sir, it is.

24           Q    That you worked with them from October 2007

25   to October 2009, correct?

1          A    Yes, sir.

2          Q    It was September of 2009 that you were given

3    a possible diagnosis of Black Lung disease, correct?

4          A    Yes, sir.

5          Q    That was the first time, correct?

6          A    Well, they'd been suspecting it, you know,

7    they was just – they had never made the final decision.

8          Q    Well, do you have any records to establish

9    that?

10         A    About eight years.

11         Q    Well, I don't see any of those in any of the

12   records that have been produced to the Director as far as

13   any prior diagnosis.  Again, you answered that question

14   there for September of 2009, correct?

15              Correct?

16         A    Yes.

17         Q    So, you were exposed to coal dust while with

18   this Cahabo Resources/Crawford Hauling that's still in

19   business, correct?

20         A    Yes, sir.

21         Q    You also filled out a questionnaire relating

22   to your employment.  One question I have is why you struck

23   out several references to Gene Ed Crawford, Crawford

24   Enterprises, which is also a part of this Cahabo Resources,

25   correct?

```
 1              A    Yes, sir.

 2              Q    I mean, they've got just a conglomerate of

 3    business names, but it's really just all one operation.

 4    They strip mine it.  They haul it.  They sell it, correct?

 5              A    Yes, sir.

 6              Q    Why you struck out - you wrote their names

 7    in, but you struck out those names.  Why did you do that?

 8              A    I realized that I had made a mistake and went

 9    back and corrected it.

10              Q    It wasn't a mistake though was it?

11              A    Yes, sir, I thought it was.

12              Q    Well, I mean, you were working for the

13    Crawfords the last two years.

14              MS. VAN ALYSTYNE:  Would you mind telling me what

15    Director's exhibit it is so I can find it quickly?

16              MR. McILWAIN:  I apologize.

17              MS. VAN ALYSTYNE:  I mean, what's the Director's

18    exhibit?

19              MR. McILWAIN:  I don't know.  This is the

20    questionnaire that was referred to throughout the Director's

21    Decision denying.

22              MS. VAN ALYSTYNE:  Here it is.

23              MR. McILWAIN:  Got it.

24              JUDGE ROMANO:  Why don't we give it a number?

25              MS. VAN ALYSTYNE:  It is Director's Exhibit 15,
```

1   Your Honor.

2           JUDGE ROMANO:   Thank you.

3   BY MR. McILWAIN:

4           Q    You refer to Number 7, in answer 7 is says,

5   please give the name and address of your immediate

6   supervisor.

7           A    Where does this say --.

8           MR. McILWAIN:  I understand, but I'm --.

9           THE WITNESS:  I'm talking about here.  I've got to

10  refer to this from this.

11          Q    Well, I hear you, but I'm just asking about

12  the fact that in answer to the question about immediate

13  supervisor you wrote in Gene Ed Crawford.

14          A    I realized - I thought I had made a mistake

15  so, you know, when I was filling this out.  So, what this

16  says and I can tell you what this says.  You see what I'm

17  saying?

18          Q    I mean, I hear you, but you did write in Mr.

19  Crawford.

20          A    But I crossed it out.

21          Q    Yes, sir.  Over --.

22          THE WITNESS:  Let's go back to the question if

23  we're going go - you know, what was the question.

24          MR. McILWAIN:  Yes, I'm going to ask you a

25  question, sir.

1          JUDGE ROMANO:  Mr. Warren, let me suggest

2    something to you.  After this gentleman is through

3    questioning you?

4          THE WITNESS:  Yes, sir.

5          JUDGE ROMANO:  I'm sure this young lady is going

6    to ask you questions and give you the opportunity to say

7    whatever you'd like to say.

8          THE WITNESS:  Right.  Okay.

9          JUDGE ROMANO:  Okay.

10   BY MR. MCILWAIN:

11         Q    Then the question, who actually owned the

12   coal being hauled – this is on what's called page 2 up at

13   the top of the lefthand corner there – who actually owned

14   the hauled coal?  You said Cahabo Resources and you also

15   wrote down Crawford Enterprises.  Now, you struck out

16   Crawford Enterprises, why did you do that?

17         A    Well, I figured Crawford Resources would

18   cover that.  Like you said, they're one and the same, okay?

19         Q    Okay.  Then on page 3 of that form at the top

20   left --.

21         A    Same reason.

22         Q    You've got who owned or operated that

23   facility and you wrote Crawford Enterprises and then wrote

24   Cahabo Resources.

25         A    Right.  Like you said, they go under

1    different names, so – I realized that was wrong, so --.

2         MR. McILWAIN:  I understand.

3         Q    Is there any reason why you didn't fill this

4    out and put all the information – just go ahead and relating

5    to your last employer, which was the Crawford conglomerate?

6    I mean, that's who it was, correct?

7         A    Yes, the last employer I had, yes, sir.

8         Q    Was Crawford Enterprises, this Cahabo

9    Resources, and these entities that we've talked about, was

10   your last employer, correct?

11        A    Yes, sir.

12        Q    You worked for them for two years?

13        A    Yes, sir, I did.

14        MR. McILWAIN:  I wanted to ask you a few bits of

15   information that you've got in here that I was curious about

16   and I think the Director was before.  You filled out some of

17   this relating to Fleetwood Trucking Company and you said

18   that – let's see, the truck you drove was air conditioned

19        Q    And you told us that it was air conditioned,

20   correct?

21        A    Yes.

22        MR. McILWAIN:  Then you said – answer to the

23   question were you required to leave the cab during loading

24   you said, Yes, to pick up shipping invoice.  First you wrote

25   no, but then you struck through that and put, yes, to pick

1    up shipping invoices.

2            Q    That would be very brief wouldn't it?

3            A    Yes.

4            Q    In a lot of operations you can just call on

5    your CB radio from your truck and they will just bring it to

6    you in your cab, correct?

7            A    No, sir, I never had one?

8            Q    Never had that?

9            MR. McILWAIN:  Well, then the next question, and

10   this was focused on by the Director many times during the

11   decision, or their opinion.

12           Q    It asks, were you regularly exposed to

13   significant amounts of coal dust during loading?  Your

14   answer was, No.  Correct?

15           A    Well --.

16           Q    Was that your answer?

17           A    Apparently.

18           Q    Yes, sir, I mean, there's no question about

19   that, correct?  I mean, it says in - correct?

20           A    Yes, sir.

21           Q    You've already told us you went to high

22   school, you graduated from high school.  You can read and

23   write and understand the English language.  I'm not trying

24   to embarrass you at all, but you can read and write,

25   correct?

1          A     Somewhat.

2          Q     You were the one that filled out all of the

3    answers to these questions in this questionnaire, correct?

4          A     Yes, sir.

5          Q     No one else did it for you?

6          A     No, sir.

7          Q     You didn't have a lawyer preparing an

8    affidavit for you or anything like that, you just filled

9    them out based on the information that you knew, correct?

10         A     Yes.

11         Q     You knew that at the very top of the form it

12   says, Please complete as accurately as possible the

13   following questions concerning your employment.  That's what

14   it says, correct?

15         A     That's what it says.

16         Q     So, when you were answering these you were

17   following the instructions, correct?

18         A     I could have lost – well, yes.

19         Q     You knew whether you had been regularly

20   exposed to significant amounts of coal dust, correct?

21         A     Yes.

22         Q     You said no?

23         A     Yes.

24         Q     It says on this were you required to leave

25   the cab during unloading and you said, just to open the

89

36

1      tailgate, is that correct?

2                A      Now, do what now?

3                Q      The question is where you required to leave

4      the cab during unloading and you answered just to open the

5      tailgate.

6                A      Yes, sir.

7                Q      So, you all would open the tailgate during

8      unloading?

9                A      Yes, sir.

10               Q      Okay.

11               A      You've got to or it won't come out.

12               Q      This is after you've already driven over the

13     road several miles to wherever you're going to be dumping,

14     correct?

15               A      That's right.

16               Q      Then the next question is, were you regularly

17     exposed to significant amounts of coal dust during

18     unloading?

19               The prior question was loading, this is unloading,

20     and what was your answer then?

21               A      Says no.

22               Q      Again, this is before you had any lawyers

23     trying to help you with this case, correct?

24               A      Of course, yes.

25               Q      Now, just so the record is clear as far as

37

1    the two years from – you said from '97 to 2002 that you were

2    working with Fleetwood Trucking.  At no time did you work in

3    an underground mine, correct?

4           A    I hauled from underground mine.

5           Q    But as far as working in an underground mine

6    you did not work inside the mine, correct?

7           A    I was a truck driver.

8           Q    Yes, sir, so you didn't work inside the mine?

9           A    No, I didn't work inside the mine.

10          Q    You weren't a coal miner, correct?

11          MS. VAN ALYSTYNE:  Objection, that's a legal

12   issue.

13          Q    You didn't actually load the coal, correct?

14          A    No, sir.

15          Q    Most of your time during each day was spent

16   on the road, correct?

17          A    No, sir, not necessarily.

18          Q    The loading process would take at most thirty

19   (30) minutes, correct?

20          A    There were days we hauled on the haul road,

21   sir.

22          Q    Okay.  Well, the haul roads, or somewhere

23   away from the stockpile, correct?

24          A    You would haul from the stockpile to an

25   unloading place such as a barge unloading place, or from a

**Bayley Reporting, Inc.**
**(727) 585-0600**

1   stockpile to a stockpile.

2       Q   Okay, but it was on its way to market in that

3   sense?

4       A   No, it hadn't been finished to go to market.

5       Q   But it was on its way to market though.

6       A   When it was re-blended, sir.

7       Q   Yes. Most of your time was spend on a road

8   moving, correct?

9       A   Yes.

10      Q   Driving, correct?

11      A   Yes.

12      Q   Fleetwood did not operate a coal mine did it?

13      A   No.

14      Q   Sir?

15      A   No.

16      MR. McILWAIN:  Okay, I'm sorry.

17      Q   I think we touched on this earlier, but the

18  Sellers Trucking that you worked for you worked for them for

19  thirteen (13) years, correct?

20      A   Yes, sir, I believe that's correct.

21      Q   That's a different company than Fleetwood

22  Trucking, Incorporated, correct?

23      A   Well, it was called two different things, it

24  was a family operation.  I'm not sure how they had it wrote

25  down.

1      Q    It was at a different location though,
2  correct, Fleetwood was?
3           A    At one time, but it isn't now.
4      Q    The operation now is significantly smaller.
5           A    We started out in the same place it came back
6  to.
7      Q    I understand, but it at one time when it was
8  doing financially well, had its own separate office and
9  everything, correct?
10          A    Yes.
11     Q    You don't know what the corporate ownership
12 or stock ownership was between Sellers Trucking Fleetwood
13 Trucking do you?
14          A    No, I do not.
15     Q    You didn't know that Lee Sellers and
16 Fleetwood Trucking has no financial interest in Sellers
17 Trucking did you?
18          A    I don't know their process, the way they had
19 things broke down, no, sir, I don't know.
20     Q    You were exposed to coal dust during that
21 thirteen (13) year period with Sellers Trucking,
22 Incorporated, correct?
23          A    Yes, sir.
24     MR. McILWAIN:  That's all I have, Your Honor,
25 thank you.

**Bayley Reporting, Inc.**
**(727) 585-0600**

1              JUDGE ROMANO:  Mr. Winfrey?

2              MR. WINFREY:  The Director has no questions of

3    this witness, Your Honor.

4              JUDGE ROMANO:  Redirect?

5              MS. VAN ALYSTYNE:  I just have a couple to follow

6    up on.

7                    REDIRECT EXAMINATION

8    BY MS. VAN ALSTYNE:

9         Q    Mr. Warren, in the –

10             MS. VAN ALYSTYNE:  Judge, I wanted to tell you

11   that District Director 15 involves one of the questionnaires

12   that Mr. McIlwain referred to.  District Direct 14 is the

13   other one.  So, there are actually two.

14             JUDGE ROMANO:  What's the chronological – which

15   was first?

16             MS. VAN ALYSTYNE:  District Director 14 --.

17             MR. McILWAIN:  They're both the same date.

18             MS. VAN ALYSTYNE:  District Director 14 refers to

19   his self-employed of Gary Warren Trucking when he was

20   hauling coal for – looks for Cahabo Resources in those last

21   years.  District Director 15 refers to Sellers Trucking

22   Company.

23             JUDGE ROMANO:  Same dates?

24             MR. McILWAIN:  Same date.

25             JUDGE ROMANO:  Okay.

1           MR. McILWAIN:  November 7, 2009.

2           JUDGE ROMANO:  Okay, thank you.

3   BY MS. VAN ALSTYNE:

4           Q    Mr. Warren, you were asked some questions

5   regarding your answers to certain questions.  On the

6   question of were you required to leave the cab during

7   loading was your testimony earlier that you were forced to

8   stay in the cab during loading by the regulations or the

9   procedures of the company themselves in order to make sure

10  you weren't in the - - I don't know what that --.

11          MR. McILWAIN:  Danger zone?

12          Q    In where the coal --.

13          A    Yes, in the process of loading.

14          Q    You were required --.

15          A    To stay in the cab.

16          Q    -- to stay in the cab?

17          A    That's true.

18          Q    Okay, during loading.  Were you required to

19  stay in the cab during unloading?

20          A    No, ma'am, you were not required to stay as

21  long as you had a hard hat on and your safety equipment.

22          Q    Okay.  Now, because you were in the cab,

23  required to be in the cab, during loading when you answered

24  the question were you regularly exposed to significant

25  amounts of coal dust during loading and your answer was no

**Bayley Reporting, Inc.**
**(727) 585-0600**

95

42

1    because you were in the cab?  Is that right?

2             A    Yes, ma'am.

3             Q    Is it true regardless of your answers to this

4    questionnaire – well, let me ask you.  When you filled out

5    this questionnaire did you - you thought you were answering

6    everything correctly, is that right?

7             A    Yes, ma'am.

8             Q    You actually included a note in your answer

9    to the questionnaire about Sellers Trucking that you didn't

10   realize the forms were for Sellers Trucking and that's why

11   you crossed them out and answered them correctly?

12            A    Yes, ma'am.

13            Q    It is true, regardless of your answers, that

14   your clothes were so dust your wife wouldn't let you come in

15   the house with them?

16            A    Yes, ma'am, she didn't like for me to come in

17   with my shoes on.  I almost got bitten by a snake on account

18   of it, so, yes, she required me to take my clothes and shoes

19   off.

20            MS. VAN ALYSTYNE:  All right, nothing further.

21            MR. McILWAIN:  Just a brief follow up

22                     RECROSS EXAMINATION

23   BY MR. McILWAIN:

24            Q    When you told Mr. Crawford that you had what

25   a doctor was saying in 2009 was possible Black Lung Disease

1    what did he say to you?

2          A    He said he hated to lose me, I was a good

3    employee, that I - you know, I hate to lose good people.

4          Q    Did he say anything else?

5          A    No, sir.

6          Q    Did he ask you not to make a claim against

7    his company for Black Lung Benefits?

8          A    No, sir, I don't - no, sir.  I didn't

9    determine who the claim went against.  All I did is

10   submitted what they asked for.  I give them the truest and

11   best answers I could give.

12         MR. McILWAIN:  Yes, I hear you, thank you.

13         Thank you, Your Honor.

14         JUDGE ROMANO:  Do you wish to call Mrs. Warren?

15         MS. VAN ALYSTYNE:  Yes, just briefly.

16   Whereupon,

17                    DEBORAH WARREN

18   having been first duly sworn, was examined and testified as

19   follows.

20         JUDGE ROMANO:  For the record, Mrs. Warren has

21   been in the courtroom for the entirety of the testimony.

22         Proceed.

23                 DIRECT EXAMINATION

24   BY MS. VAN ALSTYNE:

25         Q    Please give your name.

44

1          A     Deborah Coleen Warren.

2          MS. VAN ALYSTYNE:   Speak up a little bit.

3          A     Deborah Coleen Warren.

4          Q     You are Gary Warren's wife?

5          A     Yes, ma'am.

6          Q     Now, could you tell us first, did you ever

7    drive with your husband while he was hauling coal?

8          A     Yes.

9          Q     How often?

10          A     I would be a lot of times if he had to work

11   late, especially like on a Friday night, or something like

12   that, that — I always enjoyed being with him, so when I got

13   off from work he would pick me up and I'd ride with him.

14   Then when he'd get loaded we'd stop and we'd get something

15   to eat before we came back home.

16          Q     In your experience driving in the truck with

17   your husband did you — what were your observations about the

18   dustiness of cab?

19          A     I noticed it was in the cab of the truck and

20   I would tell him that we needed to try to clean it up.  He

21   said that he does and he would try to do that, you know,

22   periodically as often as he could.  He told me it wouldn't

23   do any good, but I thought probably we could deep clean the

24   truck, but he said, you know, it would be to be done all

25   over again.

98

45

1         It would be all in the floorboard and on the dash,
2    yes, ma'am, it was everywhere.  You could even – when you
3    went into the pits where they were loading and stuff you
4    could tell – I have asthma myself and I could tell – I told
5    him, I said, I don't know how you can do this.  He said, he
6    didn't really even notice it.

7         We would be sitting there waiting for the loader
8    man to come back from his supper hour and sometimes it'd
9    take awhile and we'd just have to sit there.  I told him, I
10   said, it would be back to have to come in there all the time
11   and breathe that, anybody that had to go through that.

12        Q    Was it something you could see in the air, or
13   was it just --.

14        A    At times you could.  It depended on how the
15   humidity was and if it was real dry and not raining you
16   could see more of it.  Even on the trucks you could see as
17   they would ride out.  You could see from their tires and
18   stuff.

19        Q    Blowing out?

20        A    Yes.

21        Q    Okay.

22        A    Picking it up in the tires.  You could also –
23   a lot of places we went into you could see how you'd go in
24   and out that you could even see it before you went into that
25   place of business.

1      Q      You could see --.

2      A      On the road and everything, too, or whatever

3  he was hauling at that time.

4      Q      You could see the dust?

5      A      Yes, visibly the dust.  Lots of dust.

6      Q      Tell me about your concern about his clothes.

7      A      Well, I didn't know it was that big a deal to

8  him, but he went ahead and did that because it did.  I mean

9  you would have it in the shower and we had ceramic tile and

10 the grout and you'd have to scrub that because it would get

11 in it.  Then in the kitchen --.

12     Q      When you say it you're talking about coal

13 dust?

14     A      The coal dust, and the kitchen, the same

15 thing.  You could sweep it up and then you could put it on a

16 dustpan and throw it away.  Then try to mop it up.  He took

17 his shoes off.  I mean, it was bad, it really was.  I hated

18 it for him.

19     Q      What about washing his clothes, did you wash

20 them in your own washing machine?

21     A      I did and I had to use Oxyclean, you know, to

22 try to get his clothes clean.  Sometimes we'd even wash an

23 extra load just to get it - you know, like where it would go

24 out of the washer before I washed anything else.

25              We'd even talked about getting a washer and dryer

1  just to wash his clothes, but I didn't know where we would

2  put it.

3          Q    Was that because his clothes were so dirty

4  from the coal dust?

5          A    Yes, and I didn't want to put our other

6  things in with it, but, you know, it was something we

7  managed.  Like I said, if used enough of the Oxyclean and

8  stuff I could get it clean.

9          Q    Now, you heard your husband testify about

10  when he was first told that he had pneumoconiosis.

11          A    Yes, ma'am, it was documented.  At the time

12  when we went to see Dr. Phillip O'Reilly on September 25th of

13  2009, I think it was, he told Gary that day.  He said, I

14  think it's advisable you quit now.  He said you'd always

15  said that you'd rather work till you die.  He said you will

16  not be able to live long if you don't stop.  He said I want

17  you to file for the Black Lung Benefits immediately.

18          So, when we went to file for his disability that

19  was approved in less than two months we did that at the same

20  place at Greensboro Avenue in Tuscaloosa at the Courthouse,

21  Social Security?

22          Q    Social Security?

23          A    Social Security on Greensboro.  Then they

24  told us that they would send that on to the Black Lung,

25  which they did.  Then later we received information from

1    Black Lung.

2         Q    All right, just so the record is clear, Dr.

3    O'Reilly told him he should file for Black Lung?

4         A    Yes, ma'am, that's why we did it.  We didn't

5    even know how to go about it.  So, we asked them at the

6    Social Security Office and they went ahead and said that

7    with all the documents we brought, because it was

8    documented, that they would go ahead and send that on for

9    him.

10        The Dr. Barney that he saw, that he was sent to

11   for the Black Lung in Birmingham, he just that day after we

12   went through all the tests and everything, he said, it's cut

13   and dried, he said, this is Black Lung.  He said there's no

14   doubt about it.

15        So, it's documented that he had it.

16        Q    Right, but he's been seeing Dr. O'Reilly for

17   his breathing problems long before 2009?

18        A    Yes, we initially went to see Dr. Phillip

19   O'Reilly as a second opinion to confirm another pulmonary

20   specialist that had already treated him for five years and

21   advised him to quit and told him that it was dust from his

22   occupation.  Then when he went to Dr. O'Reilly - he seen Dr.

23   Christian working in Tuscaloosa as a pulmonary specialist.

24        Then we went to Dr. O'Reilly.  Hear he's always

25   loved to work and that's all he's ever known to do, so when

1    Dr. Reilly understood it he told him, he said, well, I'll

2    work with you.  So, I had had all the records from day one

3    when he first got the cough.  I had all that with us when we

4    and applied for the disability and when we went to see Dr.

5    O'Reilly I carried a copy of the records.  He said let him

6    have everybody at UAB, several people there, to look at

7    everything see and see how it's been progressing.  He would

8    try to work with Gary so he could work a little longer.  But

9    that when he told him he needed to quit he would need to

10   quit.

11        MS. VAN ALYSTYNE:  Nothing further.

12        JUDGE ROMANO:  Mr. McIlwain?

13        MR. McILWAIN:  Just a couple of areas.

14                    RECROSS EXAMINATION

15   BY MR. McILWAIN:

16        Q    Your husband has had bronchitis for several

17   years, correct?

18        A    No.  I mean, he's probably had some problems,

19   but they tried to see the bronchitis would have come from

20   this industrial occupation.

21        Q    You've had bronchitis?

22        A    I have asthma.

23        Q    Asthma.

24        A    Which I only got that from when I was

25   expecting thirty (30) years ago.  That's something that you

50

1   can get during your expectancy.

2           Q    Okay.

3           A    No, I never had a problem before then.

4           Q    Did you ride with your husband when he was

5   hauling for Cahabo Resources?

6           A    No.  I can't remember ever doing that with

7   him, because he would get off earlier.

8           Q    At Cahabo?

9           A    Yes, he'd get home a little earlier.

10          Q    Because he would go in earlier, is that how

11  it worked?

12          A    Not necessarily, it just worked out that way.

13          Q    Okay.  Fine.

14          MR. McILWAIN:  Thank you.

15          No further questions.

16          JUDGE ROMANO:  Mr. Winfrey?

17          MR. WINFREY:  No questions, Your Honor.

18          JUDGE ROMANO:  Is that your case?

19          MS. VAN ALYSTYNE:  Yes.

20          JUDGE ROMANO:  I've got all the paper and I've got

21  all the testimony, is that correct?

22          MS. VAN ALYSTYNE:  I can't remember if I sent you

23  CX 1 - I have a copy of it, but I'll mail it to you or I can

24  give it to you now.

25          JUDGE ROMANO:  I'm confused, you did mail me a

1   letter on June 23rd and you included CX 1 and 2.

2           MS. VAN ALYSTYNE:  Okay.

3           JUDGE ROMANO:  So, what's your question to me?

4           MS. VAN ALYSTYNE:  I just wanted to make sure you

5   had a copy of the medical records.

6           JUDGE ROMANO:  If it's part of the letter that you

7   sent to me June 23rd I have it.

8           MS. VAN ALYSTYNE:  Yes.

9           JUDGE ROMANO:  So, Claimant's case is in.

10          Let me ask you a quick questions.  I notice on

11  your post-hearing statement a Dr. Ahmed 2/2, is that

12  complicated pneumoconiosis - 2.2, anybody can help me with

13  that?

14          MS. VAN ALYSTYNE:  Not by definition, it's depends

15  on the size of the opacities.

16          JUDGE ROMANO:  The opacities.

17          MS. VAN ALYSTYNE:  Two point two (2.2) is clearly,

18  you know, a much higher level than we typically see.  Let me

19  see if Dr. Ahmed's --.

20          JUDGE ROMANO:  That's a big number to me.  You

21  folks do a lot more of this than I do.  Is 2/2 complicated

22  in your experience?

23          MR. WINFREY:  Yes.

24          JUDGE ROMANO:  It is, okay.

25          All right, I can read the reports.  I will read

**Bayley Reporting, Inc.**
**(727) 585-0600**

52

1    the reports.

2              Let's move over to this side now.

3              Mr. Winfrey, from what I've heard and, madam, why

4    shouldn't I just dismiss Fleetwood now?  Would you folks

5    consent to a dismissal of Fleetwood?  I've heard a ton of

6    evidence exculpating Fleetwood.

7              He testified that he was – he worked for Cahabo,

8    that that was his last coal mining employment.  Apart from

9    the question of whether he's a miner and all of that

10   business, why should I dismiss Fleetwood now on the evidence

11   I've got?

12             MR. WINFREY:  Well, Your Honor, there was an issue

13   regarding the submission of certain documents.  The

14   testimony that was received today has largely – I mean, sort

15   of slanted it towards Cahabo, quite honestly, and I get your

16   point, but that wasn't presented to the Director.  So, the

17   Director has had no opportunity to consider the testimony

18   that was given today.  Despite the fact that these documents

19   were submitted there was also an equal amount of evidence

20   supporting that the responsible operator designation should

21   be Fleetwood.  So, the Operator with the designation of the

22   responsible operator that most likely had the last record on

23   the Social Security Earnings Record, which was Fleetwood not

24   Cahabo.

25             So, he just testified today that the type of

1    material and the things that he was carrying for Cahabo were

2    not fully processed, which would possibly change it.

3    Basically we're saying his testimony today went against what

4    the District Director believed to be the situation.

5            So, that's why --.

6            JUDGE ROMANO:  Isn't there some law – I don't like

7    to delay resolution of claims, but isn't there some law to

8    the effect that I cannot remand it back to you folks to re-

9    identify another responsible operator?  Is there some law on

10   that?  Isn't there a BRB Decision around that says that if

11   the District Director drops the ball and names the wrong

12   responsible operator, that's it?

13           MR. WINFREY:  Your Honor, I would be remiss if I

14   answered that question.

15           JUDGE ROMANO:  You don't know?

16           MR. WINFREY:  I don't know that answer.

17           MS. VAN ALYSTYNE:  Your Honor.

18           JUDGE ROMANO:  Go ahead.

19           MS. VAN ALYSTYNE:  I want to point out that the

20   reason that Fleetwood was named instead of Cahabo Resources,

21   according to the Director's schedule for the submission of

22   additional evidence, was because when Mr. Warren worked for

23   Cahabo Resources he was self-employed, Gary Warren Trucking.

24   He did not have liability insurance and according to the

25   District Director, as a self-employed person he wouldn't be

1    liable to himself, you know, for benefits.

2            JUDGE ROMANO:  Give me that again.

3            MS. VAN ALYSTYNE:  Okay.  During the years he was

4    hauling coal for Cahabo Resources he was not employed by

5    Cahabo Resources, he was a self-employed trucker under the

6    name of Gary Warren Trucking.

7            JUDGE ROMANO:  That would automatically exclude

8    Cahabo as a responsible operator?

9            MS. VAN ALYSTYNE:  Yes.

10           JUDGE ROMANO:  Is that true?

11           MR. WINFREY:  That was the District Director's

12   understanding.

13           MR. McILWAIN:  I totally disagree with that, plus

14   the fact that this man is --.

15           MR. WINFREY:  No, she is correct on the

16   assessment.

17           JUDGE ROMANO:  I can't hear two people.

18           MR. McILWAIN:  I apologize.

19           MR. WINFREY:  She's absolutely correct on her

20   assessment of what the District Director relied on in naming

21   Fleetwood as the responsible operator.

22           Now, based on the testimony I think there may be a

23   little bit of wiggle room in the argument, which is what he

24   may suggest.  Based upon the initial testimony and what the

25   Director had before it he was self-employed at that time and

```
 1    the last responsible operator that could have been listed on
 2    the Social Security Earnings Record was clearly Fleetwood.
 3    That ended in 2002.  There's no Social Security Earnings
 4    Records that have anything to do with Cahabo Resources. We
 5    were only basing that off of the fact that he hauled coal in
 6    the furtherness of his employment, in the furtherness of his
 7    self-employment.
 8            I think that's what his counsel just said.
 9            MR. McILWAIN:  I was just — an old lawyer told me
10    one time, he said, the law is what it ought to be.  If what
11    they're suggesting is accurate, then all I have to do is
12    call somebody self-employed, not pay Social Security tax on
13    them, and I can escape responsibility for Black Lung
14    Benefits.  Even though, as this gentleman has indicated
15    repeatedly, he was an employee of Cahabo Resources.  It's
16    just the way it was structured was apparently a way to avoid
17    — maybe unbeknownst to this man —.
18            JUDGE ROMANO:  It's all over the place —.
19            MR. WINFREY:  He was an independent contractor,
20    Your Honor.
21            JUDGE ROMANO:  —— Coca Cola Trucking, everything
22    is spinning off today.  They don't — you own your own truck.
23            MR. McILWAIN:  That's right.
24            JUDGE ROMANO:  But my question is what do we do at
25    this point?  I don't want to hold up a determination on the
```

1    merits of the claim, which we haven't spoken about yet,

2    really.  What's the most efficient thing I can do?  What's

3    your recommendation as to what I can do now?

4         MS. VAN ALYSTYNE:  Well, my recommendation or my

5    belief based on the Social Security Earnings Records, based

6    on the questionnaires that Mr. Warren has filled out, where

7    he said that he was a self-employed trucker, and that he

8    would be leased to work for different companies as a self-

9    employed trucker, my belief is that Fleetwood Trucking is,

10   in fact, his last Employer for purposes of the Black Lung

11   Benefits Act.  Therefore, you know, they are the responsible

12   operator.

13        JUDGE ROMANO:  Okay.  I hear your position.

14        Sir, what is your position?  You want to be thrown

15   out.

16        MR. McILWAIN:  Well, we should be dismissed.  I

17   think part of the reason it got skewed was I don't know what

18   kind of advice he was given by the intake folks.  I mean,

19   for whatever reason, you know, he was an employee of Cahabo

20   Resources he's the one that put this self-employment thing.

21   I'm not sure that makes a hill of beans.  I have not found

22   any case, any decision that says that because someone's

23   leased that that makes the mine operator immune from Black

24   Lung Benefits.

25        JUDGE ROMANO:  Well, let's chat a bit, Mr. Warren.

1        Let me ask you some questions here.  Did you file your own
2    - were your payroll taxes withheld from you by Cahabo?
3                 THE WITNESS:  No, sir.
4                 JUDGE ROMANO:  They didn't withhold your federal
5    income tax or your state taxes?
6                 THE WITNESS:  No, sir, I was required --.
7                 JUDGE ROMANO:  Unlike Fleetwood?  Fleetwood did
8    withhold your payroll taxes, income taxes?
9                 THE WITNESS:  No, sir - well, he did, but, see, I
10   worked for Mr. Sellers as an employee from '97 to 2002.
11                JUDGE ROMANO:  Sellers is Fleetwood though.
12                THE WITNESS:  Fleetwood, I'm sorry, Fleetwood,
13   yes, sir.
14                MR. McILWAIN:  Talking about Lee Sellers.
15                THE WITNESS:  I worked for Lee Sellers, Fleetwood
16   from '97 to '02.
17                JUDGE ROMANO:  Yes.
18                THE WITNESS:  Which was five years, as an
19   employee.
20                JUDGE ROMANO:  He withheld your federal income
21   tax, state tax, et cetera?
22                THE WITNESS:  Yes, sir, they did.
23                JUDGE ROMANO:  Okay.  Unlike Cahabo, which did
24   not?
25                THE WITNESS:  Yes, sir, this is true.  I was also

1    leased to Mr. Seller, Mr. Lee Sellers.  I was leased to him

2    from '03 to '07.

3              JUDGE ROMANO:  Was there a difference – did you

4    own your truck at Cahabo?

5              THE WITNESS:  Yes, sir, I did, and also Mr.

6    Sellers.

7              JUDGE ROMANO:  You always owned your truck?

8              THE WITNESS:  Not always.

9              JUDGE ROMANO:  But in both those companies you --.

10             THE WITNESS:  No, sir, in 1997 I went to work for

11   Mr. Lee Sellers at Fleetwood Trucking as an employee.  I

12   drove his truck, used his equipment.

13             JUDGE ROMANO:  Okay.

14             THE WITNESS:  So, he withheld taxes.

15             JUDGE ROMANO:  But with Cahabo it was your truck?

16             THE WITNESS:  Yes, sir.

17             JUDGE ROMANO:  Now, the incidents of

18   employee/employer relationship that's pretty clear to me.

19             MR. McILWAIN:  I mean, the key is Cahabo was able

20   to control how this man did his work.

21             JUDGE ROMANO:  Is that true?

22             THE WITNESS:  All they did was told me where to

23   go.  I mean, they'd load the truck, you know, and tell me

24   where they designated where the coal would go.

25             JUDGE ROMANO:  Did Sellers, Fleetwood, exercise

1    more control over your duties than did Cahabo, or was it the

2    same?

3              THE WITNESS:  As an employee when I worked for him

4    now he told me what to do and where to go.  Also – yes, sir,

5    when I was leased to him he would tell me where to go.

6              JUDGE ROMANO:  How about Cahabo, was there less

7    control over your duties and your responsibilities or the

8    same?

9              THE WITNESS:  They were the same, basically.  See,

10   I worked for Mr. Sellers in two different applications.  I

11   worked as an employee and I worked as a self-employee.  Do

12   you understand what I'm saying?

13             MS. VAN ALYSTYNE:  From 1997 to 2002 Mr. Warren

14   was an employee of Fleet Trucking.  Taxes were taken out of

15   his pay.  From 2002 to 2007 Mr. Warren was a leased trucker

16   for Fleetwood and taxes weren't taken out.

17             Is that right?

18             THE WITNESS:  Not from 2002 to 2007.

19             MS. VAN ALYSTYNE:  Then from 2007 to 2009 he was a

20   leased self-employed trucker for Cahabo.

21             JUDGE ROMANO:  Thank you, for that clarification.

22             How clear, and I'm asking the lawyers in the room,

23   how clear is the law that if you're self-employed there

24   cannot be a responsible operator designation?  How clear is

25   that law?  Do we all agree with that law, whatever it is?

1          MR. McILWAIN:  I sure don't.

2          JUDGE ROMANO:  Case law I'm talking about.

3          MR. WINFREY:  Your Honor, based on my experience

4    with the Director outside of something recent, which these

5    things come through quite frequent, that has been my

6    experience regarding self-employed people.  You typically go

7    back to the responsible operator that was last listed on the

8    Social Security Earnings Record outside of self-employment.

9    In this particular record from 1997 through 2002 his

10   employer was Fleetwood.  They did all business transactions

11   regarding him.  They took out all the taxes.  They hired him

12   they directed him to do certain things.

13          At that point he became what is essentially an

14   independent contractor, his own business man.  I'm assuming,

15   we don't have Cahabo here right, but I'm assuming as well

16   that Cahabo at any time could have stopped their contractual

17   dealings with him.  At that point he would have had to find

18   a new company.  He is his own business for Cahabo.  He was

19   responsible for making his own payments, handling all IRS

20   formalities.  If he would hire employees to do sub-

21   contracting work, he was responsible for that as opposed to

22   his employment with Fleetwood.

23          I think in this particular situation because he

24   was self-employed the case law seems pretty strong and

25   experience and wisdom would certainly suggest that you go

```
1    back to the responsible operator where he was last employed
2    versus that he took contract jobs for.  Because also from
3    that 2002 time through 2009 he was also free to take
4    contract jobs as well from other employers.
5              At that point things could get completely muddy.
6    I have no clue.  He didn't bring that out on testimony,
7    whether he took out - I mean, he could have been for ABC
8    Coal and hauling coal.
9              JUDGE ROMANO:  I'm not talking about policies so
10   much, of the District Director.  I'm talking about the case
11   law and that's BRB, I suppose, or Circuit Court.
12             MR. WINFREY:  The Director considered that in
13   making this application and apparently, from my
14   understanding and previous wisdom and handling these cases.'
15             JUDGE ROMANO:  I don't want wisdom.  I want BRB
16   law.
17             MR. WINFREY:  I don't have BRB law in front of me
18   right now, but that's exactly why we are willing to go with
19   the record and testimony as presented today and brief this
20   issue.  We do not feel that Fleetwood should be dismissed at
21   this time.
22             JUDGE ROMANO:  So, what you're suggesting is that
23   I not throw out Fleetwood?  I don't have the basis to
24   dismiss them, that everybody brief both on the RO issue and
25   the merits?
```

115

62

1              MR. WINFREY:  Yes.

2              JUDGE ROMANO:  Okay.

3              In no event will Cahabo come into this thing?  I

4    know you are going to disagree, but from your two folks

5    point of view Cahabo is out?

6              MR. WINFREY:  Cahabo is out.

7              MS. VAN ALYSTYNE:  Right.

8              JUDGE ROMANO:  Because he's self-employed.

9              You agree?

10             MS. VAN ALYSTYNE:  That's right.

11             JUDGE ROMANO:  Claimant agrees and the Government

12   agrees, okay.

13             MR. McILWAIN:  There's got to be some way to be

14   fair to everybody.

15             JUDGE ROMANO:  Tell me, how do I do it?  I'm

16   open.  I mean, we've been around the block.

17             MR. McILWAIN:  Adjourn today.  Give notice to

18   Cahabo and let Cahabo come in here.

19             JUDGE ROMANO:  The Government is suggesting that

20   the law says they cannot name Cahabo as an RO, am I right?

21             MR. McILWAIN:  If you – what the law is is if you

22   dismiss it --.

23             JUDGE ROMANO:  You mean dismiss you?

24             MR. McILWAIN:  Dismiss us you can't remand the

25   case and the claim back to the Director.

**Bayley Reporting, Inc.**
**(727) 585-0600**

1              JUDGE ROMANO:  I think that's true

2              MR. McILWAIN:  But if you don't do it at this

3     point I think that Cahabo can be brought into this case.

4              MR. WINFREY:  Your Honor, what I will say is that

5     the District Director fully considered everything thing that

6     was in front of you at the time.  Nothing that has been said

7     today has disproven any of the rational basis that it made.

8      Despite what he may be saying Fleetwood was issued a Notice

9     of Claim, a Notice of this issue, and had the opportunity to

10    respond with a schedule of submission of evidence in which

11    it could have presented this evidence and had it considered

12    previously by the District Director.  That was not presented

13    by Fleetwood.  That was not presented by Fleetwood.

14              The District Director made a determination.

15    Nothing today has done anything to really change.  He was a

16    self-employed contractor throughout that period.  Despite

17    the phraseology and how his testimony may have sounded he

18    was not an employee of Cahabo.  He was an employee of

19    himself.  That is supported by his own Social Security

20    Earnings Record for 2002 through 2009.  He's self-employed

21    by himself and that's supported by the evidence.  It's not

22    the District Director's position right now to go back and to

23    somehow try work in Cahabo and they have to go through this

24    entire process to Cahabo defend itself where there's been no

25    evidence to controvert the District Director's initial

1    decision.

2          MR. McILWAIN:  The District Director did not even

3    consider this information.  It as in the record and you can

4    read the decision and it make no reference to Cahabo about

5    whether it is a responsible operator or not.  Just ignored

6    it.  I think the reason is --.

7          MR. WINFREY:  That may have been largely because

8    he was self-employed, because therefore why consider it

9    because he was self-employed?

10         MR. McILWAIN:  It didn't say that in the opinion

11   of --.

12         MR. WINFREY:  It doesn't have to say that.

13         MR. McILWAIN:  Well, I mean, you're suggesting

14   that it was considered and I'm saying I can look at the

15   decision and know it wasn't because there's no discussion of

16   it.

17         MR. WINFREY:  I'm looking at it and saying you

18   don't know that because if the fact is he was self-employed

19   during that time therefore we don't necessarily have to

20   consider what you consider to be important.  You could have

21   submitted that evidence with a schedule of submission of

22   evidence as well as your - in your Notice of Claim and you

23   didn't do that.

24         MR. McILWAIN:  It's already in the record.  Well,

25   I mean, we don't have access to this man.  He's not our

1   employee.  He was employed by Cahabo after us, so getting

2   this testimony – this is the first opportunity we've had to

3   talk to this man.

4          MR. WINFREY:  It's also the first time that the

5   District Director has had an opportunity to consider that

6   same point.  So, with that said, we are willing to say that

7   the record is what it is.  The testimony is exactly a

8   position.  The District Director has based his determination

9   on what he chose to base his determination on.  The Claimant

10  has stated his point.  The Claimant stated that he was self-

11  insured.  The Claimant stated that he worked with Fleetwood

12  as supported by the Social Security Earnings Record.  We are

13  willing to brief that and you are free to brief it.

14          I don't really see the issue outside of briefing

15  it.

16          JUDGE ROMANO:  We're going around in circles here.

17          MR. WINFREY:  We are.

18          JUDGE ROMANO:  Here's what I'm going to do I want

19  to make sure, Mr. McIlwain, that you have the opportunity –

20  do you want to call this person as a witness, because this

21  is the evidentiary hearing.

22          MR. McILWAIN:  Yes, sir.

23          JUDGE ROMANO:  We're not going to have another

24  hearing on this.

25          MR. McILWAIN:  I did.

1          JUDGE ROMANO:  Do you want to call him?

2          MR. McILWAIN:  Very briefly, Your Honor.

3     Whereupon,

4                         LEE SELLERS

5     having been first duly sworn, was examined and testified as

6     follows.

7          JUDGE ROMANO:  Sir, your witness.

8                    DIRECT EXAMINATION

9     BY MR. McILWAIN:

10         Q    State your name for the record, please, sir.

11         A    My name is Walter Lee Sellers.

12         Q    You are the owner of Fleetwood Trucking

13    Company, correct?

14         A    That's correct.

15         Q    That's a corporation that was set up back in

16    1984?

17         A    That's correct.

18         Q    Other than yourself are there any

19    stockholders of it?

20         A    No, sir.

21         Q    Does Sellers Trucking Company have any

22    corporate ownership of Fleetwood Trucking Company?

23         A    No, sir.

24         Q    Do you have any corporate ownership of

25    Sellers Trucking Company?

1          A     I actually purchased Sellers Trucking Company

2    from my brother back about seven years ago.

3          Q     Okay, but during the time that Mr. Warren was

4    there that was a separate company, correct?

5          A     That's correct.

6          Q     Let's talk about the hauling of coal while

7    Mr. Warren was there.  It's my understanding that you also

8    hauled coal during that period?

9          A     That's correct.

10         Q     You did the same things he did, correct?

11         A     Absolutely, yes.

12         Q     You've done that for really your entire

13   career, correct?

14         A     Yes.

15         Q     You've not had any Black Lung issues,

16   correct?

17         A     No, sir.

18         Q     None of your employees have had any Black

19   Lung issues, correct?

20         A     No, sir, not to date.

21         Q     Or even these "independent contractors",

22   these self-employed, supposedly, truckers?

23         A     No, sir.

24         Q     The occasions when you would be at the

25   stockpiles, when you were getting loads, or you were

1    unloading, would Mr. Warren be there on occasions?

2            A    We have on occasion loaded and hauled the

3    same freight many times, yes, sir.

4            Q    Did you do anything different than he did?

5            A    No, sir, not particularly.  I mean, we all

6    had to stay in our trucks when we were loaded.  To unload we

7    would get out and flip an air switch and get back in our

8    cabs.  It was a minimal amount of time to either get a

9    ticket or to unload the load itself.

10           Q    Does your company, or you, have any insurance

11   coverage for Black Lung claims?

12           A    No, sir.

13           Q    Are you financially capable, or your company

14   financially capable, to be able to pay Black Lung Benefits,

15   or be financially responsible for one?

16           A    No, sir.

17           Q    Is your company in any way related to Cahabo

18   Resources or the Crawford family?

19           A    No, sir.

20           MR. McILWAIN:  That's all I have, thank you.

21           JUDGE ROMANO:  This case is becoming ridiculous.

22   What about that?  If he's not financially capable?  Doesn't

23   the law say you cannot name them as an RO?  Isn't that a

24   fact?

25           MS. VAN ALYSTYNE:  No.

1          JUDGE ROMANO:  That is not a fact?

2          MS. VAN ALYSTYNE:  No, that is not.

3          JUDGE ROMANO:  Well, that's good.

4          MS. VAN ALYSTYNE:  The law says that if – that

5    regardless of whether the responsible operator has insurance

6    or has no financial --.

7          JUDGE ROMANO:  You're sure of that?

8          MS. VAN ALYSTYNE:  Yes.

9          JUDGE ROMANO:  Okay, I thought differently, but

10   thank you.

11         MR. McILWAIN:  I agree with you.

12         MR. WINFREY:  In the event, Your Honor --.

13         JUDGE ROMANO:  You've got to give me law then.

14         MR. WINFREY:  Honestly, Your Honor, I think he's

15   completely mistaken on that.  I think that's the purpose of

16   the Black Lung Benefits Trust, in the event that that were

17   to happen he was designated the responsible operator the

18   Black Lung Benefits Trust would --.

19         JUDGE ROMANO:  I don't know, somehow I have in my

20   mind that if the person is not financially capable of

21   covering the Black Lung Benefits Uncle picks it up.

22         MR. McILWAIN:  That's exactly right it goes into

23   the trust fund.

24         MR. WINFREY:  Your Honor, we're talking about at

25   the initial determination stage.  Had this person – had

1   Fleetwood been bankrupt and totally out of business, yes,

2   that's probably what you're thinking about.  In the event

3   that they are — we had no evidence whatsoever at the time of

4   making that determination to even remotely think that

5   Fleetwood was incapable of making these payments.

6           JUDGE ROMANO:  Okay, because I don't want to wind

7   up awarding Black Lung Benefits and these folks cannot pay

8   it.

9           MR. WINFREY:  If they can't pay it, then at that

10  point then I would imagine that the things would have to

11  come out of the Black Lung Benefit Trust Fund.  At the time

12  of the determination — this is the first time that we've

13  even remotely heard of that, so we had no reason for

14  thinking that they were incapable to pay.

15          MR. McILWAIN:  Well, I mean, the Director didn't

16  even consider that.

17          MR. WINFREY:  He didn't see the evidence to say

18  that.

19          MR. McILWAIN:  The Director considered the record

20  that it had.

21          JUDGE ROMANO:  All right.

22          MR. WINFREY:  You didn't submit any financial

23  records to the Director either.

24          JUDGE ROMANO:  We're being told that the Director

25  was not in a position to determine the financial stability

124

71

1    of Fleetwood and I accept that representation.

2             Do you have any questions of Mr. Sellers?

3             MS. VAN ALYSTYNE:  No.

4             JUDGE ROMANO:  Mr. Winfrey, do you have any

5    questions of Mr. Sellers?

6             MR. WINFREY:  No, Your Honor.

7             JUDGE ROMANO:  All right.  So, what we're going to

8    do is we're going to set up a briefing schedule.  I need

9    briefs on both the merits and on the RO issue, right?  It's

10   the most sensible thing I think at this point.

11            How much time do you folks need, thirty (30) days

12   after the transcript?

13            MR. WINFREY:  Yes.

14            JUDGE ROMANO:  Okay, thirty (30) days after the

15   transcript?

16            MR. WINFREY:  After the transcript.

17            JUDGE ROMANO:  I'm relying heavily, Mr. Winfrey,

18   on the Government's position on this.

19            MR. WINFREY:  Yes.

20            JUDGE ROMANO:  Because you mentioned policy

21   before.  I don't so much want to hear policy.

22            MR. WINFREY:  You will not.

23            JUDGE ROMANO:  I want to hear the backup.  I want

24   to hear the case law supporting the Government's position on

25   these points.

1          MR. WINFREY:  Yes.

2          JUDGE ROMANO:  As opposed to policy tradition.

3     That's wonderful, but that doesn't give me substance behind

4     what decision I've got to make here.

5          MR. WINFREY:  Absolutely, Your Honor.

6          JUDGE ROMANO:  I appreciate that.

7          MR. WINFREY:  Yes, sir.

8          JUDGE ROMANO:  All right, thirty (30) days after

9     the transcript is in.

10         Thank you, sir, we'll conclude the hearing.

11         (Whereupon, the hearing in the above entitled

12    matter was adjourned at 9:53 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3     Case Name:       James Gary Warren, SR.

 4     Case Number:     2011-BLA-05343

 5     Date:            July 13, 2011

 6     Location:        Birmingham, Alabama

 7

 8           This is to certify that the attached proceedings

 9     before the United States Department of Labor, Office of

10     Administrative Law Judges, were held according to the record

11     and that this is the original, complete, true and accurate

12     transcript that has been compared to the reporting or

13     recording accomplished at the hearing.

14

15

16

17     _____            _____

18     Bayley Reporting, Inc.          .          Date

19     Official Federal Reporters

20     Building 1, Suite 14

21     12945 Seminole Boulevard

22     Seminole, FL  33778

23

24

25
```

**Bayley Reporting, Inc.**
**(727) 585-0600**

127

**U.S. Department of Labor**

Office of Administrative Law Judges
2 Executive Campus, Suite 450
Cherry Hill, NJ 08002

(856) 486-3800
(856) 486-3806 (FAX)



**Issue Date: 26 June 2012**

CASE NO.:    2011-BLA-05343

In the Matter of

**JAMES GARY WARREN, JR.,**
    Claimant,

  v.

**FLEETWOOD TRUCKING COMPANY,**
    Employer,

  and

**DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,**
    Party-in-Interest.

Appearances: Abigail Van Alstyne, Esq.    Christopher L. McIlwain, Esq.
      For Claimant         For Employer

Before:   Ralph A. Romano
      Administrative Law Judge

## DECISION AND ORDER
## AWARDING BENEFITS

  This proceeding arises from a claim for benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945 ("the Act") and the regulations issued thereunder, which are found in Title 20 of the Code of Federal Regulations. Regulations referred to herein are contained in that Title. [1]

  Benefits under the Act are awarded to coal miners who are totally disabled within the meaning of the Act due to pneumoconiosis, or to the survivors of coal miners whose deaths were due to pneumoconiosis. Pneumoconiosis, commonly known as black lung, is a disease of the lungs resulting from coal dust inhalation.

---

[1]  The regulations cited are the amended regulations, effective January 19, 2001, found at 20 C.F.R. § 718 *et seq.* (2001).

DIRECTOR EXHIBIT
NO. 12 CONSISTING
OF 11 PAGES



On January 20, 2011, this case was referred to the Office of Administrative Law Judges for a formal hearing and assigned to me. I held a hearing in Birmingham, Alabama on July 13, 2011. The decision that follows is based upon an analysis of the record, the arguments of the parties and the applicable law.

## I.    ISSUES

The parties have stipulated that Claimant suffers from coal workers' pneumoconiosis. (Tr. p. 8.)[2] I find that the record supports this stipulation. The following issues are presented for adjudication:

    1)    Whether Claimant was a miner within the meaning of the Act;
    2)    Whether Employer is the properly identified responsible operator;
    3)    Whether Claimant's pneumoconiosis arose out of his coal mine employment;
    4)    Whether Claimant has a totally disabling respiratory or pulmonary impairment;
    5)    Whether Claimant's total disability is due to pneumoconiosis.

(Id. pp. 7-9.)

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Procedural Background

Claimant filed this claim for benefits on October 23, 2009. (DX 2.) On November 30, 2010, the District Director issued a Proposed Decision and Order denying benefits. (DX 19.) Claimant disagreed with this determination and timely requested a formal hearing before an Administrative Law Judge. (DX 21.) I held the formal hearing on July 13, 2011.

### B. Factual Background

Claimant was born on January 9, 1949. (DX 2.) He and his wife married in 1980 and she is the only dependent for purposes of benefit augmentation.

Claimant testified he spent his career as a truck driver, hauling coal for various coal mine companies beginning in 1982. (Tr. p. 13.) From 1997 to 2002, Claimant hauled coal for Employer. (Id. p. 15.) Claimant testified that the coal was transported between a strip mine and a mixing plant, where the coal would be blended with other materials to make it suitable for sale. (Id.) Claimant retired in 2009. (Id. p. 16.)

Claimant is currently prescribed supplemental oxygen for his breathing problems. (Tr. p. 11.) He is a lifelong non-smoker. (Id. p. 24.)

---

[2]    The following abbreviations are used herein: "DX" refers to Director's Exhibits; "CX" refers to Claimant's Exhibits; "EX" refers to Employer's Exhibits and "Tr." refers to the hearing transcript.

129

## C. Status as a Miner

Under the regulations,

> Miner or coal miner means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. The term also includes an individual who works or has worked in coal mine construction or *transportation* in or around a coal mine, to the extent such individual was exposed to coal mine dust as a result of such employment (see § 725.202). For purposes of this definition, the term does not include coke oven workers.

20 C.F.R. § 725.101(a)(19) (emphasis added). In the Eleventh Circuit,[3] the test for determining whether a worker qualifies as a miner is based on function and situs: first, whether the worker performed a function integral to the coal production process, such as extraction or preparation, and not one merely ancillary to the delivery and commercial use of processed coal; and second, whether the work was performed in or around a coal mine or coal preparation facility. Foreman v. Director, OWCP, 794 F.2d 569 (11th Cir. 1986).

The "function" prong is satisfied if the individual's activities are found to be an integral or necessary part of the overall coal extraction process. Canonico v. Director, OWCP, 7 B.L.R. 1-547 (1984); Bower v. Amigo Smokeless Coal Co., 2 B.L.R. 1-729 (1979). Construction workers may be considered "miners" only if they were employed in or around a coal mine or preparation facility and were consequently exposed to coal mine dust. § 725.202(a) and (b). Such individuals are entitled to a presumption that they were exposed to coal mine dust during all periods of such employment, which an employer may rebut by establishing that the worker was not employed in or around a coal mine or preparation plant or "was not regularly exposed to airborne particulate matter occurring as a result of the extraction or preparation of coal in or around a coal mine." § 725.202(a) and (b); see also George v. Williamson Shaft Construction Co., 8 B.L.R. 1-91 at 1-194 (1985). The "situs" prong requires work in or around coal mines.

I find that Claimant's testimony credibly establishes his status as a miner. Claimant testified that coal was loaded into the bed of his truck by the coal mining company from a stockpile located at the mine. (Tr. p. 14.) Claimant then transported the coal to a "mixing plant" where the coal was processed to make it suitable for sale to consumers. (Id. pp. 14-15.) Claimant also testified that he was exposed to coal dust throughout this process, stating:

> The dust is going to get in your truck. You can wipe it off four or five times a day and you still write your name on the dash, you know, from the coal dust. When you get in and out you're going to tromp the coal back in your truck, especially if it's wet outside. When it dries, of course, it's going to blow up or, you know, be kicked around.

---

[3]    This case arises in the U.S. Court of Appeals for the Eleventh Circuit because Claimant's coal mine employment took place in Alabama.

(Id. p. 21.) Claimant further testified:

> When [I] would take a bath in the bathtub or shower [I] would always have – you could see the coal dust. When they washed my clothes – my wife would complain constantly about the coal dust. She even required that I take them off when I'd get home before I could come in, you know.

(Id.)

Based upon Claimant's testimony, I find that both the situs and function of Claimant's employment indicates he was a miner within the meaning of the Act. Claimant hauled coal between strip mines and coal preparation facilities and was exposed to coal dust at the stockpiles and in the cab of his truck. Further, Claimant's employment was an integral function of the coal extraction process because the coal had to be transported to processing facilities before it could be sold to consumers. And, although Employer submitted a statement from the owner of Fleetwood asserting otherwise, that statement is unsworn and I accord greater weight to the testimony adduced at the hearing.[4] I therefore find that claimant is a miner under the Act.

### D. Responsible Operator

Employer has contested its designation as the responsible operator in this case. The regulations do not permit an administrative law judge to dismiss the operator designated by the district director without the consent of the Director. § 725.465(b). However, this regulation was not intended to eliminate the administrative law judge's authority to adjudicate the issue of whether the named responsible operator is, in fact, liable for the payment of benefits. 65 Fed. Reg. 80,004 - 80,005 (Dec. 20, 2000). Responsible operators are not permitted to submit (and administrative law judges prohibited to consider) documentary evidence pertaining to their liability which was not submitted to the district director within ninety days of receiving notice of a claim, absent extraordinary circumstances. § 725.456(b)(1).

In this case, Employer is prohibited from challenging its status as responsible operator because it did not submit evidence to the District Director challenging its status until well after the ninety day deadline had passed. Specifically, the District Director notified Employer of its designation on January 12, 2010 and Employer did not respond to this notice until October 19, 2010. (DX 16.)

Employer's argument would be unavailing even if I permitted evidence on this issue. Once the District Director designates a responsible operator, the burden of proof lies with the employer to establish that it is not liable. § 725.495(c). The Employer may be relieved of liability only if it proves either that it is financially incapable of assuming liability or that another potentially liable operator more recently employed the miner and is capable of assuming liability. Id. Employer asserts that Claimant worked for another trucking company for a cumulative period of more than one year after his employment with Fleetwood. Even if true, Employer has

---

[4]    Although Mr. Sellers testified at the hearing, he did not testify as to Claimant's level of coal dust exposure.

- 4 -

not asserted that the more recent employer is financially capable of assuming liability. Further, Employer has put forth insufficient evidence establishing that Employer is incapable of paying benefits. Although Employer is uninsured, that alone is insufficient to avoid liability. § 725.494 (e). Rather, Employer must submit evidence, such as a tax return, establishing that it is incapable of paying benefits. § 725.494 (e)(3). Employer has failed to do so and, as a result, has not satisfied its burden under § 725.495(c).

## E. Length of Coal Mine Employment

The length of time that a miner worked in the coal mining industry is relevant to the applicability of various statutory and regulatory presumptions and to the probative value of physicians' opinions. The length of coal mine employment may be calculated based on any reasonable method, such as affidavits of co-workers, testimony of the miner, payroll stubs, W-2 forms, or Social Security records. § 725.101(a)(32)(ii); Clark v. Barnwell Coal Co., 22 B.L.R. 1-275, 1-280 - 1-281, BRB Nos. 01-0876 BLA and 02-0280 BLA (Apr. 30, 2003).

Calculating the precise length of Claimant's coal mine work is difficult in this case because, as I explained above, Claimant's status as a miner throughout a given period hinges on whether Claimant transported coal during the preparation process and whether he was regularly exposed to coal mine dust as a result. In his application for benefits, Claimant alleged more than twenty-five years of coal mine employment, though Claimant's testimony indicates that he was not exposed to coal dust throughout his entire career. (DX 3.)

Claimant's Social Security earnings statements indicate he worked for Employer, Fleetwood Trucking Company, from 1997 to 2002. (DX 6.) As I found above, Claimant's testimony establishes his employment as a coal miner within the meaning of the Act during this period. The earnings statements also indicate Claimant was self-employed from 2003 to 2008. Claimant testified that he hauled coal for a number of coal companies during this period, including Twin Pines and Cahabo Resources. (Tr. pp. 14-17.) According to Claimant, the coal he transported during this period was unwashed strip mine coal. (Id.) He also testified that he was exposed to significant amounts of dust during this period. (Id.) Employer did not controvert Claimant's testimony and I therefore find that Claimant performed coal mine work within the meaning of § 725.101(a) from 2003 to 2008.[5]

Although I have found that Claimant engaged in coal mine work from 1997 to 2008, Claimant will only be credited with a full eleven years of coal mine employment where his yearly earnings meet or exceed the coal mine industry average for the years in question. §725.101(a)(32)(iii). Where his yearly wages fall below the average, Claimant will be credited with a partial year. To make this calculation, I have consulted the Bureau of Labor Statistics Table 610.[6] The following table sets forth my findings:

---

[5]    Although the Social Security Earnings statements indicate Claimant worked as a truck driver throughout the 1980s and early 1990s, the evidence does not establish whether he was exposed to coal dust during this period.

[6]    The Bureau of Labor Statistics (BLS) table known as Exhibit 610, which establishes the average yearly earnings, is available at http://www.dol.gov/owcp/dcmwc/exh610.htm.



| Year | Company | Earnings | Average Wages per Exhibit 610 | Credit |
|------|---------|----------|-------------------------------|--------|
| 1997 | Fleetwood Trucking Co. | $16,842.63 | $19,010.00 | .89 |
| 1998 | Fleetwood Trucking Co. | $34,982.66 | $19,160.00 | 1.00 |
| 1999 | Fleetwood Trucking Co. | $35,032.66 | $19,340.00 | 1.00 |
| 2000 | Fleetwood Trucking Co. | $35,629.34 | $19,090.00 | 1.00 |
| 2001 | Fleetwood Trucking Co. | $36,833.42 | $19,040.00 | 1.00 |
| 2002 | Fleetwood Trucking Co.<br><br>Self-Employment | $23,375.06<br><br>$11,881.00 | $19,640.00 | 1.00 |
| 2003 | Self-Employment | $46,746.00 | $19,900.00 | 1.00 |
| 2004 | Self-Employment | $57,171.00 | $21,570.00 | 1.00 |
| 2005 | Self-Employment | $54,993.00 | $22,060.00 | 1.00 |
| 2006 | Self-Employment | $46,230.00 | $21,940.00 | 1.00 |
| 2007 | Self-Employment | $60,058.00 | $21,960.00 | 1.00 |
| 2008 | Self-Employment | $54,168.00 | $23,270.00 | 1.00 |
| | **TOTAL** | | | **11.89** |

Based on the earnings set forth above, I find the record establishes approximately twelve years of coal mine work.

F. Entitlement

Because this claim was filed after the effective date of the Part 718 regulations, Claimant's entitlement to benefits will be evaluated under Part 718 standards. § 718.2. To establish entitlement to benefits under Part 718, Claimant bears the burden of establishing the following elements by a preponderance of the evidence: (1) that he suffers from pneumoconiosis, (2) that the pneumoconiosis arose out of coal mine employment, (3) that he is totally disabled, and (4) that his total disability is caused by pneumoconiosis. Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994).

1.    Pneumoconiosis Arising out of Coal Mine Employment

The regulations provide that a miner who was employed for at least ten years in coal mine employment is entitled to a rebuttable presumption that pneumoconiosis arose out of coal mine employment. § 718.203(b). A pulmonary or respiratory impairment arises out of coal mine employment when it is caused by, significantly related to, or substantially aggravated by dust exposure during such employment. Id.

Claimant has more than ten years of coal mine employment, and the burden rests with Employer to prove an alternate etiology. Other than argue that Claimant was not exposed to coal dust during his employment (an assertion I already have found to be inapposite credible testimonial evidence), Employer has put forth no medical evidence indicating an etiology other than coal dust exposure. Claimant testified that he is a lifelong non-smoker and Dr. Joseph Barney, the Department-sponsored physician in this case, opined that Claimant suffers from pneumoconiosis arising out of his coal mine work. (DX 12.) I therefore find this element of entitlement satisfied.

2.    Total Disability

Claimant must establish he is totally disabled due to a respiratory or pulmonary condition. Section 718.204(b)(1) provides as follows:

> [A] miner shall be considered totally disabled if the miner has a pulmonary or
> respiratory impairment which, standing alone, prevents or prevented the miner
> From performing his or her usual coal mine work; and
> From engaging in gainful employment . . . in a mine or mines . . .

§ 718.204(b)(1).

Claimant may establish total disability in one of four ways: pulmonary function study; arterial blood gas study; evidence of cor pulmonale with right-sided congestive heart failure; or reasoned medical opinion. § 718.204(b)(2)(i-iv). Producing evidence of one of these four types will create a presumption of total disability only in the absence of contrary evidence of greater weight. Gee v. W.G. Moore & Sons, 9 B.L.R. 1-4 (1986). All medical evidence relevant to the question of total disability must be weighed, like and unlike together, with claimant bearing the burden of establishing total disability by a preponderance of the evidence. Rafferty v. Jones & Laughlin Steel Corp., 9 B.L.R. 1-231 (1987).

a.    Pulmonary Function Tests

Pulmonary function tests measure the degree of pulmonary impairment. The most commonly performed tests measure forced expiratory volume in one second ($FEV_1$), forced vital capacity (FVC), and maximum voluntary ventilation (MVV). In order to establish total disability through pulmonary function tests, the $FEV_1$ must be equal to or less than the values listed in Table B1 of Part 718 Appendix B and, in addition, the tests must also reveal either: (1) values equal to or less than those listed in Table B3 for the FVC test, or (2) values equal to or

less than those listed in Table B5 for the MVV test or, (3) a percentage of 55 or less when the results of the $FEV_1$ test are divided by the results of the FVC tests. § 718.204(b)(2)(i)(A-C). Such studies are designated as "qualifying" under the regulations. Assessment of pulmonary function study results is dependent on Claimant's height, which the physicians reported variously from sixty-six inches to sixty-eight inches. I therefore evaluated the studies using sixty-seven inches, the average of those heights. See Protoppapas v. Director, OWCP, 6 B.L.R. 1-221 (1983).

The record contains the pulmonary function tests summarized below:

| DATE | EX. NO. | PHYSICIAN | AGE | $FEV_1$ | FVC | $FEV_1$/FVC | MVV | EFFORT | QUALIFIES |
|------|---------|-----------|-----|---------|-----|-------------|-----|--------|-----------|
| 12/09/2009 | DX 12 | Barney | 60 66" | 1.56 1.64* | 1.76 1.83* | 89 90* | -- | Good | Yes Yes* |
| 04/23/2010 | DX 11 | O'Reilly | 61 68" | 1.68 | 1.89 | 89 | -- | -- | Invalid |

*post-bronchodilator

I note that Claimant's April 23, 2010 test is deficient because it is not sufficiently accompanied by tracings and does not note Claimant's effort. § 718.103(b). This test aside, each of the tests submitted in this claim qualified under the disability regulations. Thus, I find the pulmonary function test evidence establishes Claimant's total disability.

### b.    Arterial Blood Gas Studies

A claimant may also establish total disability based upon arterial blood gas tests. In order to establish total disability, the test must produce a qualifying value, as set out in Appendix C to Part 718. § 718.204(b)(2)(ii). Appendix C lists values for percentage of carbon dioxide ($PCO_2$) and percentage of oxygen ($PO_2$), based upon several gradations of altitudes above sea level. At a specified gradation (e.g., 2,999 feet above sea level or below), and $PCO_2$ level, a qualifying value must be less than or equivalent to the $PO_2$ listed in the table.

The current record contains the arterial blood gas studies summarized below:

| DATE | EX. NO. | PHYSICIAN | PCO2 | PO2 | QUALIFIES |
|------|---------|-----------|------|-----|-----------|
| 04/22/2010 | DX 12 | Barney | 43.1* | 33.7* | Yes* |

* Post-exercise

The blood gas study submitted in this claim resulted in qualifying values under the regulations. Therefore, I find that the Claimant has established total disability under this provision.

### c.    Cor Pulmonale

Under § 718.204(b)(2)(iii), total disability can also be established where the miner had pneumoconiosis and the medical evidence shows he suffers from cor pulmonale with right-sided

congestive heart failure. There is no record evidence of cor pulmonale with right-sided congestive heart failure, thus disability cannot be established by this method.

### d.    Physicians' Opinions

The remaining means of establishing total disability is with the reasoned medical judgment of a physician that Claimant's respiratory or pulmonary condition prevents him from engaging in his usual coal mine work or comparable and gainful work. Such an opinion must be based on medically acceptable clinical and laboratory diagnostic techniques. § 718.204(b)(2)(iv). The following contains a summary of the physician's opinion regarding total disability:

#### *Joseph Barney, M.D. (DX 12)*

Dr. Barney performed the Department-sponsored examination on March 26, 2010. Dr. Barney noted thirty years of employment as a coal truck driver. Subjective complaints included productive cough and dyspnea. Upon examination, Dr. Barney noted "diffuse rales." An X-ray interpreted by Dr. Afzal Ahmed was found to be positive for pneumoconiosis. Pulmonary function tests qualified under the disability regulations both pre- and post-bronchodilator. An arterial blood gas study also qualified. Based upon Claimant's clinical tests and occupational history Dr. Barney diagnosed pneumoconiosis and pulmonary fibrosis attributable to coal mine work. Regarding the degree of impairment Dr. Barney stated: "Patient is severely short of breath with minimal exertion. Now on oxygen."

#### *Discussion*

Dr. Barney's report does not contain an explicit opinion as to whether Claimant could return to his prior employment. Thus, Dr. Barney's narrative opinion, by itself, is insufficient to establish that Claimant is disabled under the regulations. However, Claimant's clinical tests qualified under the disability regulations and Employer has put forth no medical evidence in rebuttal. Thus, preponderant evidence establishes that Claimant suffers from a totally disabling impairment.

### 3.    Total Disability Due to Pneumoconiosis

Unless one of the presumptions at 20 C.F.R. §§ 718.304, 718.305, or 718.306 is applicable, the miner must establish that his or her total disability is due, at least in part, to pneumoconiosis.[7] See § 718.204(c)("Except as provided in Sec. 718.305 and paragraph (b)(2)(iii) of this section, proof that the miner suffers or suffered from a totally disabling respiratory or pulmonary impairment . . . shall not, by itself, be sufficient to establish that the miner's impairment is or was due to pneumoconiosis."). This element of entitlement is established if pneumoconiosis, as defined in § 718.201, is a substantially contributing cause of the miner's totally disabling respiratory or pulmonary impairment. § 718.204(c)(1); Bonessa v. United States Steel Corp., 884 F.2d 726 (3d Cir. 1989).

---

[7]    Claimant is not entitled any of these presumptions because he has fewer than fifteen years of coal mine employment, has not submitted evidence proving complicated pneumoconiosis, and did not perform coal mine work prior to June 30, 1971.

The regulations provide that pneumoconiosis is a "substantially contributing cause" of the miner's disability if it 1) has a material adverse effect on the miner's respiratory or pulmonary condition; or 2) materially worsens a totally disabling respiratory or pulmonary impairment which is caused by a disease or exposure unrelated to coal mine employment. § 718.204(c)(1). This element of entitlement may be established by a physician's documented and reasoned medical report. § 718.204(c)(2).

Dr. Barney opined that Claimant's impaired lung function is "100%" attributable to coal mine work. (DX 12.) Claimant's treatment notes also indicate that Claimant's impairments are "secondary to coal dust exposure." (CX 1, 2.) As Employer has submitted no medical evidence in rebuttal, Claimant has established this element of entitlement.

    G.    <u>Onset Date</u>

Once a claimant establishes entitlement to benefits under the Act, the fact-finder must determine the date on which benefit payments should begin. Benefits are paid monthly, beginning with the first month in which claimant satisfies all conditions of entitlement. 30 U.S.C. § 932(d); 20 C.F.R. § 725.203(a). The onset date of disability is when the miner can demonstrate he was totally disabled *due to pneumoconiosis*, not simply the date on which he was totally disabled. <u>Edmiston v. F&R Coal Co.</u>, 14 B.L.R. 1-65 (1990). The miner cannot receive benefits for any month during which he was not totally disabled. <u>Lykins v. Director, OWCP</u>, 12 B.L.R. 1-181, 1-183 (1989).

The first medical evidence of total disability in the record is from December 9, 2009, the date of the Department-sponsored examination. As I explained above, Dr. Barney's records also establish that Claimant was disabled due to pneumoconiosis. I therefore find his onset date for purposes of determining payment of benefits is December 2009.

## IV.    CONCLUSION

Claimant has established that he suffers from pneumoconiosis, his pneumoconiosis arose from coal mine employment, he is totally disabled, and his total disability is due to coal worker's pneumoconiosis. Claimant is therefore entitled to benefits under the Act dating to December 2009.

## V.    ATTORNEY'S FEE

The award of an attorney's fee under the Act is permitted only in cases in which Claimant is found entitled to benefits. Since benefits are awarded in this case, Claimant's representative is entitled to a fee for representation services rendered in pursuit of the claim.

No award of attorney's fee for services to Claimant is made herein because no fee application has been received. Thirty (30) days is hereby allowed Claimant's counsel for the submission of a fee application which must conform to §§ 725.365 and 725.366 of the regulations. A service sheet showing that service has been made upon all parties including

Claimant must accompany the application. Parties have ten (10) days following receipt of any such application within which to file any objection. The Act prohibits the charging of a fee in the absence of an approved application.

VI.    ORDER

The claim of JAMES GARY WARREN, JR. for benefits under the Act is GRANTED. Employer is ORDERED to commence payment to Claimant dating back to his onset date of December 2009.

# A

RALPH A. ROMANO
Administrative Law Judge

Cherry Hill, New Jersey

**NOTICE OF APPEAL RIGHTS**: If you are dissatisfied with the administrative law judge's decision, you may file an appeal with the Benefits Review Board ("Board"). To be timely, your appeal must be filed with the Board within thirty (30) days from the date on which the administrative law judge's decision is filed with the district director's office. *See* 20 C.F.R. §§ 725.478 and 725.479. The address of the Board is: Benefits Review Board, U.S. Department of Labor, P.O. Box 37601, Washington, DC 20013-7601. Your appeal is considered filed on the date it is received in the Office of the Clerk of the Board, unless the appeal is sent by mail and the Board determines that the U.S. Postal Service postmark, or other reliable evidence establishing the mailing date, may be used. *See* 20 C.F.R. § 802.207. Once an appeal is filed, all inquiries and correspondence should be directed to the Board.

After receipt of an appeal, the Board will issue a notice to all parties acknowledging receipt of the appeal and advising them as to any further action needed.

At the time you file an appeal with the Board, you must also send a copy of the appeal letter to Associate Solicitor, Black Lung and Longshore Legal Services, U.S. Department of Labor, 200 Constitution Ave., NW, Room N-2117, Washington, DC 20210. *See* 20 C.F.R. § 725.481.

If an appeal is not timely filed with the Board, the administrative law judge's decision becomes the final order of the Secretary of Labor pursuant to 20 C.F.R. § 725.479(a).

13?

## U.S. DEPARTMENT OF LABOR
## BENEFITS REVIEW BOARD

FLEETWOOD TRUCKING COMPANY, §
INC., §
§
     Petitioner, §
§
JAMES GARY WARREN, §
§     BRB 2012-0559-BLA
     Claimant, §
§
and §
§
DIRECTOR, OFFICE OF WORKERS' §
COMPENSATION PROGRAMS, §
§
     Party-in-Interest. §

## PETITION FOR REVIEW AND MEMORANDUM OF LAW
## BY FLEETWOOD TRUCKING COMPANY, INC.

### PETITIONER'S ISSUES

1. **Last Operator/Employer:**  It is undisputed that Petitioner Fleetwood

Trucking Company, Inc., which has never operated a single coal mine, was not the

Claimant's last coal-related employer.  On the contrary, during the administrative

hearing below, the Claimant *admitted* that he was last employed by Cahaba

Resources, an unrelated conglomerate consisting of several divisions variously named

"Crawford Enterprise" and "Crawford Hauling"  that operated strip mines.

2. **Financial Ability:** The evidence is undisputed that the Petitioner is not

1

*139*

financially able to pay Black Lung benefits.

3. **<u>Causation:</u>** There was absolutely no evidence presented during the hearing below that the Claimant's disease was actually caused by exposure to coal dust during his employment by the Petitioner. He was diagnosed with the disease only after working for Cahaba Resources hauling unwashed coal for two years from 2007 to 2009.

## I

## LAST OPERATOR/EMPLOYER

### A.

The operator responsible for paying black lung benefits to a miner is the operator or other employer "with which the miner had the *most recent* periods of cumulative employment...". *Armco, Inc. v. Martin*, 277 3d 468, 473 (4th Cir. 2002). *Accord, National Mining Assoc. v. Director, Office of Workers' Compensation Programs,* 72 Fed. Appx. 942, 946 (4th Cir. 2003). The Administrative Law Judge concluded at the hearing following the examination of the Claimant, that Petitioner Fleetwood Trucking was obviously not the Claimant's most recent employer and, instead it was an unrelated company called Cahaba Resources.[1] As the ALJ made

---

[1]The court reporter misspelled the word Cahaba as "Cahabo" or "Cahaboo" throughout the transcript. The quotations from the transcript in this Memorandum are corrected for this transcription

2

*148*

clear in his comments to counsel for the AWCP Director, Mr. Winfrey, as well as to

counsel for the Claimant, Ms. Van Alystyne:

> "Mr. Winfrey, from what I've heard and, madam, why shouldn't I just
> dismiss Fleetwood now?  Would you folks consent to a dismissal of
> Fleetwood?  **I've heard a** *ton of evidence* **exculpating Fleetwood**.  He
> testified that he was [...] he worked for Cahaba, that that was his last coal
> mining employment.  Apart from the question of whether he's a miner
> and all that business, why should[n't] I dismiss Fleetwood now on the
> evidence I've got?"

(Transcript, p. 52).

The ALJ's summary of the evidence was spot-on.  After testifying on direct

examination by the Claimant's attorney regarding his exposure to coal dust, the

Claimant admitted that his last years of exposure actually occurred while he was

employed by Cahaba Resources prior to his retirement from that company in 2009:

> "BY MR. MCILWAIN:
> Q.    Mr. Warren, you talked about a period of time from 2007 to 2009
>       that you hauled coal.  I think you said it was all unwashed coal.
> A.    Yes, that's correct.
> Q.    You did that work for Cahaba Resources, correct?
> A.    Yes.
> Q.    If you could tell the Judge who Cahaba Resources is and what it
>       does.
> A.    It's a strip mine coal operation and it strips coal and sells it on the
>       market.
> Q.    It has a strip mining operation and it also has – it utilizes truck
>       drivers like yourself to haul the coal away from the strip mine,
>       correct?

---

error and others.

141

A.  Yes, that's correct.

Q.  Its during that period that you were working the five and a half days per week, correct?

A.  Yes, sir, that's true.

Q.  The four to five load per day, correct?

A.  Yes, sir.

Q.  That you were getting out to tarp your load, correct?

A.  We didn't tarp we weren't required to tarp those loads that I hauled for those people.

Q.  I thought you said in response to your attorney's questions that there were ordinances and laws that required you to tarp.

A.  If I went in that area, I was required to. There were times, but basically we didn't go in that area.

Q.  You would also get out there at the Cahaba Resources operation to talk with the drivers there, correct?

A.  Yes.

Q.  You said you made visual inspections of your equipment?

A.  Yes.

Q.  You owned your own truck didn't you?

A.  Yes.

Q.  So, you would actually make visual inspections of your equipment before you left your base of operations, which I assume was your home, correct?

A.  That was a continuous process all day.

Q.  Yes, but you would make that inspection before you left. It's required by DOT regulations isn't it?

A.  Yes, but still you continue to monitor your equipment all day.

Q.  All right. Also, while working with Cahaba Resources you talked about you would have to get out for paperwork and that sort of thing, correct?

A.  Yes.

Q.  Cahaba Resources is owned by some people named Crawford?

A.  Yes, that is correct.

Q.  Do you know the Crawfords' names?

A.  I believe its Gene Ed Crawford, I believe that's correct.

Q.  Have you talked to Mr. Crawford about your symptoms and what the doctors are saying about you having Black Lung Disease?

4

*142*

A.   No, sir, I didn't make that determination as to who would be responsible, but I told Mr. Crawford I's going to have to quit on account of I had developed Black Lung.  I did tell him that.

Q.   It was on his watch that you were diagnosed with this, correct?

A.   Yes, sir, that's true.

\*    \*    \*

Q.   The Cahaba Resources is still in business is it not?

A.   Yes.

Q.   Mining coal, were doing apparently well, correct?

A.   Do what, sir, I didn't understand?

Q.   They're mining coal and doing well?

A.   I don't know about that, sir.

Q.   Okay.  You also sent some materials to the Director that you faxed January 25, 2010, some handwritten notes where you describe on page 5 of the handwritten notes that you leased to Crawford Hauling, correct?

A.   Yes.

Q.   Now, Crawford Hauling is the same thing as this Cahaba Resources, correct?

A.   Yes, sir, it is.

Q.   That you worked with them from October 2007 to October 2009, correct?

A.   Yes, sir.

Q.   It was September of 2009 that you were given a possible diagnosis of Black Lung disease, correct?

A.   Yes, sir.

\*    \*    \*

Q.   So, you were exposed to coal dust while with Cahaba Resources/Crawford Hauling that's still in business, correct?

A.   Yes, sir.

\*    \*    \*

5

143

> **Q.** Was Crawford Enterprises, this Cahaba Resources, and these entities that we've talked about, was your last employer, correct?
>
> **A.** Yes, sir."

(Transcript, pp. 24-29, 33). This testimony was admitted *without objection* by the Claimant or the Director. Thus, Petitioner Fleetwood Trucking was *not* "the operator responsible for paying black lung benefits to a miner" because it was not the 'operator or other employer with which the miner had the *most recent* periods of cumulative employment...". *Armco, Inc. v. Martin*, 277 F. 3d 468, 473 (4th Cir. 2002).

## B.

It appears that the confluence of two factors led to the initial, erroneous allegation by the Director regarding Petitioner Fleetwood Trucking. First, although the Claimant denied that the owner of Cahaba Resources influenced him to point the finger elsewhere when he filled out the AWCP's intake questionnaires, (Transcript, p. 43), it is apparent that the Claimant violated 30 U.S.C. § 941 when he attempted to mislead the Petitioner and the Director by intentionally deleting and expunging critically important information regarding Cahaba Resources and its related divisions from his responses to those questionnaires, Director's Exhibits 14 and 15:

> "Q.  You also filled out a questionnaire relating to your employment. One question I have is why you struck out several references to Gene Ed Crawford, Crawford Enterprises, which is also a part of

6

144

Cahaba Resources, correct?

A.    Yes, sir.

Q.    I mean, they've got just a conglomerate of business names, but its really just all one operation. They strip mine it. They haul it. They sell it, correct?

A.    Yes, sir.

Q.    Why you struck out you wrote their names in, but you struck out those names. Why did you do that?

A.    I realized that I had made a mistake and went back and corrected it.

Q.    It wasn't a mistake though was it?

A.    Yes, sir, I thought it was.

*    *    *

Q.    You refer to Number 7, in answer 7 it says, please give the name and address of your immediate supervisor.

A.    Where does this say –

MR. MCILWAIN: I understand, but I'm –

THE WITNESS: I'm talking about here. I've got to refer to this from this.

Q.    Well, I hear you, but I'm just asking about the fact that in answer to the question about immediate supervisor you wrote in Gene Ed Crawford.

A.    I realized I thought I had made a mistake so, you know, when I was filling this out. So, what this says and I can tell you what this says. You see what I'm saying?

Q.    I mean, I hear you, but you did write in Mr. Crawford.

A.    But I crossed it out.

Q.    Yes, sir. Over –

THE WITNESS: Let's go back to the question if we're going go you know, what was question.

MR. MCILWAIN: Yes, I'm going to ask you a question, sir.

JUDGE ROMANO: Mr. Warren, let me suggest something to you. After this gentleman is through questioning you?

THE WITNESS: Yes, sir.

JUDGE ROMANO: I'm sure this young lady is going to ask you questions and give you the opportunity to say whatever you'd like to say.

7

145

WITNESS: Right.  Okay.

JUDGE ROMANO: Okay.

BY MR. MCILWAIN:

Q    Then the question, who actually owned the coal being hauled, this is on what's called page 2 up at the top of the lefthand corner there, who actually owned the hauled coal?  You said Cahaba Resources and you also wrote down Crawford Enterprises.  Now, you struck out Crawford Enterprises, why did you do that?

A    Well, I figured Crawford Resources would cover that.  Like you said, they're one and the same, okay?

Q.    Okay.  Then on page 3 of that form at the top left –

A.    Same reason.

Q.    You've got, who owned or operated that facility, and you wrote Crawford Enterprises and then wrote Cahaba Resources.

A.    Right. Like you said, they go under different names, so I realized that was wrong, so –

MR. MCILWAIN:    I understand.

Q.    Is there any reason why you didn't fill this out and put all the information just go ahead and relating to your last employer, which was the Crawford conglomerate?  I mean, that's who it was, correct?

A.    Yes, the last employer I had, yes, sir.

Q.    Was Crawford Enterprises, this Cahaba Resources, and these entities that we've talked about, was your last employer, correct?

A.    Yes, sir.

Q.    You worked for them for two years?

A.    Yes, sir, I did."

(Transcript, pp. 31-33).

## C.

The second factor contributing to the erroneous designation of the Petitioner as the Claimant's last employer  is that the Director failed to confront the Claimant regarding his alterations in the responses to the questionnaires, or to apply the

8

144

Director's own applicable regulation requiring the use of the "benefits" test regarding "employment" to the Claimant's illusory "lease" relationship with Cahaba Resources to which the Claimant admitted in response to one of the questionnaires, Director's Exhibit 14. That regulation, which is part of the Director's due process obligation owed the Petitioner, states in pertinent part as follows:

> "§ 725.493 Employment relationship defined.
>
> (a)(1) In determining the identity of a responsible operator under this part, the terms "employ" and "employment" shall be construed *as broadly as possible*, and shall include any relationship under which an operator retains the right to direct, control, or supervise the work performed by a miner, or *any other relationship under which an operator derives a **benefit** from the work performed by a miner.* Any individuals who participate with one or more persons in the mining of coal, such as owners, proprietors, partners, and joint venturers, whether they are compensated by wages, salaries, piece rates, shares, profits, or by any other means, shall be deemed employees. *It is the specific intention of this paragraph to disregard any financial arrangement or business entity devised by the actual owners or operators of a coal mine or coal mine-related enterprise to avoid the payment of benefits to miners who, based upon the economic reality of their relationship to this enterprise, are, in fact, employees of the enterprise.*"

20 C.F.R. § 725.493(a)(1) (emphasis added). If the Director had questioned the Claimant at the outset regarding whether his hauling of coal for Cahaba Resources was of benefit to Cahaba Resources, the Claimant would certainly have admitted it. Indeed, at the hearing the Claimant admitted that he was an employee of Cahaba Resources, that he hauled unwashed coal for Cahaba Resources, *and* that Cahaba

*147*

Resources controlled his work. (Transcript, pp. 58-59). His work, therefore, obviously benefitted Cahaba.

### D.

Although counsel for the Director suggested at one point that Petitioner Fleetwood Trucking should have earlier provided this information (*first learned by your Petitioner at the hearing*) about the Claimant's relationship with Cahaba Resources despite the fact that it occurred after the Claimant left Fleetwood, the law is clear that making inquiry of the Claimant was the Director's responsibility. *See*, 20 C.F.R.§ 725.407(a) ("Upon receipt of the miner's employment history, the district director *shall* investigate whether *any* operator may be held liable for the payment of benefits as a responsible operator..."). This legal duty is also imposed by the federal courts. *See, e.g., Venicassa v. Consolidation Coal Co.*, 137 F.3d 197, 203-204 (3d Cir. 1998) (regarding another mistake made by the Director in the designation of the Responsible Operator). The reason this was not the Petitioner's obligation is simple: at that early point in the process, the government has the ability to compel the production of probative information while the Petitioner does not.

Despite this, it is clear the Director made no effort to exercise this power, or to otherwise to fulfill the Director's legal obligation to investigate the Claimant's relationship to "any operator" such as Cahaba Resources. Instead, according to

10

*14*

counsel for the Director, Mr. Winfrey, the Director simply relied upon the Claimant's "Social Security Earnings Record" in designating the Petitioner, and not Cahaba Resources, as the Responsible Operator. (Transcript, pp. 52-53). In other words, the Director failed to question the Claimant, or investigate Cahaba Resources, instead relying exclusively on Social Security records that do not even relate to the issue of whether the Claimant's work benefitted Cahaba Resources. Even Mr. Winfrey conceded that the Claimant's testimony contradicted these records:

> "MR. WINFREY: Well, Your Honor, there was an issue regarding the submission of certain documents. The testimony that was received today has largely, I mean, sort of slanted it towards Cahaba, quite honestly, and I get your point, but that wasn't presented to the Director. So, the Director has had no opportunity to consider the testimony that was given today. Despite the fact that these documents were submitted there was also an equal amount of evidence supporting that the responsible operator designation should be Fleetwood. So, the Operator with the designation of the responsible operator that *most likely had the last record on the Social Security Earnings Record*, which was Fleetwood not Cahaba. So, he just testified today that the type of material and the things that he was carrying for Cahaba were not fully processed, which would possibly change it. *Basically we're saying his testimony today went against what the District Director believed to be the situation.*"

(Transcript, pp. 52-53).

Not only does merely reviewing Social Security earnings records fail to constitute a reasonable investigation by the Director, the use of those records alone merely encourages employers, such as Cahaba Resources, to utilize the subterfuge of

11

149

an illusory independent contractor relationship in order to avoid responsibility for

black lung benefits, all to the detriment of the Trust Fund *and* prior employers like the

Petitioner:

> "MR. MCILWAIN: I was just... an old lawyer told me one time, he said, the law is what it ought to be. If what they're suggesting is accurate, then all I have to do is call somebody self-employed, not pay Social Security tax on them, and I can escape responsibility for Black Lung Benefits. Even though, as this gentleman has indicated repeatedly, he was an employee of Cahaba Resources. Its's just the way it was structured was apparently a way to avoid maybe unbeknownst to this man –
> JUDGE ROMANO: Its all over the place –
> MR. WINFREY: He was an independent contractor, Your Honor.
> JUDGE ROMANO: Coca Cola Trucking, everything is spinning off today. They don't... you own your own truck.
> MR. MCILWAIN: That's right."

(Transcript, p. 55). This is precisely the illusion § 725.493(a)(i) expressly abrogates.

In any event, learned counsel for the Director stipulated during the hearing that

the Director was "willing to go with the record and testimony as presented today"

(Transcript, p. 61), and based on that, the Petitioner is not the Responsible Operator

and should have been dismissed from this case based on that evidence.

### E.

Although the learned ALJ that conducted the July 13, 2011 hearing below also

may have signed the "Decision and Order Awarding Benefits" issued almost a year

later on June 26, 2012, one can only speculate whether he actually prepared that

150

document.  However, if he did, it is readily apparent that after the passage of that extended period of time,[2] he had forgotten what he had learned in the hearing.  In addition, the ALJ, or whoever wrote the decision, was confused and in error regarding the legal principles to be applied.

### 1.

For example, citing 20 CFR 725.456(b)(1), the decision concluded that the "Employer is prohibited from challenging its status as responsible operator because it did not submit evidence to the District Director challenging its status until well after the ninety day deadline had passed.  Specifically, the District Director notified Employer of its designation on January 12, 2010 and Employer did not respond to this notice until October 19, 29012.  (DX 16)."  (ALJ Decision, p 4).

However, although § 725.456 does preclude the admission of "documentary" evidence under these circumstances in connection with the responsible operator issue, it does *not* bar *testimonial* evidence, oral testimony, on that issue.  Otherwise the regulation would have used the word "evidence," rather than the more narrow term "documentary evidence."

Petitioner submits that the narrow wording of the regulation was likely intended

---

[2] 20 CFR § 725.476 required a decision to be issued within 20 days after the official termination of the hearing.

to address situations like that involved in this case, where a Claimant – who knows the identity of his most recent employer better than anyone – fudges in the information provided to the District Director, and the District Director does not question the Claimant despite having the ability and responsibility to do so. As written, the regulation permits the former employer to attempt to rectify this clear denial of due process by posing questions to the Claimant at the hearing, as occurred in the hearing below. If the District Director had fulfilled its obligation to investigate in this regard at the outset, and the Claimant had answered the District Director's follow up questions honestly, the Director, like the ALJ at the hearing, would have also become aware of "a ton of evidence exculpating Fleetwood," your Petitioner. (Transcript, p. 52).

## 2.

The ALJ, or whoever wrote the decision, compounded this error by holding that 20 CFR § 725.495(c) somehow also foreclosed this evidence. However, that is incorrect. As discussed above, federal case law and § 725.495(a)(1) mandate that in order to be responsible for the payment of benefits, an operator or other employer must be "the potentially liable operator, as determined in accordance with § 725.494, *that most recently employed the miner.*" §§ 725.495(b) and (c) simply address the respective burdens of proof of the Director and the "designated operator responsible"

14

under normal circumstances:

> "(b) Except as provided in this section and § 725.408(a)(3), with respect to the adjudication of the identity of a responsible operator, the Director shall bear the burden of proving that the responsible operator initially found liable for the payment of benefits pursuant to § 724.410 (the "designated responsible operator" is a potentially liable operator. It shall be presumed, in the absence of evidence to the contrary, that the designated responsible operator is capable of assuming liability for the payment of benefits in accordance with § 725.494(e).
>
> (c) The designated responsible operator shall bear the burden of proving either:
>
> (1) That it does not possess sufficient assets to secure the payment of benefits in accordance with § 725.606; or
>
> (2) That it is not the potentially liable operator that most recently employed the miner. Such proof must include evidence that the miner was employed as a miner after he or she stopped working for the designated responsible operator and that the person by whom he or she was employed is a potentially liable operator within the meaning of § 725.494. In order to establish that a more recent employer is a potentially liable operator, the designated responsible operator must demonstrate that the more recent employer possesses sufficient assets to secure the payment of benefits in accordance with § 725.606. The designated responsible operator may satisfy its burden by presenting evidence that the owner, if the more recent employer is a sole proprietorship; the partners, if the more recent employer is a partnership; or the president, secretary, and treasurer, if the more recent employer is a corporation that failed to secure the payment of benefits pursuant to part 726 of this subchapter, possess assets sufficient to secure the payment of benefits, provided such assets may be reached in a proceeding brought under subpart I of this part."

20 CFR § 725.495(b) and (c). These provisions do not prohibit the Petitioner from introducing evidence. On the contrary, they expressly permit it. Then § 725.495(d),

15

which addresses "any case referred to the Office of Administrative Law Judges," expressly allows for a finding that the operator finally designated as responsible operator by the Director in its proposed decision and order pursuant to 20 CFR § 725.418(d) was "not the operator that most recently employed the Miner." This is consistent with 20 CFR § 725.455(b) which requires the ALJ to "inquire fully into all matters at issue...," and to "receive into evidence the testimony of the witnesses and the parties."

Thus, the Decision was clearly erroneous insofar as it concluded that "[r]esponsible operators are not permitted to submit (and administrative law judges prohibited to consider") the Petitioner's evidence regarding its liability or its status as responsible operator.

### 3.

The decision was also in error in concluding that the Petitioner had a burden of proof at all. Where, as here, the Director fails to comply with its legal duty to investigate imposed by 20 CFR § 725.407(a), the Director should be estopped from enforcing even the burden-shifting provisions of this regulation. Normally, the burden of proof is on the Director. 20 CFR § 725.103. The Director has a legal, constitutional duty to "investigate whether *any* operator may be held liable for the payment of benefits as a responsible operator...". 20 CFR § 725.407(a). The other

16

154

regulations permitting the Director to designate and notify a "potentially liable operator" are obviously predicated on the assumption that the Director has fulfilled this basic obligation. This is evident from the fact that, even if the Petitioner had initially responded after the Director's erroneous designation of it as a Responsible Operator,[3] that response would not have addressed the identity of the Claimant's last employer. A review of the DOL's prescribed response form, Form CM-2970A entitled "Operator Response to Notice of Claim," reveals that the issue of "last" employer is not even a topic on that form. The Director was alone required to, and should have, fully investigated that issue before it ever notified the Petitioner.

To hold otherwise would be an unconstitutional denial of due process. In essence, under the Decision, the Petitioner would be presumed to be the potentially liable operator that "*most recently* employed the miner" even though it clearly was not, simply based on its failure to provide evidence to the Director regarding totally unrelated issues within a relatively short period of time after being notified of a claim, specifically, whether it denied being "an operator," or "the operator" that "employed the miner as a miner," that "the miner was exposed to coal mine dust" or that it "is capable of assuming liability for the payment of benefits." 20 CFR 725.408(a)(2).

---

[3]The Petitioner's failure to initially respond was simply a matter of ignorance, not disrespect. As indicated above and by its name, it is not a sophisticated mining company or anything other than a tiny, closely held trucking company that had no experience whatsoever with black lung claims.

155

None of those factors bear any relation whatsoever to who the *last* such employer actually was. Yet, the effect of the Decision, as well as the Director's position on the interpretation of § 725.495(b) and (c), creates a presumption that the operator designated by the Director was the Claimant's last employer.

It is hornbook law that Congress can only create presumptions where the presumed fact "more likely than not..." flows from the proved fact on which it is made to depend." *Leary v. U.S.*, 395 U.S. 6, 36 (1969). If there is no *rational* connection between the two, the presumption violates the due process clause. *Western & A.R.R. v. Henderson*, 279 U.S. 639, 641-42 (1929). Therefore, Congress cannot constitutionally authorize any administrative agency, whether it is the Department of Justice or the Department of Labor, to create a presumption that fails to meet this due process standard and thereby "relieve the Government of having to adduce such evidence at every" ALJ hearing. *Leary v. U.S.*, 395 U.S., 38. The fact that an unconstitutional presumption is rebuttable does not save it. *Id. See also, Western & A.R.R. v. Henderson, supra; Morales v. Nationwide Ins. Co.*, 237 F. Supp. 2d 147 (D.P.R. 2002); *Miller v. Norvell*, 775 F.2d 1572, 1575 (11th Cir. 1985).

Obviously, the mere fact that an operator might qualify as a potentially responsible operator furnishes no basis whatsoever for any inference that it was the *most recent* coal-related employer. This is irrefutable in the instant case where the

18

15

Claimant *admitted* that the Petitioner was most certainly not his last employer, and that a conglomerate for which he was employed for over two years actually was. Therefore, any attempt to presume otherwise is clearly unconstitutional. *Compare with, Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 11 (1976) (presumption under Black Lung Act upheld where there was a strong rational connection between long term exposure to mine work – the proved fact – and respiratory ailments, and developing pneumoconiosis – the presumed facts).

The Petitioner would be remiss if it did not note the deleterious effect that the application of the rationale of the Decision has and will have on the quality of the Director's investigation of this issue in the future. This is clearly demonstrated in the instant case. The imposition of a burden of proof on an operator encourages the Director to make only a cursory investigation – here a mere review of Social Security records – and make no effort to determine whether the "independent contractor" relationship with Cahaba Resources reported by the Claimant is a mere sham to obscure a mutually beneficial employment relationship with another operator.

## II

## FINANCIAL ABILITY

Even if the burden of proof shifted to Petitioner Fleetwood Trucking under 20 CFR § 725.495(c), the Petitioner carried its burden under that provision by the

19

uncontradicted testimony of Petitioner:

> "Q.   Does your company, or you, have any insurance coverage for
>       Black Lung claims?
> A.    No, sir.
> Q.    Are you financially capable, or your company financially capable,
>       to be able to pay Black Lung Benefits, or be financially
>       responsible for one?
> A.    No, sir.
> Q.    Is your company in any way related to Cahaba Resources or the
>       Crawford family?
> A.    No, sir.
> MR. McILWAIN: That's all I have, thank you."

The ALJ was certainly so convinced that he openly criticized the Claimant's and the
Director's case:

> "JUDGE ROMANO: This case is becoming ridiculous.  What about
> that?  If he's not financially capable?  Doesn't the law say you cannot
> name them as an RO?  Isn't that a fact?
>
>                              *    *    *
>
> JUDGE ROMANO: Okay, because I don't want to wind up awarding
> Black Lung Benefits and these folks cannot pay it."

(Transcript, pp. 68, 70).

Despite this, the text of the Decision held that the Petitioner had "put forth

insufficient evidence" that it was "financially incapable of assuming liability under §

725.495(c)."  This is obviously directly contrary to the ALJ's statements during the

hearing set out above.  In addition, citing § 725.494(e)(3), the text of the Decision

20

158

states that the alleged insufficiency relates to the failure to "submit evidence, such as a tax return." (Decision and Order, pp. 4-5). However, that provision *makes no such requirement*, whether of tax returns or any other documentary evidence. The ALJ was fully satisfied with the evidence of financial inability at the hearing, and indeed so satisfied that he deemed the case as "becoming ridiculous." With all due respect to the ALJ, to later hold otherwise was too.[4]

Thus, even if the ALJ's interpretation of 20 CFR § 725.495(b) and (c) was not unconstitutional as discussed in part I above, the Petitioner carried the burden of proof imposed by (c)(1) thereof.[5]

## III

## CAUSATION

That the Decision below constitutes a manifest injustice is also demonstrated by the absence of evidence on the issue of causation. Significantly, the Director originally decided that the Claimant's black lung disease was not proximately caused by the Claimant's alleged exposure to coal dust while employed by Petitioner Fleetwood

---

[4]Moreover, based on § 725.494(d), it is apparent that the Director already had this type of information, and therefore was on notice that the Petitioner was not financially able to pay benefits

[5]20 CFR 725.495(c) does not require the Petitioner to prove both (c)(1) and (c)(2) to avoid liability. Instead, it expressly states that the Petitioner can prove "either." The Decision recognized this distinction stating that the Petitioner "may be relieved of liability only if it proves *either* that it is financially incapable...". (Decision and Order, p. 4).

21

Trucking:

> "The available evidence establishes Mr. Warren's prolonged exposure to
> coal dust. However, in evaluating his employment dates, the transported
> material and delivery locations, the evidence establishes limited exposure
> to coal mine dust. It is the Department's *long-held position* that the
> occupational dust exposure at issue under Black Lung Benefits Act is a
> *total exposure arising from coal mining*, and not only exposure to coal
> dust itself. The evidence establishes that most of the coal the claimant
> hauled was in the stream of commerce. Therefore, although the presence
> of pneumoconiosis as defined in 20 CFR 718.201 has been established,
> the provisions of 20 CFR 718.203, which relate to the causal relationship
> of the disease to coal mine employment is not established in accordance
> with 20 CFR 718.203."

Unlike the Responsible Operator issue, it is apparent that the Director

thoroughly investigated the causation issue, and the Director's conclusion was fully

supported at the hearing in light of the Claimant's oftentimes evasive testimony about

responses he earlier gave to the Director's questionnaire (Director's Exhibit 15)

regarding his employment with the Petitioner. Indeed, his testimony at the hearing in

response to his attorney's questions conflicted with the responses he made to the

Director's questionnaires before hiring an attorney:

> "MR. McILWAIN: I wanted to ask you a few bits of information that
> you've got in here that I was curious about and I think the Director was
> before. You filled out some of this relating to Fleetwood Trucking
> Company and you said that let's see, the truck you drove was air
> conditioned.
> Q.    And you told us that it was air conditioned, correct?
> A.    Yes.
> MR. McILWAIN: Then you said [in] answer to the question, "were you

*160*

required to leave the cab during loading," you said, "Yes, to pick up shipping invoice." First you wrote no, but then you struck through that and put, yes, to pick up shipping invoices.

Q.    That would be very brief wouldn't it?

A.    Yes.

Q.    In a lot of operations you can just call on your CB radio from your truck and they will just bring it to you in your cab, correct?

A.    No, sir, I never had one?

Q.    Never had that?

MR. McILWAIN: Well, then the next question, and this was focused on by the Director many times during the decision, or their opinion.

Q.    It asks, "were you regularly exposed to significant amounts of coal dust during loading?" Your answer was, "No." Correct?

A.    Well –

Q.    Was that your answer?

A.    Apparently.

Q.    Yes, sir, I mean, there's no question about that, correct? I mean, it says it, correct?

A.    Yes, sir.

Q.    You've already told us you went to high school, you graduated from high school. You can read and write and understand the English language. I'm not trying to embarrass you at all, but you can read and write, correct?

A.    Somewhat.

Q.    You were the one that filled out all of the answers to these questions in this questionnaire, correct?

A.    Yes, sir.

Q.    No one else did it for you?

A.    No, sir.

Q.    You didn't have a lawyer preparing an affidavit for you or anything like that, you just filled them out based on the information that you knew, correct?

A.    Yes.

Q.    You knew that at the very top of the form it says, "Please complete as accurately as possible the following questions concerning your employment." That's what it says, correct?

A.    That's what it says.

23

161

Q. So, when you were answering these you were following the instructions, correct?

A. I could have lost well, yes.

Q. You knew whether you had been regularly exposed to significant amounts of coal dust, correct?

A. Yes.

Q. You said no?

A. Yes.

Q. It says on this, "were you required to leave the cab during unloading" and you said, "just to open the tailgate," is that correct?

A. Now, do what now?

Q. The question is "were you required to leave the cab during unloading" and you answered "just to open the tailgate."

A. Yes, sir.

Q. So, you all would open the tailgate during unloading?

A. Yes, sir.

Q. Okay.

A. You've got to it won't come out.

Q. This is after you've already driven over the road several miles to wherever you're going to be dumping, correct?

A. That's right.

Q. Then the next question is, "were you regularly exposed to significant amounts of coal dust during unloading?" The prior question was loading, this is unloading, and what was your answer then?

A. Says "no."

Q. Again, this is before you had any lawyers trying to help you with this case, correct?

A. Of course, yes.

Q. Now, just so the record is clear as far as the two years from, you said from 97 to 2002, that you were working with Fleetwood Trucking. At no time did you work in an underground mine, correct?

A. I hauled from underground mine.

Q. But as far as working in an underground mine you did not work inside the mine, correct?

24



A.    I was a truck driver.

Q.    Yes, sir, so you didn't work inside the mine?

A.    No, I didn't work inside the mine.

Q.    You weren't a coal miner, correct?

MS. VAN ALYSTYNE: Objection, that's a legal issue.

Q.    You didn't actually load the coal, correct?

A.    No, sir.

Q.    Most of your time during each day was spent on the road, correct?

A.    No, sir, not necessarily.

Q.    The loading process would take at most thirty (30) minutes, correct?

A.    There were days we hauled on the haul road, sir.

Q.    Okay. Well, the haul roads, or somewhere away from the stockpile, correct?

A.    You would haul from the stockpile to an unloading place such as a barge unloading place, or from a stockpile to a stockpile.

Q.    Okay, but it was on its way to market in that sense?

A.    No, it hadn't been finished to go to market.

Q.    But it was on its way to market though.

A.    When it was re-blended, sir.

Q.    Yes. Most of your time was spend on a road moving, correct?

A.    Yes.

Q.    Driving, correct?

A.    Yes.

Q.    Fleetwood did not operate a coal mine did it?

A.    No.

Q.    Sir?

A.    No."

(Transcript, pp. 33-36).

Obviously, this occasional exposure to dust does not constitute a "total exposure arising from coal mining" consistent with the Department of Labor's "long-held position" that was binding on the ALJ. The justification for that position was

25

certainly born out by the facts of this case. Tellingly, the evidence was undisputed that none of Petitioner Fleetwood Trucking's other drivers ever suffered from black lung disease. Petitioner's owner, Lee Sellers, testified that he performed the very same tasks as the Claimant and never has had this disease either. (Transcript, pp. 67-68). Moreover, the Claimant submitted absolutely no expert testimony that any coal dust encountered during his employment by the Petitioner caused or ever contributed to cause any health issues.

By contrast, the Claimant admitted that he hauled unwashed coal from Cahaba Resources' strip mines for two years, and that it was only at the conclusion of his employment by Cahaba that he was diagnosed with a possible case of black lung disease. (Transcript, pp. 15-16, 26-29). Apparently, exposure during his employment by Cahaba, which continued until his retirement from Cahaba in October of 2009, was the cause, and he filed his claim shortly thereafter. Indeed, in his Post-Hearing Brief, the Claimant unwittingly conceded this was probable:

> "It is obvious that his total years of covered coal mine employment are not great. However, it is equally obvious that Claimant has acquired a high degree of pneumoconiosis and that he has become totally disabled by it. The evidence strongly suggests that *his lungs are very susceptible to the disease* and that its progression in his case has been more rapid and severe than it is for many miners. The medical literature acknowledges that individuals with high susceptibility to lung damage can show the kind of progression that Mr. Warren has shown with *relatively brief periods of exposure*."

164

(Claimant's Post-Hearing Brief, p. 12). In other words, from all that appears, the Claimant's disease was caused by his exposures at Cahaba Resources.

## V

## CONCLUSION

For the reasons discussed above, the decision below is due to be reversed and the Trust Fund deemed to be responsible for benefits, if any are awarded.

16

Christopher Lyle McIlwain, Sr. - MCI-002
Hubbard, Wiggins, McIlwain
& Brakefield, P.C.
Post Office Box 2427
Tuscaloosa, AL  35403
Telephone: (205) 345-6789
Attorneys for Petitioner Fleetwood Trucking
Company, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served the foregoing Memorandum of Law on each of the below-named parties by placing a copy of the same in the U.S. Mail, first-class postage prepaid, and addressed as follows on this the 5th day of September, 2012.

Rae Ellen James, Associate Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC 20210

Regional Solicitor
U.S. Department of Labor
618 Church Street, Suite 230
Washington, DC 20210

James Garry Warren, Jr.
14536 Lake Wildwood
Cottondale, AL 35453

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 290, Suite 380
Birmingham, AL 35223

Of Counsel

28

166

**U.S. Department of Labor**

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 12-0559 BLA

| | | |
|---|---|---|
| JAMES GARY WARREN, SR. | ) | **NOT PUBLISHED** |
| Claimant-Respondent | ) | |
| v. | ) | |
| FLEETWOOD TRUCKING COMPANY, INCORPORATED | ) | DATE ISSUED: ___ MAY 2 2 2013 |
| Employer-Petitioner | ) | |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR | ) | |
| Party-in-Interest | ) | DECISION and ORDER |

Appeal of the Decision and Order Awarding Benefits of Ralph A. Romano, Administrative Law Judge, United States Department of Labor.

Abigail P. van Alstyne (Quinn, Connor, Weaver, Davies & Rouco, LLP), Birmingham, Alabama, for claimant.

Christopher Lyle McIlwain, Sr. (Hubbard, Wiggins, McIlwain & Brakefield, P.C.), Tuscaloosa, Alabama, for employer.

Helen H. Cox (M. Patricia Smith, Solicitor of Labor; Rae Ellen James, Associate Solicitor; Michael J. Rutledge, Counsel for Administrative Litigation and Legal Advice), Washington, D.C., for the Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: DOLDER, Chief Administrative Appeals Judge, SMITH and McGRANERY, Administrative Appeals Judges.

PER CURIAM:

Employer, Fleetwood Trucking Company, Incorporated (employer or Fleetwood), appeals the Decision and Order Awarding Benefits (2011-BLA-05343) of Administrative Law Judge Ralph A. Romano rendered on a claim filed pursuant to the provisions of the

Black Lung Benefits Act, as amended, 30 U.S.C. §§901-944 (Supp. 2011) (the Act). This case involves a miner's claim filed on October 29, 2009.  The administrative law judge initially found that claimant, who worked as a truck driver hauling coal, was employed as a miner under the Act, and he credited claimant with twelve years of coal mine employment.[1]  The administrative law judge also determined that employer is the properly designated responsible operator. Adjudicating this claim pursuant to 20 C.F.R. Part 718, the administrative law judge found that the evidence established the existence of pneumoconiosis, pursuant to 20 C.F.R. §718.202(a), and that claimant's pneumoconiosis arose out of coal mine employment, pursuant to 20 C.F.R. §718.203(b). The administrative law judge further found that claimant established that he is totally disabled by a respiratory impairment, pursuant to 20 C.F.R. §718.204(b)(2), and that pneumoconiosis is a substantially contributing cause of his total disability, pursuant to 20 C.F.R. §718.204(c). Accordingly, the administrative law judge awarded benefits.

On appeal, employer argues that the administrative law judge erred in finding that it is the responsible operator. Employer also challenges the administrative law judge's determination, pursuant to 20 C.F.R. §718.203(b), that claimant's pneumoconiosis arose out of coal mine employment.  Claimant and the Director, Office of Workers' Compensation Programs (the Director), respond, urging the Board to hold that employer is the properly designated responsible operator, and to affirm the award of benefits.[2] Employer filed a reply brief, reiterating its contentions on appeal.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is supported by substantial evidence, is rational,

---

[1] Because the administrative law judge found that claimant established fewer than fifteen years of coal mine employment, a recent amendment to the Black Lung Benefits Act, which became effective on March 23, 2010, does not apply to this case. *See* 30 U.S.C. §921(c)(4), *amended by* Pub. L. No. 111-148, §1556(a), 124 Stat. 119, 260 (2010).

[2] We affirm, as unchallenged on appeal, the administrative law judge's determinations that claimant was a miner under the Act, and established twelve years of coal mine employment. *See Skrack v. Island Creek Coal Co.*, 6 BLR 1-710, 1-711 (1983). We further affirm, as unchallenged, the administrative law judge's findings that claimant established the existence of pneumoconiosis, pursuant to 20 C.F.R. §718.202(a), that he has a totally disabling respiratory impairment, pursuant to 20 C.F.R. §718.204(b)(2), and that his total disability is due to pneumoconiosis, pursuant to 20 C.F.R. §718.204(c). *See Skrack*, 6 BLR at 1-711.

2

and is in accordance with applicable law.[3]  33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

### Responsible Operator

We first address employer's challenge to the administrative law judge's responsible operator determination.  The responsible operator is the "potentially liable operator, as determined in accordance with [20 C.F.R.] §725.494, that most recently employed the miner." 20 C.F.R. §725.495(a)(1).  A coal mine operator is a "potentially liable operator" if it meets the criteria set forth at 20 C.F.R. §725.494(a)-(e).[4]  Once a potentially liable operator has been properly identified by the Director, that operator may be relieved of liability only if it proves either that it is financially incapable of assuming liability for benefits, or that another operator more recently employed the miner for at least one year and it is financially capable of assuming liability for benefits. *See* 20 C.F.R. §725.495(c).

Through its investigation, the district director determined that employer was an ongoing business and was financially capable of assuming liability for the payment of benefits.  Thus, on January 12, 2010, the district director issued a Notice of Claim, informing employer that it was identified as a potentially liable operator.  Director's Exhibit 16.  In the Notice, the district director acknowledged that claimant was more recently employed as a self-employed truck driver, but indicated that claimant did not qualify as a responsible operator.  Director's Exhibit 16.  The Notice further provided that "within 30 days of receipt of this Notice of Claim, you (or your insurer) must file a response . . . indicating your intent to accept or contest your identification as a potentially liable operator." *Id.*  The Notice advised employer that if it wished to contest its status as a potentially liable operator, it "must state the precise nature of [its] disagreement by accepting or denying each of the five assertions listed" in

---

[3] This case arises within the jurisdiction of the United States Court of Appeals for the Eleventh Circuit, as claimant's coal mine employment was in Alabama. *See Shupe v. Director, OWCP*, 12 BLR 1-200, 1-202 (1989) (en banc); Director's Exhibit 3.

[4] In order for a coal mine operator to meet the regulatory definition of a "potentially liable operator," the miner's disability or death must have arisen out of employment with the operator, the operator must have been in business after June 30, 1973, the operator must have employed the miner for a cumulative period of not less than one year, the employment must have occurred after December 31, 1969, and the operator must be financially capable of assuming liability for the payment of benefits, either through its own assets or through insurance. 20 C.F.R. §725.494(a)-(c).

3

the Notice. Director's Exhibit 16. The Notice also emphasized to employer that if it did "not respond within 30 days of [its] receipt of the Notice of Claim," it would "not be allowed to contest [its] liability for payment of benefits on any of the grounds set forth in 20 C.F.R. 725.408(a)(2) . . . ."[5]  Director's Exhibit 16. Further, the cover letter accompanying the Notice of Claim reiterated that "failure to respond within thirty (30) days will result in our finding that your company is the proper responsible operator and that you are financially able to assume liability for any benefits that may accrue from this claim." Director's Exhibit 16. The Notice of Claim was sent by certified mail to Mr. Lee Sellers, the president of Fleetwood, who signed the certified mail return receipt on March 9, 2010. Director's Exhibit 16. Fleetwood did not respond to the Notice of Claim.

On August 31, 2010, the district director issued a Schedule for the Submission of Additional Evidence, identifying employer as the responsible operator.  Director's Exhibit 17. The Schedule stated that Fleetwood met the criteria of a potentially liable operator, and explained that, while Fleetwood was not the operator that most recently employed claimant, Fleetwood was the designated responsible operator because claimant's most recent employment was as a self-employed truck driver.[6]  Director's Exhibit 17. The Schedule informed employer that "it may respond to this schedule by September 30, 2010, and accept or reject its designation. If the responsible operator does not respond, it will be deemed to accept its designation and to waive its right to contest its liability in any further proceedings." Director's Exhibit 17. The Schedule also informed employer that because it failed to respond to the Notice of Claim, it could no longer submit evidence challenging its status as a potentially liable operator. The Schedule was sent by certified mail to Mr. Lee Sellers, the president of Fleetwood, who signed the

---

[5] An operator that wishes to contest its identification as a potentially liable operator in a Notice of Claim must timely file a response in which it either admits or denies each of the following assertions: (1) that it was an operator for any period after June 30, 1973; (2) that it employed the miner for a cumulative period of not less than one year; (3) that the miner was exposed to coal mine dust while working for the operator; (4) that the miner's employment included at least one working day after December 31, 1969; and (5) that the operator is capable of assuming liability for the payment of benefits. 20 C.F.R. §725.408(a)(2)(i)-(v).

[6] The district director's Liability Analysis portion of the Schedule for the Submission of Additional Evidence set forth that claimant hauled coal and other products for multiple companies from August 2, 2002 to October 2, 2009. Director's Exhibit 17. The analysis concluded that, as claimant's most recent work was as an uninsured, self-employed coal truck driver, claimant was not considered to be a potentially liable operator. Director's Exhibit 17.

certified mail return receipt on September 9, 2010. Director's Exhibit 17. Employer submitted no response within the stated time period.

Instead, on October 19, 2010, Mr. Sellers telephoned the district director's office and left a voicemail message asking what he needed to submit in response to claimant's claim for benefits. Director's Exhibit 16. The following day, in a telephone conversation with a claims examiner, Mr. Sellers acknowledged that he received the Schedule for the Submission of Additional Evidence, and he asserted that claimant hauled only rock, sand, stone, and finished coal for employer. *Id.* The claims examiner referred Mr. Sellers to the instructions provided in the Schedule as to the documentation he needed to submit. On November 9, 2010, Mr. Sellers submitted a written statement asserting that Fleetwood did not fit the definition of a coal mine operator, that claimant did not fit the definition of a miner, and that claimant was not exposed to coal dust while working for Fleetwood.[7] Director's Exhibit 16.

In a Proposed Decision and Order dated November 30, 2010, the district director denied benefits, but determined that Fleetwood "is the coal mine operator designated responsible for the payment of benefits due claimant should this denial be reversed to an award of benefits as a result of subsequent proceedings." Director's Exhibit 19. The accompanying liability analysis noted that employer failed to file timely responses to the Notice of Claim or to the Schedule for the Submission of Additional Evidence. The Proposed Decision and Order acknowledged receipt of Mr. Seller's November 9, 2010 written statement, but concluded that this evidence was untimely. *Id.*

At claimant's request, the case was referred to the Office of Administrative Law Judges for a hearing. Director's Exhibit 20. In response to the hearing notice, by letter dated June 3, 2011, employer notified the administrative law judge that it intended to allege that it was improperly identified as the responsible operator. Employer's Exhibit 1. At the hearing, claimant's counsel and employer's counsel elicited testimony from claimant that, after working for employer, he hauled coal for Cahaba Resources for over one year.[8] Hearing Tr. at 24-40. Additionally, Mr. Sellers testified, and he was asked

---

[7] Specifically, Mr. Sellers stated that Fleetwood hauled "some coal" that had been strip mined and placed on stock piles at least one-quarter mile from the mining operation, that claimant "was not a miner and did not work in or around a coal mine . . . . [H]e simply drove a truck to the stockpile where it was loaded by others while he remained in the cab of his air-conditioned truck. In short, he had no known exposure to coal mine dust." Director's Exhibit 16.

[8] At the hearing, counsel for employer and counsel for the Director, Office of Workers' Compensation Programs (the Director), disagreed as to whether claimant's testimony indicated that he hauled coal as an employee of Cahaba Resources, or as a self-

whether he or his company, Fleetwood Trucking, is financially capable of paying benefits. Hearing Tr. at 68. He responded, "No, sir." *Id.*

In his Decision and Order, the administrative law judge reviewed the evidence, claimant's testimony, and the arguments of the parties, and determined that employer is the properly designated responsible operator. Decision and Order at 4-5. The administrative law judge found that, by failing to timely submit evidence to the district director, employer waived its right to submit evidence before the administrative law judge challenging its identification as the responsible operator. Alternatively, the administrative law judge found that, even if he considered employer's evidence, employer failed to meet its burden to prove that it is financially incapable of assuming its liability for benefits.

Employer contends that the administrative law judge erred because claimant's testimony establishes that his last coal mine employment for over one year was with Cahaba Resources, not employer, and asserts that the district director would have uncovered this evidence had it conducted a more thorough investigation into claimant's employment history. Employer's Brief at 12, 14-15, 18-19. Employer contends that the district director's "fail[ure] to comply with its legal duty to investigate" resulted in an improper presumption that employer was the most recent operator to employ claimant, thereby depriving employer of due process of law. Employer's Brief at 16-17. Finally, employer asserts that, assuming it was the most recent operator to employ claimant, it has established that it is financially incapable of assuming liability for the payment of benefits. Employer asserts that, therefore, employer should be dismissed as the responsible operator, and liability should be transferred to the Black Lung Disability Trust Fund. Employer's Brief at 20-21. We disagree.

The regulations provide that "within 30 days after the district director issues a schedule [for the submission of additional evidence] . . . containing a designation of the responsible operator liable for the payment of benefits, that operator shall file a response with regards to its liability." 20 C.F.R. §725.412(a)(1). If the designated responsible operator "does not file a timely response, it shall be deemed to have accepted the district director's designation with respect to its liability, *and to have waived its right to contest its liability in any further proceeding conducted with respect to the claim.*" 20 C.F.R. §725.412(a)(2) (emphasis added). The district director issued the schedule on August 31,

---

employed, independent contractor. Hearing Tr. at 55-61. Additionally, the Director's counsel informed the administrative law judge that employer did not timely respond to the Notice of Claim or to the Schedule for the Submission of Evidence, and thus, did not present any evidence to the district director at the time the district director was making the responsible operator determination. Hearing Tr. at 63-65.

2010, and notified employer that it had until September 30, 2010 to respond. As the administrative law judge found, employer did not respond to the district director's notification until October 19, 2010, when Mr. Sellers telephoned the district director. Decision and Order at 4; Director's Exhibit 16. While employer subsequently submitted a written statement, it was both untimely and unresponsive to the request for information delineated in the Schedule for the Submission of Additional Evidence. Director's Exhibit 16. We, therefore, agree with the Director that employer waived its right to contest its liability in any further proceeding conducted with respect to this claim, and we affirm the administrative law judge's determination that employer "is prohibited from challenging its status as responsible operator. . . ." Decision and Order at 4; 20 C.F.R. §725.412(a)(2); Director's Brief at 6.

We further affirm, as supported by substantial evidence, the administrative law judge's alternative finding that, even assuming employer's response was timely, employer did not meet its burden to establish either that Cahaba Resources more recently employed claimant *and* "possesses sufficient assets to secure the payment of benefits," or that employer does not possess sufficient assets to secure the payment of benefits. 20 C.F.R. §725.495(c)(1), (2); Decision and Order at 4-5. Contrary to employer's arguments, the administrative law judge properly found that employer had the burden of proof on those issues. Specifically, employer maintains that the district director did not thoroughly investigate whether claimant's more recent employment, hauling coal for Cahaba Resources, was as an independent contractor, as claimant asserted, or was performed as an employee of Cahaba Resources, such that Cahaba Resources should have been identified as a potentially liable operator. Employer asserts that the district director's failure to properly investigate before naming employer as a potentially liable operator deprived employer of due process. Contrary to employer's assertion, due process requires that employer be given the opportunity to mount a meaningful defense by being timely informed of the claim and be given the opportunity to develop evidence in response to the claim. *See Island Creek Coal Co. v. Holdman*, 202 F.3d 873, 22 BLR 2-25 (6th Cir. 2000); *North Am. Coal Co. v. Miller*, 870 F.2d 948, 12 BLR 2-222 (3d Cir. 1989). Here, employer received timely notice of the claim, but failed to timely respond. Therefore, employer has not established that it was deprived of an opportunity to mount a meaningful defense. *See Holdman*, 202 F.3d at 883-84, 22 BLR at 2-32; *see also Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 871-72, 23 BLR 2-124, 2-176-77 (D.C. Cir. 2002), *aff'g in part and rev'g in part Nat'l Mining Ass'n v. Chao*, 160 F. Supp.2d 47 (D.D.C. 2001)(upholding the burden shifting provisions of the responsible operator liability regulations).

Further, the administrative law judge's findings are supported by substantial evidence. As the administrative law judge found, employer did not assert, or present evidence, that Cahaba Resources possesses sufficient assets to secure the payment of benefits. Therefore, whether claimant was more recently employed by Cahaba Resources

is immaterial. *See* 20 C.F.R. §725.495(c)(2). Nor has employer submitted any evidence to establish that Fleetwood does not possess sufficient assets to secure the payment of benefits. As the administrative law judge found, the mere fact that employer is uninsured does not relieve employer of liability for payment. *See* 20 C.F.R. §§725.494(e)(1)-(3), 725.495(c)(1). Accordingly, for all the foregoing reasons, we affirm the administrative law judge's determination that employer is the properly designated responsible operator. *See McClendon v. Drummond Coal Co.*, 861 F.2d 1512, 1513, 12 BLR 2-108, 2-109 (11th Cir. 1988).

## Pneumoconiosis Arising out of Coal Mine Employment

Employer next contends that the administrative law judge erred in finding that claimant's pneumoconiosis arose out his coal mine employment with Fleetwood. Employer's Brief at 21-27. Specifically, employer contends that claimant provided no medical evidence to establish that his pneumoconiosis arose out of coal mine employment with employer, and asserts that no other truck drivers employed by Fleetwood have been diagnosed with pneumoconiosis. Employer's Brief at 26. Employer also asserts that the administrative law judge's finding is flawed, because it is contrary to the district director's determination that claimant did not prove that his pneumoconiosis arose out of coal mine employment, pursuant to 20 C.F.R. §718.203(c). Employer's Brief at 22. Employer's contentions lack merit.

Findings of fact made by the district director are not binding upon the administrative law judge, who must perform a de novo review of the evidence in order to determine whether entitlement to benefits has been established. *See* 20 C.F.R. §§725.351, 725.450, 725.452, 725.455(a); *see Oggero v. Director, OWCP*, 7 BLR 1-860 (1985). Further, while the district director found fewer than ten years of coal mine employment established, the administrative law judge credited claimant with more than ten years of coal mine employment, a finding employer does not contest. Decision and Order at 5-6. Thus, the administrative law judge properly found that claimant is entitled to the rebuttable presumption that his pneumoconiosis arose out of coal mine employment. 20 C.F.R. §718.203(b); Decision and Order at 7.

With respect to whether employer rebutted the presumption, the administrative law judge considered employer's contention that claimant was not exposed to coal mine dust while working for Fleetwood, but he permissibly found that more credible evidence, specifically, claimant's testimony that he was exposed to coal dust, belied that assertion. *See U.S. Steel Mining Co. v. Director, OWCP [Jones]*, 386 F.3d 977, 992, 23 BLR 2-213, 2-238 (11th Cir. 2004); Decision and Order at 3-4, 7. Moreover, the administrative law judge found, and the record reflects, that employer put forth no medical evidence that claimant's pneumoconiosis was due to something other than coal mine dust exposure. Decision and Order at 7. We, therefore, affirm the administrative law judge's findings

that claimant is entitled to the rebuttable presumption that his pneumoconiosis arose out of coal mine employment, and that employer failed to rebut the presumption. 20 C.F.R. §718.203(b); Decision and Order at 7. Because employer raises no other arguments regarding claimant's entitlement, we affirm the award of benefits.

Accordingly, the administrative law judge's Decision and Order Awarding Benefits is affirmed.

SO ORDERED.


NANCY S. DOLDER, Chief
Administrative Appeals Judge


ROY P. SMITH
Administrative Appeals Judge


REGINA C. McGRANERY
Administrative Appeals Judge

# CERTIFICATE OF SERVICE

2012-0559-BLA James Garry Warren, Jr. v. FLEETWOOD TRUCKING COMPANY, Director, Office of Workers' Compensation Programs (Case No. 11-BLA-5343)

I certify that the parties below were served this day.

_MAY 2 2 2013_
(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Christopher Lyle McIlwain, Sr.
HUBBARD, WIGGINS, McILWAIN &
BRAKEFIELD, P.C.
808 Lurleen Wallace Blvd., North
P.O. Box 2427
Tuscaloosa, AL 35403-2427
   --Certified

James Garry Warren, Jr.
14536 Lakewildwood
Cottondale, AL 35453
   --Certified

Maia S. Fisher, Esq.
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Suite N-2117, NDOL
   --Certified

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 280
Suite 380
Birmingham, AL 35223
   --Certified

Ralph A. Romano
U.S. Department of Labor
Office of the Administrative Law Judges
2 Executive Campus
Suite 450
Cherry Hill, NJ 08002

Steven Breeskin
U.S. Department of Labor
Suite C-3516, NDOL
Washington, DC 20210

176

# ALABAMA
## CERTIFICATE OF DEATH

**TYPE IN PERMANENT BLACK INK. DO NOT USE GREEN, RED, OR BLUE INK.**

County File Number

State File Number  101 NOV U 8 2013

| 1 DECEASED—NAME First Middle Last (Type last name all capitals) | | 2 DATE OF DEATH (Month, Day, Year) | 3 COUNTY OF DEATH |
|---|---|---|---|
| James Gary WARREN | | October 18, 2013 | Jefferson |

| 4 CITY, TOWN, OR LOCATION OF DEATH AND ZIP CODE | 5 INSIDE CITY LIMITS (Specify Yes or No) | 6 PLACE OF DEATH—HOSPITAL OR OTHER INSTITUTION—(If not in either, give street and number) |
|---|---|---|
| Birmingham 35294 | Yes | UAB Hospital |

| 7 IF HOSPITAL (Specify Inpatient, ER or Outpatient, DOA) | 8 OF HISPANIC ORIGIN (Specify Yes or No) If Yes, Specify Cuban, Mexican, Puerto Rican, etc. | 9 RACE—(Specify American Indian, Black, White, etc.) | 10 SEX |
|---|---|---|---|
| Inpatient | No | White | Male |

| 11 AGE 64 YRS. | 12 UNDER 1 YEAR MOS. DAYS | UNDER 1 DAY HOURS MINS. | 13 DATE OF BIRTH (Month, Day, Year) January 9, 1949 | 14 DECEASED'S SOCIAL SECURITY NUMBER -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 |
|---|---|---|---|---|

| 15 EDUCATION (Specify ONLY highest grade completed below) Elementary or High School (0-12) 12 College (1-4 or 5+) | 16 MARITAL STATUS (Specify Married, Never Married, Widowed, Divorced) Married | 17 SURVIVING SPOUSE (If wife, give maiden name) Debbie Blaich | 18 Was Decedent ever in Armed Forces (Specify Yes or N Yes |
|---|---|---|---|

| 19 STATE OF BIRTH (If not in USA, name country) Alabama | 20 RESIDENCE—STATE Alabama | 21 COUNTY Tuscaloosa | 22 CITY, TOWN, OR LOCATION AND ZIP CODE Cottondale 35453 |
|---|---|---|---|

| 23 INSIDE CITY LIMITS (Specify Yes or No) No | 24 STREET AND NUMBER 14536 Lake Wildwood Drive | 25 INFORMANT—Name and Address Debbie Warren 14536 Lake Wildwood Dr. Cottondale, AL 3545 |
|---|---|---|

| 26 USUAL OCCUPATION (Give kind of work done during most of working life even if retired) Hauling Coal | 27 KIND OF BUSINESS OR INDUSTRY Trucking |
|---|---|

| 28 FATHER—NAME First Middle Last James Wesley Warren | 29 MAIDEN NAME OF MOTHER— First Middle Last Drexal Akers |
|---|---|

| 30 DISPOSITION OF BODY (Specify Burial, Cremation, Medical Donation, Hospital Disposal, Other) Burial | 31 DATE OF DISPOSITION (Month, Day, Year) Oct. 21, 2013 | 32 CEMETERY OR CREMATORY—Name Tuscaloosa Memorial Park | 33 LOCATION—(City or Town—State) Tuscaloosa, Alabama |
|---|---|---|---|

| 34 FUNERAL HOME—Name and Address Tuscaloosa Memorial Chapel 5434 Old Birmingham Hwy. Tusc. AL 35404 | 35 FUNERAL DIRECTOR—Signature Jon R Wyatt | 36 DATE SIGNED BY FUNERAL DIRECT 10-31-13 |
|---|---|---|

37. Certifying Physician (Physician certifying cause of death) "To the best of my knowledge death occurred at the time and date, and due to the cause(s) and manner stated."
☐ Medical Examiner ☐ Coroner "On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, place, and due to the cause(s) and manner stated."
Signature: *Miller*

| 38 DATE SIGNED (Month, Day, Year) October 31, 2013 |
|---|

| 39 TIME AND DATE OF DEATH 23:45 10/18/2013 | 40 DATE AND TIME PRONOUNCED DEAD (For Coroner/M.E. use only) | 41 NAME AND TITLE OF PERSON WHO COMPLETED CAUSE OF DEATH (Item 46) Spencer Melby, MD |
|---|---|---|

| 42 ADDRESS OF PERSON WHO COMPLETED CAUSE OF DEATH (Item 46) THT 720 1900 Univ. Blvd. Birmingham, AL 35294 | 43 CERTIFIER LICENSE NUMBER 1720081243 |
|---|---|

| 44 REGISTRAR—Signature Christi A Banks | For State or County use only | 45 DATE FILED (Month, Day, Year) Nov. 1, 2013 |
|---|---|---|

## MEDICAL CERTIFICATION

| 46 PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. LIST ONLY ONE CAUSE ON EACH LINE. | APPROXIMATE INTERVAL BETWEEN ONS AND DEATH |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) a. Respiratory Failure | 1 month |
| DUE TO (OR AS A CONSEQUENCE OF): b. Pneumoconiosis | 6 yrs |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST. DUE TO (OR AS A CONSEQUENCE OF): c. Interstitial Lung Disease | 6 yrs |
| DUE TO (OR AS A CONSEQUENCE OF): d. | |

| 47 PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. | 48 WAS THERE A PREGNANCY IN LAST 42 DAYS (Specify Yes, No, or Unk.) |
|---|---|

| 49 MANNER OF DEATH (Specify—Accident, Homicide, Suicide, Undetermined Circumstances, Pending Investigation, Natural Cause) Natural causes | 50 AUTOPSY (Specify Yes or No) | 51 If yes, were findings considered in determining cause of death? (Specify Yes or No) |
|---|---|---|

| 52 HOW INJURY OCCURRED (Enter nature of injury in Item 46, Part I or Item 47, Part II) | 53 DATE OF INJURY (Month, Day, Year) | 54 HOUR OF INJURY |
|---|---|---|

| 55 INJURY AT WORK (Specify Yes or No) | 56 PLACE OF INJURY—(Specify at home, farm, street, factory, office building, etc.) | 57 LOCATION (Street or R.F.D. No., City or Town, State) |
|---|---|---|

This is a legal record and must be filed within five (5) days after death.

ADPH-HS 2/Rev. 11

Certified **Nov 1, 2013**

*Christi A Banks*
**County Registrar/Deputy Registrar**

**I HEREBY CERTIFY THAT THE ABOVE IS A TRUE OFFICIAL COPY OF THE ORIGINAL CERTIFICATE SUBMITTED TO THE TUSCALOOSA COUNTY HEALTH DEPARTMENT, TUSCALOOSA, ALABAMA.**

**TUSCALOOSA COUNTY HEALTH DEPARTMENT WAS DESIGNATED A COPY ISSUING CENTER BY THE ALABAMA STATE COMMITTEE OF PUBLIC HEALTH, JANUARY 1, 1982.**

DIRECTOR EX ... PT
NO. 9 CONSISTING
OF 2 PAGES

SSN: 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

**U.S. Department of Labor**   Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 12-0559 BLA

| | | |
|---|---|---|
| JAMES GARY WARREN, SR. | ) | |
| | ) | |
| Claimant-Respondent | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FLEETWOOD TRUCKING COMPANY, | ) | |
| INCORPORATED | ) | DATE ISSUED: **DEC 1 2 2013** |
| | ) | |
| Employer-Petitioner | ) | |
| | ) | |
| DIRECTOR, OFFICE OF WORKERS' | ) | |
| COMPENSATION PROGRAMS, UNITED | ) | |
| STATES DEPARTMENT OF LABOR | ) | ORDER ON |
| | ) | RECONSIDERATION |
| Party-in-Interest | ) | and AWARD OF FEES |

As no member of the panel has affirmatively voted to vacate or modify the decision herein, the motion for reconsideration filed by employer is DENIED. 33 U.S.C. §921(b)(5); 20 C.F.R. §§801.301(b), 802.407(a), 802.409.

Claimant's counsel has filed a complete, itemized statement requesting a fee for services performed before the Board pursuant to 20 C.F.R. §802.203. Counsel requests a fee of $5,368.75 for 21.75 hours of legal services at an hourly rate of $250.00 (Abigail P. van Alstyne) and .75 hours of legal services at an hourly rate of $75.00 (legal assistant). No objection to the fee petition was filed. Upon review of the fee petition, the Board finds the requested fee to be reasonable in light of the services performed, and thus approves a fee of $5,368.75, to be paid directly to claimant's counsel by employer.[1] 33 U.S.C. §928,

---

[1] An attorney's fee award does not become effective, and is thus unenforceable, until there is a successful prosecution of the claim and the award of benefits becomes final. *Coleman v. Ramey Coal Co.*, 18 BLR 1-9, 1-17 (1995).

CERTIFICATE OF SERVICE

2012-0559-BLA James Garry Warren, Jr. v. FLEETWOOD TRUCKING COMPANY, Director, Office of Workers' Compensation Programs (Case No. 11-BLA-5343)

I certify that the parties below were served this day.

DEC 1 2 2013
(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Christopher Lyle McIlwain, Sr.
HUBBARD, WIGGINS, McILWAIN &
BRAKEFIELD, P.C.
808 Lurleen Wallace Blvd., North
P.O. Box 2427
Tuscaloosa, AL 35403-2427
         *--Certified*

James Garry Warren, Jr.
14536 Lakewildwood
Cottondale, AL 35453
         *--Certified*

Maia S. Fisher, Esq.
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Suite N-2117, NDOL
         *--Certified*

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 280
Suite 380
Birmingham, AL 35223
         *--Certified*

Ralph A. Romano
U.S. Department of Labor
Office of the Administrative Law Judges
2 Executive Campus
Suite 450
Cherry Hill, NJ 08002

Seena Foster, Esq.
Office of Administrative Law Judges
Techworld Plaza
800 K Street NW
Suite 400
Washington, DC 20210

Steven Breeskin
U.S. Department of Labor
Suite C-3516, NDOL
Washington, DC 20210

## NOTICE OF APPEAL RIGHTS

A Decision of the Benefits Review Board shall become final sixty (60) days after its issuance unless a written petition for review is filed with the appropriate United States Court of Appeals prior to the expiration of the sixty (60) day period, or unless a timely request for reconsideration is filed with the Board. 33 U.S.C. Section 921; 30 U.S.C. Section 932(a); 20 C.F.R. Sections 802.406, 802.407. Therefore, you are advised that you may SEEK RECONSIDERATION OF, OR APPEAL, a final decision of the Board within the time limits set forth below. THE TIME LIMITS CANNOT BE EXTENDED, AND YOU MUST SUBMIT YOUR REQUEST TO THE PROPER PLACE WITHIN THE TIME PROVIDED.

If you seek RECONSIDERATION by this Board (that is, if you want the Board to reconsider its decision), you must submit to the Board a written Motion for Reconsideration within 30 DAYS OF THE DATE STAMPED ON THE FRONT OF THIS DECISION. Your motion should identify any error you find in the Board's opinion and state the reasons you believe warrant further consideration of your case. If you file a timely motion for reconsideration, you will have sixty (60) days from issuance of the Board's decision on reconsideration to file an appeal with a Court of Appeals, as set forth below.

Alternatively, if you wish to APPEAL to a United States Court of Appeals, you must insure that a petition for review is received by THE APPROPRIATE COURT (NOT THIS BOARD WITHIN SIXTY (60) DAYS OF THE DATE STAMPED ON THE FRONT OF THIS DECISION. The petition for review should contain the case number and the date of the Board's decision. The petition should be sent to the Court of Appeals which covers the state in which the employee's injury occurred. In a black lung claim, any state in which the miner had coal mine employment may be considered the state in which the injury occurred (i.e., for a black lung appeal, you may file in any Court of Appeals covering any state in which you worked as a miner). Listed on the back of this page are the twelve Courts of Appeals and the states they cover. You should identify the court covering the state of injury (including all states of mine employment for black lung claims) and file your petition with that court. If you have question about your case, call the Clerk of the court at the number shown on the bottom of this page. If you appeal directly to the Court of Appeals you may not later get reconsideration by the Board. However if you seek Board reconsideration you may later appeal the Board's ruling on reconsideration to the Court of Appeals.

IF YOU HAVE ANY QUESTIONS ABOUT THE PROCEDURES TO BE FOLLOWED IN YOUR CASE CALL THE OFFICE OF THE CLERK OF THE BOARD. (202) 693-6300.

## COURT OF APPEALS

**First Circuit** (Maine, New Hampshire, Rhode Island
Massachusetts, Puerto Rico)
Margaret Carter, Clerk
U.S. Court of Appeals
for the First Circuit
1 Court House Way
Suite 2500
Boston, MA 02210
(617) 748-9057
www.ca1.uscourts.gov

**Third Circuit** (Pennsylvania, New Jersey, Delaware,
Virgin Islands)
Marcia M. Waldron, Clerk
U.S. Court of Appeals
for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
(215) 597-2995
www.ca3.uscourts.gov

**Fifth Circuit** (Louisiana, Texas, Mississippi)
Lyle W. Cayce, Clerk
U.S. Court of Appeals
for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408
(504) 310-7700
www.ca5.uscourts.gov

**Seventh Circuit** (Wisconsin, Illinois,
Indiana)
Gino Agnello, Clerk
U. S. Court of Appeals
for the Seventh Circuit
219 South Dearborn Street
Room 2722
Chicago, IL 60604
(312) 435-5850
www.ca7.uscourts.gov

**Ninth Circuit** (Washington, Oregon, Montana, Idaho,
California, Nevada, Arizona, Alaska, Hawaii)
Molly C. Dwyer, Clerk
U.S. Court of Appeals
for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103
(415) 355-8000
www.ca9.uscourts.gov

**Eleventh Circuit** (Alabama, Georgia, Florida)
John Ley, Clerk
U.S. Court of Appeals
for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303
(404) 335-6100
www.ca11.uscourts.gov

June 2011

**Second Circuit** (New York, Connecticut,
Vermont)
Catherine O'Hagan Wolfe, Clerk
U.S. Court of Appeals
for the Second Circuit
40 Foley Square
Room 1702, U.S. Courthouse
New York, NY 10007
(212) 857-8544
www.ca2.uscourts.gov

**Fourth Circuit** (Maryland, Virginia, West Virginia,
North Carolina, South Carolina)
Patricia S. Connor, Clerk
U.S. Court of Appeals
for the Fourth Circuit
1100 East Main Street
Room 501
Richmond, VA 23219-3517
(804) 916-2700
www.ca4.uscourts.gov

**Sixth Circuit** (Ohio, Kentucky, Tennessee,
Leonard Green, Clerk                    Michigan)
U.S. Court of Appeals
for the Sixth Circuit
100 East 5th Street, Room 424
Cincinnati, OH 45202
(513) 564-7000
www.ca6.uscourts.gov

**Eighth Circuit** (Minnesota, Iowa, Missouri,
Arkansas, Nebraska, South Dakota, North Dakota)
Michael Gans, Clerk
U.S. Court of Appeals
for the Eighth Circuit
Thomas F. Eagleton Court House
111 South 10th Street, Room 24.32.9
St. Louis, MO 63102
(314) 244-2400
www.ca8.uscourts.gov

**Tenth Circuit** (Wyoming, Utah, Colorado,
Kansas, Oklahoma, New Mexico)
Elisabeth A. Shumaker, Clerk
U.S. Court of Appeals
for the Tenth Circuit
1823 Stout Street
Denver, CO 80257
(303) 844-3157
www.ca10.uscourts.gov

**District of Columbia Circuit** (Washington
D.C.)
Mark J. Langer, Clerk
U.S. Court of Appeals
for the D.C. Circuit
3rd and Constitution Avenue, N.W.
Washington, D.C. 20001
(202) 216-7000
www.cadc.uscourts.gov

181

## U.S. DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES

IN THE MATTER OF THE CLAIM FOR    §
BENEFITS UNDER THE BLACK LUNG    §
ACT                              §
                                 §                    RECEIVED
                                 §
                                 §                   DEC 1 6 2013
                                 §
DEBBIE WARREN,                   §
                                 §
    Claimant,                    §
                                 § MINER: JAMES GARY WARREN
v.                               § CLAIM NO.:
                                 § XXX-XX-3646 LWC
FLEETWOOD TRUCKING CO. INC.      §
AND DIRECTOR, OFFICE OF WORKERS'§
COMPENSATION PROGRAMS.           §

## REQUEST FOR REVISION
## AND FORMAL HEARING

    Comes now Fleetwood Trucking Co., Inc. ("Fleetwood"), and makes this request for revision and formal hearing with regard to the Proposed Decision and Order filed November 18, 2013.  As grounds therefore, Fleetwood states as follows:

1.    In paragraphs numbered 5 and 6, the Decision and Order states that James Gary Warren was determined to be eligible, and that Fleetwood Trucking Co., Inc., has been determined to be liable for those benefits.  Solely on this basis, Fleetwood is ordered to pay benefits to the Claimant.

2.    As the Department of Labor is well aware, however, the determination made with regard to James Gary Warren's claim is not final.  (Exhibit 1).

DIRECTOR EXHIBIT
NO 15 CONSISTING
OF 13 PAGES

3.     Thus, any determination with regard to the Claimant's claim under 30 USC 932(1) of the BLBA is premature.

RECEIVED

DEC 1 6 2013

Christopher Lyle McIlwain, Sr. - MCI-002
Hubbard, McIlwain & Brakefield, P.C.
Post Office Box 2427
Tuscaloosa, AL 35403
Telephone: (205) 345-6789
Attorneys for Fleetwood Trucking
Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing document on each of the below-named parties by placing a copy of the same in the U.S. Mail, first-class postage prepaid, and addressed as follows on this the 10th day of December, 2013.

Rae Ellen James, Associate Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC 20210

Steven Breeskin
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite C-3516, NDOL
Washington, DC 20210

Roger Belcher
District Director
U.S. Department of Labor
402 Campbell Way
Mt. Sterling, KY 40353

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 290, Suite 380
Birmingham, AL 35223

Of Counsel

2

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| FLEETWOOD TRUCKING COMPANY, INC., §§§§ | |
| Petitioner, §§ | Case No. _____ |
| JAMES GARY WARREN, §§ | |
| Claimant, §§ | |
| and §§ | |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, §§§ | Petition for Review for BRB 2012-0559-BLA |
| Party-in-Interest. §§ | |

### PETITION FOR REVIEW

Notice is hereby given that Fleetwood Trucking Company, Inc., Petitioner, hereby petitions the United States Court of Appeals for the Eleventh Circuit to set aside the attached Decision and Order of the Benefits Review Board of the United States Department of Labor issued on May 22, 2013, in BRB No. 12-559 BLA.

Enforcement of the BRB's erroneous decision pending this appeal against the Petitioner, which is a small business not insured for black lung benefits, would fatally cripple the Petitioner. Therefore, Petitioner also requests this Court to stay the payment of amounts required by the award.

1

*184*

Christopher Lyle McIlwain, Sr. - MCI-002
Hubbard, Wiggins, McIlwain
& Brakefield, P.C.
Post Office Box 2427
Tuscaloosa, AL 35403
Telephone: (205) 345-6789
Attorneys for Petitioner Fleetwood Trucking
Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Memorandum of Law on each of the below-named parties by placing a copy of the same in the U.S. Mail, first-class postage prepaid, and addressed as follows on this the ___ day of July, 2013.

Rae Ellen James, Associate Solicitor
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite N-2117, NDOL
Washington, DC 20210

Regional Solicitor
U.S. Department of Labor
618 Church Street, Suite 230
Washington, DC 20210

James Garry Warren, Jr.
14536 Lake Wildwood
Cottondale, AL 35453

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 290, Suite 380
Birmingham, AL 35223

David Breeskin
US Department of Labor
200 Constitution Avenue NW
Suite C-3516, NDOL
Washington, DC 20210

Of Counsel

2

185

**U.S. Department of Labor**

Benefits Review Board
P.O. Box 37601
Washington, DC 20013-7601



BRB No. 12-0559 BLA

|  |  |  |
|---|---|---|
| JAMES GARY WARREN, SR. | ) | |
| Claimant-Respondent | ) ) ) | **NOT PUBLISHED** |
| v. | ) ) | |
| FLEETWOOD TRUCKING COMPANY, INCORPORATED | ) ) ) | DATE ISSUED: __MAY 2 2 2013__ |
| Employer-Petitioner | ) ) ) | |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR | ) ) ) ) | |
| Party-in-Interest | ) | DECISION and ORDER |

Appeal of the Decision and Order Awarding Benefits of Ralph A. Romano, Administrative Law Judge, United States Department of Labor.

Abigail P. van Alstyne (Quinn, Connor, Weaver, Davies & Rouco, LLP), Birmingham, Alabama, for claimant.

Christopher Lyle McIlwain, Sr. (Hubbard, Wiggins, McIlwain & Brakefield, P.C.), Tuscaloosa, Alabama, for employer.

Helen H. Cox (M. Patricia Smith, Solicitor of Labor; Rae Ellen James, Associate Solicitor; Michael J. Rutledge, Counsel for Administrative Litigation and Legal Advice), Washington, D.C., for the Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: DOLDER, Chief Administrative Appeals Judge, SMITH and McGRANERY, Administrative Appeals Judges.

PER CURIAM:

Employer, Fleetwood Trucking Company, Incorporated (employer or Fleetwood), appeals the Decision and Order Awarding Benefits (2011-BLA-05343) of Administrative Law Judge Ralph A. Romano rendered on a claim filed pursuant to the provisions of the

*186*

Black Lung Benefits Act, as amended, 30 U.S.C. §§901-944 (Supp. 2011) (the Act). This case involves a miner's claim filed on October 29, 2009. The administrative law judge initially found that claimant, who worked as a truck driver hauling coal, was employed as a miner under the Act, and he credited claimant with twelve years of coal mine employment.[1] The administrative law judge also determined that employer is the properly designated responsible operator. Adjudicating this claim pursuant to 20 C.F.R. Part 718, the administrative law judge found that the evidence established the existence of pneumoconiosis, pursuant to 20 C.F.R. §718.202(a), and that claimant's pneumoconiosis arose out of coal mine employment, pursuant to 20 C.F.R. §718.203(b). The administrative law judge further found that claimant established that he is totally disabled by a respiratory impairment, pursuant to 20 C.F.R. §718.204(b)(2), and that pneumoconiosis is a substantially contributing cause of his total disability, pursuant to 20 C.F.R. §718.204(c). Accordingly, the administrative law judge awarded benefits.

On appeal, employer argues that the administrative law judge erred in finding that it is the responsible operator. Employer also challenges the administrative law judge's determination, pursuant to 20 C.F.R. §718.203(b), that claimant's pneumoconiosis arose out of coal mine employment. Claimant and the Director, Office of Workers' Compensation Programs (the Director), respond, urging the Board to hold that employer is the properly designated responsible operator, and to affirm the award of benefits.[2] Employer filed a reply brief, reiterating its contentions on appeal.

The Board's scope of review is defined by statute. The administrative law judge's Decision and Order must be affirmed if it is supported by substantial evidence, is rational,

---

[1] Because the administrative law judge found that claimant established fewer than fifteen years of coal mine employment, a recent amendment to the Black Lung Benefits Act, which became effective on March 23, 2010, does not apply to this case. *See* 30 U.S.C. §921(c)(4), *amended by* Pub. L. No. 111-148, §1556(a), 124 Stat. 119, 260 (2010).

[2] We affirm, as unchallenged on appeal, the administrative law judge's determinations that claimant was a miner under the Act, and established twelve years of coal mine employment. *See Skrack v. Island Creek Coal Co.*, 6 BLR 1-710, 1-711 (1983). We further affirm, as unchallenged, the administrative law judge's findings that claimant established the existence of pneumoconiosis, pursuant to 20 C.F.R. §718.202(a), that he has a totally disabling respiratory impairment, pursuant to 20 C.F.R. §718.204(b)(2), and that his total disability is due to pneumoconiosis, pursuant to 20 C.F.R. §718.204(c). *See Skrack*, 6 BLR at 1-711.

2

and is in accordance with applicable law.[3]  33 U.S.C. §921(b)(3), as incorporated by 30 U.S.C. §932(a); *O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.*, 380 U.S. 359 (1965).

## Responsible Operator

We first address employer's challenge to the administrative law judge's responsible operator determination.  The responsible operator is the "potentially liable operator, as determined in accordance with [20 C.F.R.] §725.494, that most recently employed the miner." 20 C.F.R. §725.495(a)(1).  A coal mine operator is a "potentially liable operator" if it meets the criteria set forth at 20 C.F.R. §725.494(a)-(e).[4]  Once a potentially liable operator has been properly identified by the Director, that operator may be relieved of liability only if it proves either that it is financially incapable of assuming liability for benefits, or that another operator more recently employed the miner for at least one year and it is financially capable of assuming liability for benefits.  *See* 20 C.F.R. §725.495(c).

Through its investigation, the district director determined that employer was an ongoing business and was financially capable of assuming liability for the payment of benefits.  Director's Exhibit 16.  Thus, on January 12, 2010, the district director issued a Notice of Claim, informing employer that it was identified as a potentially liable operator.  Director's Exhibit 16.  In the Notice, the district director acknowledged that claimant was more recently employed as a self-employed truck driver, but indicated that claimant did not qualify as a responsible operator.  Director's Exhibit 16.  The Notice further provided that "within 30 days of receipt of this Notice of Claim, you (or your insurer) must file a response . . . indicating your intent to accept or contest your identification as a potentially liable operator." *Id.*  The Notice advised employer that if it wished to contest its status as a potentially liable operator, it "must state the precise nature of [its] disagreement by accepting or denying each of the five assertions listed" in

---

[3] This case arises within the jurisdiction of the United States Court of Appeals for the Eleventh Circuit, as claimant's coal mine employment was in Alabama. *See Shupe v. Director, OWCP,* 12 BLR 1-200, 1-202 (1989) (en banc); Director's Exhibit 3.

[4] In order for a coal mine operator to meet the regulatory definition of a "potentially liable operator," the miner's disability or death must have arisen out of employment with the operator, the operator must have been in business after June 30, 1973, the operator must have employed the miner for a cumulative period of not less than one year, the employment must have occurred after December 31, 1969, and the operator must be financially capable of assuming liability for the payment of benefits, either through its own assets or through insurance. 20 C.F.R. §725.494(a)-(e).

3

*188*

the Notice. Director's Exhibit 16. The Notice also emphasized to employer that if it did "not respond within 30 days of [its] receipt of the Notice of Claim," it would "not be allowed to contest [its] liability for payment of benefits on any of the grounds set forth in 20 C.F.R. 725.408(a)(2) . . . ."[5] Director's Exhibit 16. Further, the cover letter accompanying the Notice of Claim reiterated that "failure to respond within thirty (30) days will result in our finding that your company is the proper responsible operator and that you are financially able to assume liability for any benefits that may accrue from this claim." Director's Exhibit 16. The Notice of Claim was sent by certified mail to Mr. Lee Sellers, the president of Fleetwood, who signed the certified mail return receipt on March 9, 2010. Director's Exhibit 16. Fleetwood did not respond to the Notice of Claim.

On August 31, 2010, the district director issued a Schedule for the Submission of Additional Evidence, identifying employer as the responsible operator. Director's Exhibit 17. The Schedule stated that Fleetwood met the criteria of a potentially liable operator, and explained that, while Fleetwood was not the operator that most recently employed claimant, Fleetwood was the designated responsible operator because claimant's most recent employment was as a self-employed truck driver.[6] Director's Exhibit 17. The Schedule informed employer that "it may respond to this schedule by September 30, 2010, and accept or reject its designation. If the responsible operator does not respond, it will be deemed to accept its designation and to waive its right to contest its liability in any further proceedings." Director's Exhibit 17. The Schedule also informed employer that because it failed to respond to the Notice of Claim, it could no longer submit evidence challenging its status as a potentially liable operator. The Schedule was sent by certified mail to Mr. Lee Sellers, the president of Fleetwood, who signed the

---

[5] An operator that wishes to contest its identification as a potentially liable operator in a Notice of Claim must timely file a response in which it either admits or denies each of the following assertions: (1) that it was an operator for any period after June 30, 1973; (2) that it employed the miner for a cumulative period of not less than one year; (3) that the miner was exposed to coal mine dust while working for the operator; (4) that the miner's employment included at least one working day after December 31, 1969; and (5) that the operator is capable of assuming liability for the payment of benefits. 20 C.F.R. §725.408(a)(2)(i)-(v).

[6] The district director's Liability Analysis portion of the Schedule for the Submission of Additional Evidence set forth that claimant hauled coal and other products for multiple companies from August 2, 2002 to October 2, 2009. Director's Exhibit 17. The analysis concluded that, as claimant's most recent work was as an uninsured, self-employed coal truck driver, claimant was not considered to be a potentially liable operator. Director's Exhibit 17.

*189*

certified mail return receipt on September 9, 2010. Director's Exhibit 17. Employer submitted no response within the stated time period.

Instead, on October 19, 2010, Mr. Sellers telephoned the district director's office and left a voicemail message asking what he needed to submit in response to claimant's claim for benefits. Director's Exhibit 16. The following day, in a telephone conversation with a claims examiner, Mr. Sellers acknowledged that he received the Schedule for the Submission of Additional Evidence, and he asserted that claimant hauled only rock, sand, stone, and finished coal for employer. *Id.* The claims examiner referred Mr. Sellers to the instructions provided in the Schedule as to the documentation he needed to submit. On November 9, 2010, Mr. Sellers submitted a written statement asserting that Fleetwood did not fit the definition of a coal mine operator, that claimant did not fit the definition of a miner, and that claimant was not exposed to coal dust while working for Fleetwood.[7] Director's Exhibit 16.

In a Proposed Decision and Order dated November 30, 2010, the district director denied benefits, but determined that Fleetwood "is the coal mine operator designated responsible for the payment of benefits due claimant should this denial be reversed to an award of benefits as a result of subsequent proceedings." Director's Exhibit 19. The accompanying liability analysis noted that employer failed to file timely responses to the Notice of Claim or to the Schedule for the Submission of Additional Evidence. The Proposed Decision and Order acknowledged receipt of Mr. Seller's November 9, 2010 written statement, but concluded that this evidence was untimely. *Id.*

At claimant's request, the case was referred to the Office of Administrative Law Judges for a hearing. Director's Exhibit 20. In response to the hearing notice, by letter dated June 3, 2011, employer notified the administrative law judge that it intended to allege that it was improperly identified as the responsible operator. Employer's Exhibit 1. At the hearing, claimant's counsel and employer's counsel elicited testimony from claimant that, after working for employer, he hauled coal for Cahaba Resources for over one year.[8] Hearing Tr. at 24-40. Additionally, Mr. Sellers testified, and he was asked

---

[7] Specifically, Mr. Sellers stated that Fleetwood hauled "some coal" that had been strip mined and placed on stock piles at least one-quarter mile from the mining operation, that claimant "was not a miner and did not work in or around a coal mine . . . . [H]e simply drove a truck to the stockpile where it was loaded by others while he remained in the cab of his air-conditioned truck. In short, he had no known exposure to coal mine dust." Director's Exhibit 16.

[8] At the hearing, counsel for employer and counsel for the Director, Office of Workers' Compensation Programs (the Director), disagreed as to whether claimant's testimony indicated that he hauled coal as an employee of Cahaba Resources, or as a self-

5

whether he or his company, Fleetwood Trucking, is financially capable of paying benefits. Hearing Tr. at 68. He responded, "No, sir." *Id.*

In his Decision and Order, the administrative law judge reviewed the evidence, claimant's testimony, and the arguments of the parties, and determined that employer is the properly designated responsible operator.   Decision and Order at 4-5.   The administrative law judge found that, by failing to timely submit evidence to the district director, employer waived its right to submit evidence before the administrative law judge challenging its identification as the responsible operator.   Alternatively, the administrative law judge found that, even if he considered employer's evidence, employer failed to meet its burden to prove that it is financially incapable of assuming its liability for benefits.

Employer contends that the administrative law judge erred because claimant's testimony establishes that his last coal mine employment for over one year was with Cahaba Resources, not employer, and asserts that the district director would have uncovered this evidence had it conducted a more thorough investigation into claimant's employment history. Employer's Brief at 12, 14-15, 18-19. Employer contends that the district director's "fail[ure] to comply with its legal duty to investigate" resulted in an improper presumption that employer was the most recent operator to employ claimant, thereby depriving employer of due process of law. Employer's Brief at 16-17. Finally, employer asserts that, assuming it was the most recent operator to employ claimant, it has established that it is financially incapable of assuming liability for the payment of benefits.   Employer asserts that, therefore, employer should be dismissed as the responsible operator, and liability should be transferred to the Black Lung Disability Trust Fund. Employer's Brief at 20-21. We disagree.

The regulations provide that "within 30 days after the district director issues a schedule [for the submission of additional evidence] . . . containing a designation of the responsible operator liable for the payment of benefits, that operator shall file a response with regards to its liability." 20 C.F.R. §725.412(a)(1).  If the designated responsible operator "does not file a timely response, it shall be deemed to have accepted the district director's designation with respect to its liability, *and to have waived its right to contest its liability in any further proceeding conducted with respect to the claim.*" 20 C.F.R. §725.412(a)(2) (emphasis added).  The district director issued the schedule on August 31,

---

employed, independent contractor. Hearing Tr. at 55-61.  Additionally, the Director's counsel informed the administrative law judge that employer did not timely respond to the Notice of Claim or to the Schedule for the Submission of Evidence, and thus, did not present any evidence to the district director at the time the district director was making the responsible operator determination. Hearing Tr. at 63-65.

6

2010, and notified employer that it had until September 30, 2010 to respond. As the administrative law judge found, employer did not respond to the district director's notification until October 19, 2010, when Mr. Sellers telephoned the district director. Decision and Order at 4; Director's Exhibit 16. While employer subsequently submitted a written statement, it was both untimely and unresponsive to the request for information delineated in the Schedule for the Submission of Additional Evidence. Director's Exhibit 16. We, therefore, agree with the Director that employer waived its right to contest its liability in any further proceeding conducted with respect to this claim, and we affirm the administrative law judge's determination that employer "is prohibited from challenging its status as responsible operator. . . ." Decision and Order at 4; 20 C.F.R. §725.412(a)(2); Director's Brief at 6.

We further affirm, as supported by substantial evidence, the administrative law judge's alternative finding that, even assuming employer's response was timely, employer did not meet its burden to establish either that Cahaba Resources more recently employed claimant *and* "possesses sufficient assets to secure the payment of benefits," or that employer does not possess sufficient assets to secure the payment of benefits. 20 C.F.R. §725.495(c)(1), (2); Decision and Order at 4-5. Contrary to employer's arguments, the administrative law judge properly found that employer had the burden of proof on those issues. Specifically, employer maintains that the district director did not thoroughly investigate whether claimant's more recent employment, hauling coal for Cahaba Resources, was as an independent contractor, as claimant asserted, or was performed as an employee of Cahaba Resources, such that Cahaba Resources should have been identified as a potentially liable operator. Employer asserts that the district director's failure to properly investigate before naming employer as a potentially liable operator deprived employer of due process. Contrary to employer's assertion, due process requires that employer be given the opportunity to mount a meaningful defense by being timely informed of the claim and be given the opportunity to develop evidence in response to the claim. *See Island Creek Coal Co. v. Holdman*, 202 F.3d 873, 22 BLR 2-25 (6th Cir. 2000); *North Am. Coal Co. v. Miller*, 870 F.2d 948, 12 BLR 2-222 (3d Cir. 1989). Here, employer received timely notice of the claim, but failed to timely respond. Therefore, employer has not established that it was deprived of an opportunity to mount a meaningful defense. *See Holdman*, 202 F.3d at 883-84, 22 BLR at 2-32; *see also Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 871-72, 23 BLR 2-124, 2-176-77 (D.C. Cir. 2002), *aff'g in part and rev'g in part Nat'l Mining Ass'n v. Chao*, 160 F. Supp.2d 47 (D.D.C. 2001)(upholding the burden shifting provisions of the responsible operator liability regulations).

Further, the administrative law judge's findings are supported by substantial evidence. As the administrative law judge found, employer did not assert, or present evidence, that Cahaba Resources possesses sufficient assets to secure the payment of benefits. Therefore, whether claimant was more recently employed by Cahaba Resources

7

is immaterial. *See* 20 C.F.R. §725.495(c)(2). Nor has employer submitted any evidence to establish that Fleetwood does not possess sufficient assets to secure the payment of benefits. As the administrative law judge found, the mere fact that employer is uninsured does not relieve employer of liability for payment. *See* 20 C.F.R. §§725.494(e)(1)-(3), 725.495(c)(1). Accordingly, for all the foregoing reasons, we affirm the administrative law judge's determination that employer is the properly designated responsible operator. *See McClendon v. Drummond Coal Co.*, 861 F.2d 1512, 1513, 12 BLR 2-108, 2-109 (11th Cir. 1988).

### Pneumoconiosis Arising out of Coal Mine Employment

Employer next contends that the administrative law judge erred in finding that claimant's pneumoconiosis arose out his coal mine employment with Fleetwood. Employer's Brief at 21-27. Specifically, employer contends that claimant provided no medical evidence to establish that his pneumoconiosis arose out of coal mine employment with employer, and asserts that no other truck drivers employed by Fleetwood have been diagnosed with pneumoconiosis. Employer's Brief at 26. Employer also asserts that the administrative law judge's finding is flawed, because it is contrary to the district director's determination that claimant did not prove that his pneumoconiosis arose out of coal mine employment, pursuant to 20 C.F.R. §718.203(c). Employer's Brief at 22. Employer's contentions lack merit.

Findings of fact made by the district director are not binding upon the administrative law judge, who must perform a de novo review of the evidence in order to determine whether entitlement to benefits has been established. *See* 20 C.F.R. §§725.351, 725.450, 725.452, 725.455(a); *see Oggero v. Director, OWCP*, 7 BLR 1-860 (1985). Further, while the district director found fewer than ten years of coal mine employment established, the administrative law judge credited claimant with more than ten years of coal mine employment, a finding employer does not contest. Decision and Order at 5-6. Thus, the administrative law judge properly found that claimant is entitled to the rebuttable presumption that his pneumoconiosis arose out of coal mine employment. 20 C.F.R. §718.203(b); Decision and Order at 7.

With respect to whether employer rebutted the presumption, the administrative law judge considered employer's contention that claimant was not exposed to coal mine dust while working for Fleetwood, but he permissibly found that more credible evidence, specifically, claimant's testimony that he was exposed to coal dust, belied that assertion. *See U.S. Steel Mining Co. v. Director, OWCP [Jones]*, 386 F.3d 977, 992, 23 BLR 2-213, 2-238 (11th Cir. 2004); Decision and Order at 3-4, 7. Moreover, the administrative law judge found, and the record reflects, that employer put forth no medical evidence that claimant's pneumoconiosis was due to something other than coal mine dust exposure. Decision and Order at 7. We, therefore, affirm the administrative law judge's findings

8

*193*

that claimant is entitled to the rebuttable presumption that his pneumoconiosis arose out of coal mine employment, and that employer failed to rebut the presumption. 20 C.F.R. §718.203(b); Decision and Order at 7. Because employer raises no other arguments regarding claimant's entitlement, we affirm the award of benefits.

Accordingly, the administrative law judge's Decision and Order Awarding Benefits is affirmed.

SO ORDERED.


NANCY S. DOLDER, Chief
Administrative Appeals Judge


ROY P. SMITH
Administrative Appeals Judge


REGINA C. McGRANERY
Administrative Appeals Judge

*194*

## CERTIFICATE OF SERVICE

2012-0559-BLA James Garry Warren, Jr. v. FLEETWOOD TRUCKING COMPANY, Director, Office of Workers' Compensation Programs (Case No. 11-BLA-5343)

I certify that the parties below were served this day.

MAY 2 2 2013
(DATE)

Thomas O. Shepherd, Jr., Esq.
Clerk of the Appellate Boards

Christopher Lyle McIlwain, Sr.
HUBBARD, WIGGINS, McILWAIN &
BRAKEFIELD, P.C.
808 Lurleen Wallace Blvd., North
P.O. Box 2427
Tuscaloosa, AL 35403-2427
    *--Certified*

James Garry Warren, Jr.
14536 Lakewildwood
Cottondale, AL 35453
    *--Certified*

Maia S. Fisher, Esq.
U.S. Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Suite N-2117, NDOL
    *--Certified*

Abigail P. Van Alstyne, Esq.
Quinn, Walls, Weaver & Davies, LLP
2700 Highway 280
Suite 380
Birmingham, AL 35223
    *--Certified*

Ralph A. Romano
U.S. Department of Labor
Office of the Administrative Law Judges
2 Executive Campus
Suite 450
Cherry Hill, NJ 08002

Steven Breeskin
U.S. Department of Labor
Suite C-3516, NDOL
Washington, DC 20210